UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Victor Grant, by his
parent Kelley Sunderlin,

Plaintiff,

v.

State of Minnesota, et al.,

Defendant.

Court File No. 02-795 (ADM/AJB)

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD/ SUMMARY JUDGMENT**

---

Pursuant to Magistrate Boylan's November 16, 2004 Order, Defendant Independent School District No. 11, Anoka-Hennepin submits this memorandum of law in support of its Motion for Judgment on the Record/Summary Judgment in the above-captioned matter.

## INTRODUCTION

Pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., and controlling case law, this is a civil action in which the Plaintiff, Victor Grant, seeks review of a decision issued by a second tier administrative law judge or Hearing Review Officer ("HRO"). The Defendant School District respectfully requests that the Court review the record and affirm the decision of the HRO in all respects.

## STATEMENT OF THE FACTS

Plaintiff Victor Grant ("Student") began attending school in the Anoka-Hennepin School District in September, 1998. At the time of the due process hearing in this matter, the Student was thirteen years old and attended Northdale Middle School. In December, 2000, during the Student's sixth grade year and pursuant to a request from the Student's parent, the District

completed an educational evaluation of the Student. S.D. Ex. 36.[1] The District determined that the Student met state eligibility criteria for a Specific Learning Disability (SLD) in the areas of broad math and broad written language, but did not meet eligibility criteria in the area of broad reading. S.D. Ex. 36. The Student's IEP team, including the Parent, met in December 2000 and January 2001. S.D. Ex. 37, 38; Tr. at 102-103. The Student's case manager brought a draft IEP to the January, 2001 meeting to serve as a starting point for discussion by the IEP team. Tr. at 102. Although the District attempted several times to schedule another IEP meeting with the Parent after the January, 2001 meeting, the Parent was unavailable or unwilling to meet with staff until she requested another IEP meeting in March, 2001. See S.D. Ex. 45, Tr. at 108-109, 131, 855-856, S.D. Ex. 48, S.D. Ex. 50; Tr. at 857, 113-116.

An IEP meeting was held on March 20, 2001 to continue developing an IEP for the Student. Tr. at 116; S.D. Ex. 52. The Parent admitted during the hearing that when she went to the March 20, 2001 IEP meeting, she was unwilling to accept anything less than one-to-one reading instruction for the Student, and she was unwilling to consider any options that did not include one-to-one reading instruction. Tr. at 1372-73. At the hearing, the Parent stated the March 20 meeting was "a waste of time." Tr. at 1084. Although the District made extensive efforts to schedule additional IEP meetings with the Parent after March, 2001, the Parent was unwilling to participate in further meetings. Tr. at 137-138; 1085, S.D. Ex. 66, S.D. Ex. 77, S.D. Ex. 71, Tr. at 782-83. Consequently, the Student's IEP team met without the Parent and proposed an initial annual IEP for the Student on May 10, 2001. S.D. Ex. 83, 84.

Through the Parent, the Student requested a due process hearing on March 30, 2001 seeking to contest the January 2001 draft IEP. This was the third due process hearing the Parent

[1] "S.D. Ex." refers to School District exhibits introduced during the due process hearing. These exhibits were filed with the Court by the Minnesota Department of Education (MDE) upon Plaintiff's appeal.

had requested against the District during the 2000-2001 school year. Tr. at 1424. IHO Kenneth Udoibok identified the following nine issues for hearing:

1. Whether the District provided the Parent with timely notice of her procedural safeguards between March 30, 2000 and March 30, 2001;

2. Whether the District's special education consultant "predetermined" an IEP team decision at a meeting held on March 20, 2001;

3. Whether the District provided the Parent with sufficient notice of the IEP meeting held on May 1, 2001;

4. Whether the District provided the Parent with prior written notice of its decision to deny her request for one-to-one reading instruction;

5. Whether the Student needs one-to-one reading instruction in order to receive FAPE;

6. Whether the Student needs a computer to receive FAPE;

7. Whether the Student is entitled to an assistive technology evaluation;

8. Whether the IEP dated January 31, 2001 was a proposed IEP or a draft IEP; and

9. Whether the proposed IEP dated May 10, 2001 offers the Student FAPE in the least restrictive environment.

See Exhibit 1 at 12-13.

An eight-day hearing was held between May 30, 2001 and July 23, 2001. On September 17, 2001, the IHO issued his decision ruling in favor of the School District on all issues. See Exhibit 1.

On September 21, 2001, the Student appealed the IHO's decision. The Hearing Review Officer, Patricia Marty Villaume, identified seventeen issues for consideration on appeal:

1. Whether the IHO erred in extending his decision date and, if so, whether the extension compromised the Student's right to an appropriate education, seriously hampered Parent's opportunity to participate in the formulation process, or caused a deprivation of educational benefits;

---

Similarly, "Tr." refers to the transcript of the administrative hearing. These transcripts were also filed with the Court by MDE upon Plaintiff's appeal.

2. Whether the IHO erred in finding that the Parent did not oppose the District's motion in limine;

3. Whether the District provided the Parent with prior written notice of its decision to deny her request for one-to-one reading instruction;

4. Whether the District provided the Parent with timely notice of her procedural safeguards between March 30, 2000 and March 30, 2001;

5. Whether the IHO erred in determining that Student did not need one-to-one reading instruction in order to receive FAPE;

6. Whether the IHO erred in determining that one-to-one instruction was not the LRE for Student;

7. Whether the IHO erred in determining that the Student was not entitled to an assistive technology evaluation;

8. Whether the IHO erred in determining that the IEP dated January 31, 2001 was merely a draft;

9. Whether the IHO erred in admitting the District's proposed IEP dated May 10, 2001;

10. Whether the IHO erred in assessing the credibility of the witnesses, weighing the evidence, and making the findings challenged by the Parent;

11. Whether the IHO failed to give the Student's testimony the proper weight;

12. Whether the IHO erred in deeming certain issues waived;

13. Whether the IHO erred in "preventing" the testimony of the Student's private tutor;

14. Whether the IHO erred in allowing the District to cross-examine Parent's experts about their discussions with Parent's counsel;

15. Whether the IHO erred in allowing the testimony of the District's expert witness;

16. Whether the IHO erred in determining the adequacy of the District's evaluation of the Student; and

17. Whether the IHO erred in his Findings about ESY services and, thereby, denied the services.

<u>See</u> Exhibit 2.

The HRO ruled in favor of the District on all issues and affirmed the IHO's decision in all respects. Ex. 2. The Student appeals from the HRO's decision in MDCFL Case No. 429-2 through the April 15, 2002 complaint in this matter. In this complaint, the Student alleges:

> Plaintiff Victor Grant has been and continues to be denied a free appropriate public education to meet his unique needs in reading, assistive technology and ESY after a two year delay in identification of those needs, in part because of lack of staff properly licensed and trained to meet his needs. Although a hearing was held, Plaintiff Victor continues to be denied effective procedural safeguards that could have enabled him to redress the denial of FAPE. Plaintiff Victor remains without an appropriate IEP, including necessary 1:1 reading services, transition services and assistive technology services.

See Plaintiff's Complaint at ¶ 39.

Unlike the other cases included under the Reinholdson umbrella, the Student never filed a separate federal court action appealing the HRO's decision in MDCFL Case No. 429-2, nor did he refile his case as a separate action pursuant to this Court's decision in Reinholdson v. State of Minnesota et al., 2002 WL 31026580 (D. Minn. 2002). As a result, the sole grounds for the Student's appeal must be gleaned from the April 15, 2002 complaint requesting class certification in this matter.

## ARGUMENT

### I. STANDARD OF REVIEW

An IHO's factual determinations may not be rejected on review if they are supported by a preponderance of the evidence in the record. Independent School District No. 283 v. S.D., 948 F. Supp. 860, 870 & n.5 (D. Minn. 1995), aff'd 88 F.3d 556, 561 (8th Cir. 1996); see also 20 U.S.C. § 1415(i)(2)(B)(iii) (preponderance of evidence standard). This standard of review applies regardless of whether the review is being conducted by an HRO or by the Court. S.D., 948 F. Supp. at 870 n.5. Unlike factual determinations, purely legal determinations receive plenary, or de novo, review. U.S. v. Davis, 202 F.3d 1060, 1062 (8th Cir. 2000).

Because judges are not trained educators, judicial review under IDEA is limited. E.S. v. Independent Sch. Dist. No. 196, 135 F.3d 566 (8th Cir. 1998). In a Motion for Judgment on the Record, in the context of IDEA, the Court may make a decision on the merits, even if there exist, upon the stipulated record, disputed issues of material fact. Independent Sch Dist. No. 283 v. S.D., 88 F.3d 556, 561 (8th Cir. 1996); Slama v. Independent Sch. Dist. No. 2580, 259 F.Supp.2d 880 (D. Minn. 2003). The Eighth Circuit Court of Appeals and the U.S. District Court of Minnesota have held numerous times under Rowley that a reviewing court must give "due weight" to agency decision-making in a special education due process proceeding. Hendrick Hudson Dist. Bd. of Ed. v. Rowley, 458 U.S. 176 (1982); Independent School District No. 283 v. S.D., 88 F.3d 556, 561 (8th Cir. 1996); Moubry v. Independent School District No. 696, 9 F.Supp.2d 1086, 1104 (D. Minn. 1998). As the District Court of Minnesota recently observed, "Rowley…instructs that we may not substitute our own 'notions of sound judicial policy for those of the school authorities.'" Slama, 259 F.Supp.2d at 882-883 (quoting S.D., 88 F.3d at 561.) "Judicial review of the [Hearing Officer's] decision under IDEA is limited because judges are not trained educators." Slama, 259 F.Supp.2d at 883.

In line with these cases, this Court must exercise the proper deference to the findings and assessment of evidence by the Independent Hearing Officer and Hearing Review Officer below. The language in IDEA regarding "preponderance of the evidence" should by no means be taken as an invitation for the Court to retry this case or to substitute its judgment for that of the IHO and HRO regarding, for example, the weighing of evidence and the credibility of witnesses. The HRO affirmed the factual findings of the IHO in their entirety and the IHO's findings of fact are amply supported by a preponderance of the evidence in the record. Moreover, the HRO correctly applied the law to the facts in this case, finding that the Student's program of education was formulated in accordance with the requirements of IDEA and was reasonably calculated to

enable the Student to receive meaningful educational benefit. Based on the well supported and detailed findings of the IHO and the HRO, the District is entitled to judgment on the administrative record in MDCFL Case No. 429.

**II. THE DISTRICT PROVIDED THE STUDENT WITH FAPE**

Under IDEA, school districts are required to provide a free appropriate public education (FAPE) to disabled students who require special education services. The landmark case regarding a school district's obligation to provide FAPE is Board of Educ. of the Hendrick Hudson Sch. Dist. v. Rowley, 458 U.S. 176 (1982). In that case, the U.S. Supreme Court held that the determination of whether FAPE has been met is a two-fold inquiry:

> First, has the [school district] complied with the procedures noted in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the [school district] has complied with the obligations imposed by Congress and the courts can require no more.

458 U.S. at 206-07. Thus, once a court determines that the procedural and substantive requirements of IDEA have been met, questions of methodology are left to the school district. Id. at 208. Courts must resist any impulse to substitute their own notions of educational policy for those of the school district. Id. at 203; Petersen v. Hastings Pub. Schools, 31 F.3d 705, 707 (8th Cir. 1994).

In regard to the substantive requirements of IDEA, the Rowley Court repeatedly stated that the Act does not require school districts to provide services which "maximize" a disabled child's potential. 458 U.S. at 198-200. In passing IDEA, "Congress sought primarily to make public education available to handicapped children." Id. at 192. Thus, the intent of the Act was "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." Id.

> IDEA does not promise perfect solutions to the vexing problems posed by the existence of learning disabilities in children and

> adolescents. The Act sets more modest goals: it emphasizes an appropriate, rather than an ideal education; it requires an adequate, rather than an optimal, IEP. Appropriateness and adequacy are terms of moderation.

S.D., 948 F. Supp. at 878-79 (emphasis added).

**A. The IHO and HRO correctly determined that the Student does not need one-to-one reading instruction to receive FAPE.**

A disabled child is entitled to receive one-to-one instruction only if such instruction is necessary for the child to receive FAPE. See E.S. v. Independent Sch. Dist. No. 196, 135 F.3d 566, 569 (8th Cir. 1998) (holding that although the student was below grade level and did not read as well as her nondisabled peers, she was making progress and, thus, was not entitled to one-to-one services); see also Klein Indep. Sch. Dist., 29 IDELR 670 (SEA Texas 1998) (denying parent's request for tutoring service, where parent did not establish that student required tutoring to receive FAPE); Hingham Pub. Schs., 29 IDELR 567 (SEA Mass. 1998) (denying parents' request for additional reading tutorials, where there was no evidence that student required additional services in order to receive FAPE). In other words, a school district is not required to provide one-to-one instruction in reading, unless the child needs such instruction to make progress in reading. See Board of Ed. v. Diamond, 808 F.2d 987, 991 (3d Cir. 1986) (whether a child received educational benefit is typically determined by looking at whether the student has made educational progress).

In the instant case, District staff uniformly testified at the hearing that Student does not need one-to-one reading instruction because Student has made significant progress in the small group setting of his Assurance of Mastery (AOM) class, a non-special education remedial reading program, during the 2000-2001 school year. Tr. at 147-48, 241, 392, 495. Buttressing this testimony, the record overwhelmingly demonstrates that, based on numerous measures, the Student has undeniably made progress in reading during the 2000-2001 school year without one-

to-one instruction. For example, the Student made progress as measured by the unmodified grades he earned in Reading. During the 2000-2001 school year, the Student earned the following quarterly grades in Reading: B, A, A, A. Tr. at 382, 478, 485; S.D. Ex. 72. In addition, the Student improved his scores on the STAR reading test, a computer adaptive test that assesses vocabulary and reading comprehension skills. Tr. at 636, 408. The Student took the STAR reading test on September 8, 2000, and the test showed that on that date the Student's grade equivalent ("GE") was a 3.4, meaning third grade, fourth month. Tr. at 363; S.D. Ex. 15. As of November 7, 2000, the Student's GE in reading increased from 3.4 to 4.2. P. Ex. II.[2] The Student took the STAR test again on January 23, 2001, shortly after the District's holiday break and the test showed that the Student's GE had declined to 3.3. P. Ex. II. This variation could be explained by the Student's motivation or attention when taking the test. Tr. at 712. From January 23, 2001 to April 6, 2001, the Student's grade equivalent increased from 3.3 to 4.8. Tr. at 1313; P Ex. II. Based on his review of the Student's STAR tests, Dr. Richard Spicuzza, a licensed school psychologist and Ph.D. with extensive research experience involving the STAR test, testified "with certainty" that the data show the Student made gains in reading between September 2000 and April 2001. Tr. at 639-40; 714. Ms. Nordin, the Student's AOM reading teacher, testified that an increase from a 3.4 GE at the beginning of the year to a 4.8 GE at the end of the year shows "a great increase" in Student's reading comprehension and vocabulary and "a great amount of growth." Tr. at 470. By this measure, the Student's progress over the year was 1.4 grade levels, an extraordinary achievement for any student.

Similarly, the Student's scores on Gates-MacGintie reading tests demonstrate progress in reading. The Gates-MacGintie tests measures a child's vocabulary and reading comprehension skills. Tr. at 406; 646. The Student's September, 2000 Gates test showed that the Student's GE

[2] "P. Ex." refers to exhibits introduced by the Parent during the due process hearing. These exhibits were

at that time was 3.8. Tr. at 364; S.D. Ex. 15 at 2. The Student took the Gates test again in April, 2001 and scored a 4.9. Tr. at 371, S.D. Ex. 70. Both Dr. Spicuzza and the Student's sixth grade regular education teacher, Ms. Kleppe, provided reliable and uncontested testimony that the Gates tests show the Student made substantial progress in reading. Tr. at 646, 373. Finally, in addition to formal tests, the Student's teachers monitored his reading comprehension by listening to him read, asking him questions about the materials to determine whether he understood them, and having the Student summarize readings in a journal to verify that he was comprehending what he read. Tr. at 462; 456-57.

Having assessed the credibility of the witnesses and weighed the evidence, IHO Udoibok found that the Student made significant progress in reading without one-to-one instruction. See Ex. 1 at p. 15-16. This conclusion is amply supported by the IHO's detailed findings of progress. See Ex. 1, FF 53-71. As the HRO correctly held, "The record here is replete with evidence, including test results, grades, and teacher observations, that all indicate the Student made significant progress in reading without one-to-one instruction." Ex. 2, page 6 at ¶ 16. The IHO and the HRO properly concluded the Student does not need one-to-one reading instruction to receive FAPE, and this Court should uphold those decisions.

**B. The Student was not entitled to an assistive technology evaluation or assistive technology services.**

The Student next alleges that he was denied FAPE because his proposed IEP did not contain assistive technology services. During the hearing, the Student argued that he was entitled to an assistive technology evaluation and that he needs a computer to receive FAPE. As both the IHO and HRO properly found, however, the District was not obligated to evaluate the Student for, or provide, assistive technology. More importantly,

---

filed with the Court by the Minnesota Department of Education (MDE) upon Plaintiff's appeal.

the question of whether the Student needs a computer to receive FAPE was not appealed to the HRO, and therefore is not properly before this Court. See Ex. 2; Moubry v. Independent Sch. Dist. No. 696, 951 F.Supp. 867, 886-87 (D. Minn. 1996) (failure to preserve issue on administrative appeal constitutes waiver); Doe v. Arlington County Sch. Bd., 41 F.Supp.2d 599, 608 (E.D. Va. 1999) (issue raised in the initial due process hearing, but not argued and briefed on appeal, is deemed waived).

The United States District Court for the District of Minnesota has held that a school district's "obligation to provide assistive technology is limited to assistive technology which is necessary to provide FAPE." Zigich v. Independent School District No. 623, Civ. No. 99-1212 at 12 (D. Minn. 2000) (unpublished opinion) (Ex. 5.). Likewise, the Office of Special Education Programs ("OSEP") has repeatedly opined that school districts are not required to provide an assistive technology ("AT") device to a child with a disability unless the device is necessary for the child to receive FAPE. Letter to Hutcheson, 30 IDELR 708, 709 (OSEP 1998); Letter to Anonymous, 29 IDELR 1089, 1090 (OSEP 1997); Letter to Ballenger, 24 IDELR 967, 968 (OSEP 1996); Letter to Noan, 22 IDELR 888, 889 (OSEP 1995); Letter to Anonymous, 18 IDELR 627, 627-28 (OSEP 1991). Thus, the obligation to provide an AT device arises only if the device is necessary for the child to derive educational benefit, a determination that is commonly made by examining whether the device is necessary for the child to make educational progress. See Board of Ed. of City Sch. Dist. of N.Y., 21 IDELR 265, 268 (SEA NY 1994).

In Zigich, the parents requested that the district evaluate the child for a particular AT device. When the District did not oblige, the parents obtained a private AT evaluation and then asserted at hearing that the district had denied them FAPE. Zigich v. Independent School

District No. 623, Civ. No. 99-1212, at 11 (D. Minn. 2000). Rejecting the parents' claim, the Federal District Court of Minnesota held that because the student was making progress, the district had no obligation under IDEA to provide him with additional assistive technology, even if doing so would have enhanced his educational benefit. Id. The court further held that "while there is no question that IDEA requires school districts to evaluate a student's needs for assistive technology, that requirement, too, is only applicable where the child's particular circumstances indicate that such technology might be necessary to acquire FAPE." Id. at 12. Because the child was making progress without the AT requested by the parents, the school district had no obligation to provide the assistive technology requested by the parents. Id. The court explained:

> It would make little sense to suggest that the District had an obligation to evaluate technology which they were then free to reject—regardless of the outcome. Given that Danny was provided with FAPE without [the AT requested by parents], the District had no obligation to evaluate Danny's "need" for these devices, and the District has no obligation to reimburse the Zigichs for the private evaluation they obtained.

Id.

In the instant case, the Parent requested an AT evaluation for Student on or about May 20, 2001. SD Ex. 90; Tr. 891. At the IEP meeting on May 1, 2001, the team had already fully considered and discussed whether Student needed AT. Tr. 150, 392-93, 896, 901; see also SD Ex. 92. The team concluded that Student would be successful if the District provided him with a palm sized, hand held spell checker and a calculator. Tr. 150, 793-94; SD Ex. 84 at 8. The team also concluded that Student did not need a computer to receive meaningful educational benefit, because he made significant progress during the 2000-2001 school year without a computer. Tr. 150, 263, 393, 580. Accordingly, on May 22, 2001, the District sent Parent a letter denying her request for an AT evaluation. SD Ex. 92; Tr. 896.

The record shows, and the IHO and HRO both found, that Student made excellent progress during the 2000-01 school year without a computer or other assistive technology. For

example, during the 2000-20001 school year, the Student earned a B and three A's in Reading. Tr. at 382, 478, 485. He also earned four B's in English (Tr. at 382, 386) and two C's and a B in Math. (Tr. at 382.) The Student's teachers testified that he has neat handwriting, (Tr. at 222), nice penmanship (Tr. at 377) and "excellent writing." (Tr. at 499, 580). Dr. Johnson, the school psychologist, testified that, after evaluating the Student, he found the Student was "able to form letters. He's able to write them quickly enough. There is no problem with legibility." Tr. at 264. The Parent agreed that the Student does not have any physical impairment that would prevent him from writing by hand. Tr. at 1408. Furthermore, at hearing the Parent presented no testimony or other evidence regarding the function she believes a computer would serve for Student, or why she believes Student needs a computer. Accordingly, pursuant to the Minnesota Federal District Court's decision in Zigich, the District does not have any obligation to conduct an AT evaluation of the Student to determine whether he needs a computer or other assistive technology. See Zigich, Civ. No. 99-1212, at 12 .

**C. Student's claim regarding denial of ESY services is not properly before this Court.**

The Plaintiff's complaint also asserts that the Student was denied FAPE because he did not receive Extended School Year (ESY) services. This issue, however, was not before the IHO and therefore could not be appealed to the HRO. See Exhibit 2 at page 10, ¶ 35 (stating "The Parent claims ESY services were denied by the IHO because of an incorrect conclusion. Even if that was supported by the record, ESY was not an issue before the IHO and cannot now be raised here.") More importantly, this Court has already held that "claims not presented at the administrative hearing level are not properly before this Court." Reinholdson v. State of Minnesota, et al., 2002 WL 31026580 at *5 (D. Minn. 2002). "To the extent any Plaintiff is attempting to bring claims in the present lawsuit they did not raise in the administrative hearing process, such claims are dismissed." Id. at *10.

It is well-settled that IDEA demands administrative exhaustion as a prerequisite to judicial review. See 20 U.S.C. § 1415(i)(2)(A) (requiring that appeal be "with respect to the complaint presented"). Relying on "well-established judicial interpretations of IDEA," the Eighth Circuit has required parties to exhaust their administrative remedies before asserting their claims in district court. Blackmon v. Springfield R-XII Sch. Dist., 198 F.3d 648, 655-56 (8th Cir. 2000). The administrative exhaustion requirement is followed in the District of Minnesota. See e.g., Moubry v. Independent Sch. Dist. No. 696, 9 F.Supp.2d 1086, 1099 (D. Minn. 1998). As noted by the Eighth Circuit, the exhaustion requirement serves several appropriate policy goals by allowing agencies to exercise discretion, allowing complete development of the record, preventing parties from circumventing statutory procedures, and giving agencies the opportunity to correct errors. Blackmon, 198 F.3d at 656. See also Moubry, 9 F.Supp.2d at 1099 (noting that the propriety of an exhaustion requirement "seems particularly telling" where, as in the context of the IDEA, "the doctrine minimizes unnecessary judicial intervention, by a Federal Court, into an area of educational policy which is traditionally in the orb of the States").

Where Congress has imposed an administrative exhaustion requirement by statute, "the exhaustion of those procedures is mandatory." Bueford v. Resolution Trust Co., 991 F.2d 481, 484 (8th Cir. 1993). Failure to exhaust IDEA's administrative remedies "may properly be raised in a motion to dismiss for lack of subject matter jurisdiction." Brown v. Metropolitan Sch. Dist. of Lawrence, 945 F.Supp. 1202, 1206 (S.D. Ind. 1996) (determining that, where parents failed to exhaust their administrative remedies under the IDEA, their claim for IDEA violation failed for lack of jurisdiction). Plaintiff is obligated to exhaust administrative remedies and any claims not presented at the administrative hearing level are not properly before this Court. Therefore, any claims not raised by Plaintiff in the administrative hearing process, including the claim that the Student was denied ESY services, must be dismissed.

**D. Plaintiff's claim that the District delayed in identifying the student's needs are not properly before this Court.**

Similarly, the Plaintiff apparently asserts that the Student was denied FAPE because the School District delayed in identifying the Student's needs in "reading, assistive technology and ESY…in part because of lack of staff properly licensed and trained to meet his needs." Pl. Complaint at ¶ 39. Again, these claims are not properly before this Court because the Student has failed to exhaust administrative remedies on these claims. Blackmon v. Springfield R-XII Sch. Dist., 198 F.3d 648, 655-56 (8th Cir. 2000); Moubry v. Independent Sch. Dist. No. 696, 9 F.Supp.2d 1086, 1099 (D. Minn. 1998). During the due process hearing and the appeal to the HRO, the Student never asserted that the District delayed in identifying the Student's needs in reading, assistive technology or ESY services. None of these issues are included in the IHO's statement of the issues decided at hearing (Ex. 1 at p. 12-13) and none of these issues was raised on appeal before the HRO (Ex. 2 at p. 2-3). As argued above, the Student has not exhausted administrative remedies on these claims and therefore these issues must be dismissed as a matter of law.

**E. The District complied with the procedural requirements of IDEA, and any non-compliance constitutes harmless error.**

The Student next asserts that he has been denied FAPE because the District failed to comply with IDEA's procedural safeguards. The Student raised the following procedural issues before the HRO:

1. Whether the District provided the Parent with prior written notice of its decision to deny her request for one-to-one reading instruction;

2. Whether the District provided the Parent with timely notice of her procedural safeguards between March 30, 2000 and March 30, 2001.

See Ex. 2 at p. 2.

The Eighth Circuit has adopted the following harmless error standard with regard to procedural violations of IDEA: "An IEP should be set aside only if 'procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits.'" Independent Sch. Dist. No. 283 v. S.D., 88 F.3d 556, 562 (8th Cir. 1996) (citation omitted); see also Moubry v. Independent Sch. Dist. 696, 9 F. Supp.2d 1086, 1102 (D. Minn. 1998) (employing "harmless error standard"). Consequently, "a challenge to the validity of an IEP, 'based upon a laundry listing which details a myriad of technical deficiencies,' may well be insufficient to discredit the appropriateness of the education that was shouldered by that IEP." Moubry, 9 F. Supp.2d at 1102 (citation omitted).

**1. The District Provided Parent with Prior Written Notice of Its Decision to Deny Her Request for One-to-One Reading Instruction.**

On April 23, 2001, Parent filed an amendment to her statement of objections prior to hearing. See Ex. 3. Parent alleged that the District failed to provide her with prior written notice regarding her request for two hours per week of one-to-one reading instruction. Id. Parent further alleged that the District had orally refused her request at the IEP meeting held on March 20, 2001. Id. On May 1, 2001, the District responded to Parent's amendment to her statement of objections. See Ex. 4.

The prior written notice requirement applies when a school district proposes to initiate or change, or refuses to initiate or change, the identification, evaluation, educational placement, or provision of FAPE for a child with a disability. See 34 C.F.R. § 300.503(a). The facts established at hearing demonstrate that the District had not made a final decision regarding the Parent's request for one-to-one reading instruction at the March 20, 2001 meeting, and therefore the prior written notice requirement did not apply.

For example, on April 18, 2001, Parent wrote a letter to the District requesting "Prior Written Notice" of the District's decision on her request for tutoring services. SD Ex. 75. Parent testified that she wrote this letter because she "wanted to know if they weren't going to provide tutoring services at home for [Student]." Tr. 1094-95. The fact that Parent did not know as of April 18, 2001 what the District's decision was, belies the assertion in her amended statement of objections that the team had reached a decision at the IEP meeting on March 20, 2001. By Parent's own admission, the prior written notice requirement was not triggered as a result of the March 20, 2001 IEP meeting.

Furthermore, during the March 20, 2001 IEP meeting, the IEP team discussed and considered a range of alternatives and options regarding reading instruction for the Student. S.D. Ex. 54; Tr. at 859-60; S.D. Ex. 87 at 2. These options included: (1) a mainstream class with support; (2) an AOM class; (3) a resource room with higher level reading; (4) a resource room with lower level reading; (5) the computer based Fast ForWord program; (6) the computer based earobics program; (7) the targeted services program ("TSP"), which is an after school program with one-to-one support available; and (8) one-to-one instruction. SD Exs. 54 & 87, at 2. During the meeting on March 20, 2001, the IEP team did not reach a decision with respect to the Parent's request for one-to-one services, because the Parent needed to leave before a decision could be reached. Tr. at 136, 232, 369-70; S.D. Ex. 54 at 15.

After the meeting on March 20, 2001, the District made numerous attempts to schedule a follow-up meeting for the purpose of addressing Parent's request for one-to-one reading instruction and completing an IEP for Student. Tr. at 137-38; S. D. Ex. 58, 66, 77. On April 18, 2001, Parent informed the District that she did not intend to attend any further IEP meetings. Tr. at 783. The District scheduled a meeting for May 1, 2001, and provided Parent with notice of same. Tr. at 784-85; 813; S.D. Ex. 77, 78.

At the meeting on May 1, 2001, District staff on the IEP team rejected Parent's request for one-to-one reading instruction. Tr. 789. The team reached the following conclusion: "With the exception of [Student]'s mother, the IEP team believes that [Student] does not need one-on-one instruction to receive meaningful educational benefit and that one-on-one instruction would not be the least restrictive environment for [Student]." SD Ex. 84, at 3. During the meeting on May 1, 2001, every member of the team affirmatively expressed agreement with this statement, except for Parent who was not present. Tr. 391, 828-29.

By letter dated May 16, 2001, the District provided Parent with prior written notice of the IEP team's decision regarding her request for one-to-one tutoring in reading. SD Ex. 87; Tr. 890. The District's letter contains all the required elements of prior written notice. See 34 C.F.R. § 300.503(b). And the information in the District's letter of May 16, 2001 reflects the opinion of all staff members on Student's IEP team. Tr. 890.

Based on the foregoing, the IHO must conclude that the District met its obligation to provide prior written notice to Parent. However, in the event that the IHO disagrees, the District asserts that the record contains no evidence to support a conclusion that Student's right to an education has been compromised, that Parent's ability to participate in the planning of Student's program has been seriously hampered, or that Student has been deprived of educational benefits to which he is entitled. Even if the District had not provided any prior written notice whatsoever, Parent could not show that any harm has occurred because, as discussed above, the Student clearly does not need one-to-one reading instruction to receive FAPE.

**2.. The District Provided Parent with Timely Notice of Her Procedural Safeguards Between March 30, 2000 and March 30, 2001.**

Parent claims that she did not receive notice of her procedural safeguards until May 10, 2001. Contrary to Parent's assertion, the evidence introduced at the hearing shows that the Parent received adequate notice of her procedural safeguards.

The regulations implementing IDEA provide that a copy of the procedural safeguards available to the parents of a child with a disability must be given to the parents at the following times: (1) upon initial referral for evaluation; (2) upon each notification of an IEP meeting; (3) upon reevaluation of the child; and (4) upon receipt of a request for a due process hearing. 34 C.F.R. § 300.504(a).

However, a failure to provide a parent with notice of the procedural safeguards does not constitute a denial of FAPE unless the lack of notice compromised the pupil's right to an appropriate education, seriously hampered the parent's opportunity to participate in the formulation process, or caused a deprivation of educational benefits. Independent Sch. Dist. No. 283 v. S.D., 88 F.3d 556, 562 (8th Cir. 1996). This principal has been applied to cases in which students alleged that they were denied FAPE because their parents did not receive proper notice of their parental rights. See, e.g., Fairfax County Public Schs., 29 IDELR 1096 (SEA VA 1998); Gwinett County Sch. System, 27 IDELR 890 (SEA GA 1998).

In the instant case, Parent testified that she reads documents before she signs them, and that she understands the importance of not signing her name on a document without reading it first. Tr. 1417. Parent then admitted that on November 4, 1998, she signed on a line directly to the right of the following statement: "Parents or students age 18 or older please sign here if you have received a copy of the parents rights and procedural safeguards brochure." Tr. 1418; SD Ex. 8, at 3. Parent's subsequent testimony that she foolishly signed her name anywhere without

reading first, is no different than a party who seeks to avoid a contractual obligation by asserting that she did not read the contract before signing it.

The Parent's receipt of her procedural safeguards in November 1998 establishes two important points. First, Parent's memory is faulty in regard to when she first received a copy of her procedural safeguards. Second, the fact that Parent received notice of her procedural safeguards in November 1998 decreases the likelihood that she was harmed in the event that she did not receive such notice at a later date.

The record also clearly shows that on September 28, 2000, Michele Rydberg, the Student's case manager from September 2000 through March 2001, sent Parent a notice of procedural safeguards brochure along with the Notice of Educational Evaluation/Reevaluation Plan. Tr. 75-76; SD Ex. 20. Ms. Rydberg testified that she is very confident she sent Parent the procedural safeguards brochure, that she specifically recalls sending Parent the procedural safeguards brochure on September 28, 2000, and that she has a practice of sending the brochure for all initial evaluations. Tr. 76.

In addition, Ms. Rydberg testified that she is "very confident" that she also gave Parent a procedural safeguards brochure at the start of the first IEP meeting for Student, which was held on December 8, 2000. Tr. 95. Ms. Rydberg specifically recalled that when she gave Parent the notice of procedural safeguards, Parent was sitting at the head of the table. Tr. 95.

Unlike Ms. Rydberg's specific and clear recollection, Parent's memory of events occurring in the fall of 2000 is unreliable. Parent testified that even though Student's reading was her primary concern, she cannot recall who Student's reading teacher was in September or the fall of 2000—the same period of time that she claims to have not received notice of her procedural safeguards. Tr. 1308-09, 1387; see also Tr. 1039. Additionally, although Parent objected to the original evaluation plan on the ground that she needed additional information,

Parent could not recall what additional information she needed. Instead, apparently based on the testimony she heard from other witnesses, Parent stated "I was asking for the team to evaluate him in speech and language area I guess." Tr. 1045 (emphasis added).

Moreover, Parent acknowledges that in December 2000 she received notice of her procedural safeguards in connection with her youngest son, who is also a special education student. Tr. 1032. Parent demonstrated her awareness of her procedural rights in January 2001 when she requested a special education hearing with respect to her youngest son. See Tr. 1348. Thus, by December 2000, Parent was obviously familiar with her rights. Indeed, during the past school year alone, Parent has requested three special education due process hearings against the District. Tr. 1424.

Similarly, in the Fairfax County case, cited above, the parents alleged that the school district had failed to provide them with written notice of their procedural rights and, as a result, they claimed that had been denied the opportunity to participate fully in an IEP meeting. The hearing review officer found the parents' argument unpersuasive because they had previously received written notice of their procedural rights and had previously invoked some of those rights.

Additional facts in the instant case suggest that Parent has received notice of her procedural safeguards along with each notice of an IEP meeting held between March 30, 2000 and March 30, 2001. At hearing Parent testified that she carefully reads all documents and notices, including IEP team meeting notices, which she receives from the District. Tr. 1417. The Notice of a Team Meeting for the December 13, 2000 IEP meeting, and the written notice for each of the following meetings, states in boldface type:

> **Enclosed is a NOTICE OF PROCEDURAL SAFEGUARDS brochure.** If for some reason the document has not been enclosed, please call me immediately. The brochure is provided for you (and your child) to review prior to your meeting.

> It is important that you understand your rights. If you have questions please contact me.

See SD Exs. 37, 52, 62, 78 (emphasis in original). Parent admits that she never informed anyone at the District that she had not received the procedural safeguards brochure. Tr. 1420, 1422. Given that Parent carefully read the meeting notices she received, and that she has a history of vigorously enforcing her rights, it is highly likely that she would have contacted the District if, in fact, she had not received the procedural safeguards brochure. Hence, the preponderance of the evidence provided at hearing shows that the District provided the Parent with timely notice of her procedural safeguards as required by the law.

Assuming, *arguendo*, that the District had not provided Parent with notice of her procedural safeguards on each occasion that it was required to do so, the record is devoid of any evidence to suggest that a lack of notice has compromised Student's right to an education, seriously hampered Parent's ability to participate in planning Student's program of education, or deprived Student of educational benefits. Indeed, Parent actively participated in the IEP meetings held on December 13, 2000, January 31, 2001, and March 20, 2001. See SD Ex. 54. Parent's counsel was present at the meeting on March 20, 2001, and advocated for Parent's rights. Tr. 986. Moreover, Parent has fervently exercised her rights, as evident by the three special education hearings she has requested during the past school year. In sum, even if the District had not provided Parent with notice of her procedural safeguards each time it was required to do so, such error would be harmless error under the facts of this case.

## III. OTHER CLAIMS RAISED IN THE STUDENT'S COMPLAINT HAVE BEEN PREVIOUSLY DISMISSED BY THIS COURT

In addition to appealing the administrative decision in MDCFL Case No. 429-2, Plaintiff's complaint also attempts to raise the following causes of action allegedly related to Plaintiff Victor Grant:

1. The District violated the Student's rights under § 504 of the Rehabilitation Act of 1973 by denying him notice of procedural safeguards and a §504 hearing. Pl. Complaint at ¶ 42.

2. Superintendent Roger Giroux and Special Education Director Susan Butler have failed to ensure that the School District complied with IDEA, thereby denying the Student FAPE. Pl Complaint at ¶ 49-50.

3. Defendant Susan Butler denied the Student a § 504 hearing constituting gross misjudgment and intentional violation of § 504. Pl. Complaint at ¶ 42; 53.

On September 9, 2002, these claims were dismissed with prejudice by this Court pursuant to Federal Rule of Civil Procedure 12(b)(6). See Reinholdson v. State of Minnesota et al., 2002 WL 31026580 (D. Minn. 2002) ("Reinholdson II"). On October 23, 2003, the Eighth Circuit Court of Appeals modified the Reinholdson II decision with respect this Court's severance of Plaintiffs' individual actions. Reinholdson v. State of Minnesota et al., 346 F.3d 847, 851 (8th Cir. 2003). The Eighth Circuit did not, however, overturn this Court's decision dismissing Plaintiff's claims under § 1983 (against Roger Giroux and Susan Butler) and § 504 of the Rehabilitation Act.[3] As a result, these claims are no longer pending before this Court. Assuming, however, the Court decides that these claims somehow survive this Court's decision and the Eighth Circuit's decision in Reinholdson, these claims must be dismissed.

First, the Student asserts the District violated his rights under § 504 of the Rehabilitation Act by denying him notice of procedural safeguards and a §504 hearing. Pl. Complaint at ¶ 42. The Student, however, has failed to exhaust administrative remedies on this claim. See Brown v. Metropolitan School Dist. of Lawrence Tp, 945 F.Supp. 1202, 1207 (S.D. Ind. 1996) (holding plaintiff was required to exhaust administrative remedies under IDEA before she could assert a claim that the school district violated § 504). The Student may not sidestep IDEA's exhaustion

[3] "With the severance order limited in this fashion, the remaining portions of the order being appealed, including the statute of limitations ruling, are interlocutory and therefore beyond our appellate jurisdiction

requirement merely by repackaging his claims under Section 504. See Rose v. Yeaw, 214 F.3d 206, 209-10 (1st Cir. 2000) (explaining that because the scope of a due process hearing is broad, encompassing all "'complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of [FAPE] to such child' [20 U.S.C.] § 1415(b)(6)," any overlapping claims under Section 504 must also be exhausted through the due process hearing before being brought in federal court). During the due process hearing in this matter, the Student never alleged the District violated Section 504 of the Rehabilitation Act, nor was this issue raised on appeal before the HRO. See Ex. 1 and Ex. 2. As a result, this claim must be dismissed as a matter of law.

Furthermore, § 504 does not "create general tort liability for educational malpractice." Smith v. Special Sch. Dist. No. 1, 184 F.3d 764, 769 (8th Cir. 1999) (quotation omitted); see also, Heidemann v. Rother, 84 F.3d 1021, 1032 (8th Cir. 1996). Thus, in order to recover under § 504, a plaintiff must show more than a mere failure to provide a free appropriate public education as required by IDEA. Brantley v. Independent Sch. Dist. No. 625, 936 F.Supp. 649, 556 (D. Minn. 1996). Rather, gross misjudgment or bad faith on the part of school officials must be shown to demonstrate a violation of § 504. Heidemann, 84 F.3d at 1032; Id. at 657. Here, the Student makes bald, conclusory allegations of discrimination, bad faith, or gross misjudgment on the part of the school district, but has failed to plead any specific facts demonstrating gross misjudgment or bad faith. Similarly, the Student alleges Defendant Susan Butler denied him a § 504 hearing "constituting gross misjudgment and intentional violation of § 504," but fails to plead any facts suggesting bad faith or gross misjudgment on Ms. Butler's part. As a result, Student's claims under Section 504 must fail as a matter of law.

---

at this stage of the proceedings." Reinholdson v. State of Minnesota et al., 346 F.3d 847, 851 (8th Cir. 2003).

Second, the Student argues Superintendent Roger Giroux and Special Education Director Susan Butler failed to ensure that the School District complied with IDEA, thereby denying the Student FAPE. Pl Complaint at ¶ 49-50. Apparently, the Student's complaint attempts to raise a cause of action under § 1983 of the Civil Rights Act. Section 1983, however, does not create any new substantive rights, rather it provides relief for violations of certain rights secured by the U.S. Constitution and other federal laws. See Mrs. W. v. Tirozzi, 832 F.2d 748 (2nd Cir. 1987). Section 1983 authorizes the imposition of liability against a person who, acting under "color of state law," deprives another person of rights guaranteed under the Constitution or federal law. 42 U.S.C. § 1983. In interpreting Section 1983, courts have ruled that a school district may only be held liable under Section 1983 if a Plaintiff establishes that he or she suffered discrimination or was deprived the benefit of a guaranteed constitutional or federal statutory right as a result of an official custom or policy of the school district. Monell v. City of New York Dep't of Social Services, 463 U.S. 658, 694, 98 S.Ct. 2018, 2037 (1978); see also Larson v. Miller, 55 F.3d 1343, 1349 (8th Cir. 1995). In his complaint, the Student makes vague reference to "policies, procedures, practices, acts and omissions" of the District. But he has not identified any specific facts that indicate a system, policy, or practice that caused him a deprivation of his rights. Nor has he identified, in any other than a conclusory manner, the specific statutory rights that he was denied by the alleged "policies, procedures and practices," or the circumstances under which the alleged deprivation of his rights occurred. Nor has the Student alleged Mr. Giroux or Ms. Butler acted "under color of state law." Finally, the Eighth Circuit Court of Appeals has held that alleged violations of the IDEA cannot provide a basis for a § 1983 action to recover general or punitive damages. Heidemann, 84 F.3d at 1033. As a result, the Student's claims against Ms. Butler and Mr. Giroux must be dismissed.

## CONCLUSION

For the foregoing reasons, the School District respectfully requests that the Court uphold the Hearing Review Officer's decision in MDCFL Case No. 429.

**RATWIK, ROSZAK & MALONEY, P.A.**

Dated: February 14, 2005

By: s/Paul C. Ratwik

Paul C. Ratwik
Atty. Reg. No. 89795
Stacey L. Wilson
Atty. Reg. No. 0306174
300 U.S. Trust Building
730 Second Avenue South
Minneapolis, MN 55402
(612) 339-0060

**ATTORNEYS FOR DEFENDANTS INDEPENDENT SCHOOL DISTRICT NO. 11**

RRM: 72422