**STATE OF MINNESOTA**
**MINNESOTA DEPARTMENT OF CHILDREN, FAMILIES & LEARNING**
**BEFORE THE INDEPENDENT HEARING OFFICER**
**MDCFL No.: 429**

---

Kelley Sunderlin, on behalf of her minor child, Victor Grant )

v. )

Independent School District No. 11, Anoka-Hennepin )

**FINDINGS OF FACT**
**CONCLUSION OF LAW**
**MEMORANDUM AND**
**ORDER**

---

## PROCEDURAL HISTORY

This Hearing came before Independent Hearing Officer ("IHO") Kenneth U. Udoibok pursuant to the request for a special education due process hearing which Kelley Sunderlin ("Parent") made on behalf of her minor son, Victor Grant ("Student"). The Student resides within the bounds of Independent School District No. 11, Anoka-Hennepin ("District").

The District was represented by Mr. Michael J. Waldspurger of Ratwik, Roszak & Maloney, P.A., U.S. Trust Building, 730 Second Avenue South, Suite 300, Minneapolis, MN 55402.

The Parent was represented by Ms. Sonja D. Kerr of Kerr Law Office, 5972 Cahill Avenue, Suite 110, Inver Grove Heights, MN 55076.

A prehearing scheduling conference was held on April 19, 2001. The Student requested an extension of the hearing date to accommodate the Student's attorney's schedule and temporary disability.

The District filed a motion in limine seeking application of a one-year statute of limitations. The Student did not oppose the District's motion. The IHO granted the District's motion.

The Student brought a prehearing motion to exclude the District's proposed Individualized Education Plan (" IEP"), dated May 10, 2001. The IHO denied the Student's motion, but allowed the introduction of evidence developed within five business days before the hearing.

EXHIBIT
1

Multiple extension were sought in this matter because of the length and volume of the case. On September 7, 2001, the last request for extension was requested by the IHO sua sponte; the District concurred. The Parent did not respond to the request until September 14, 2001, and only then the Parent objected to the request for extension. On September 7, 2001, the IHO issued an order that his opinion would be on file September 17, 2001.

The hearing was held on May 30, June 7, 8, 15, July 16, 17 and 23, 2001. The hearing was open to the public according to the Student's request.

The following exhaustive list of people testified at the hearing:

DISTRICT WITNESSES

(a) Ms. Michele Rydberg, Case Manager from September 2000 to April 2001;
(b) Dr. Wendy Johnson, School Psychologist;
(c) Ms. Jennifer Peterson, Speech and Language ("S/L") Clinician;
(d) Ms. Holly Kleppe, Student's Sixth Grade Reading teacher for first quarter, English teacher for the 2000-2001 school year, and Math Teacher for the third and fourth quarter;
(e) Ms. Betsy Nordin, Sixth Grade Reading Assurance of Mastery ("AOM") Teacher for second, third, and fourth quarter;
(f) Ms. Tami Knicker, Case Manager from April 2001;
(g) Ms. Linda Gardner, Special Education Consultant for Blaine Cluster;
(h) Dr. Richard Spicuzza, Expert on Educational Assessments and Evaluations;

STUDENT'S WITNESSES

(a) Scott Sunderlin, Student's Step Father;
(b) Kelley Sunderlin, Parent;
(c) Jennifer Brown, Owner of the Learning Edge;
(d) Arlene Sonday, Expert on the Sonday System Learning to Read;
(e) Victor Grant, Student.

The IHO's decision is final and binding upon both parties unless appealed within thirty (30) calendar days after the receipt of this decision, as provided in Minn. Stat. § 125A.09, subd. 9. If the decision is appealed, a written transcript of the hearing must be accessible to the parties involved and the hearing review officer ("HRO") within five calendar days of the filing of appeal. Id. The HRO must issue a final independent decision based on an impartial review of the local decision and the entire record within thirty (30) calendar days after the filing of the appeal. Id. The HRO must seek additional evidence if necessary and may afford the parties an opportunity for written or oral argument. Id. The decision of

the HRO shall be final unless appealed.

## FINDINGS OF FACT

**Background**

1. The Student is thirteen years old and was born on February 29, 1988. SD Ex. 84.
2. The Student originally attended school in Illinois at which time he retained and he repeated the second grade. SD Ex. 25; Tr. at 160.
3. The Student attended school in the District in September 1998.
4. The District evaluated the Student in December 1998 and concluded that he did not meet eligibility criteria for special education services. SD Ex. 36. As a result, the Student did not receive special education services during fifth grade. In his fifth grade, the Student passed all his classes during 1999-2000 school year. SD Ex. 13.

**District Evaluation**

5. The Parent asked the District to conduct an educational evaluation of the Student. SD Ex. 14. The District impaneled a child study team ("CST") on September 26, 2000. Tr. 70-71; SD Ex. 19. The Parent was unable to attend the meeting. Tr. 73-74; SD Ex. 17. At the meeting, the District reviewed the Student's educational records. Tr. 65-66, 71-72, 177-78, 334, 350, 356.
6. The CST developed a Notice of Educational Evaluation/Reevaluation Plan for the Student. Tr. 73; SD Ex. 20. The CST did not plan to evaluate the Student in the area of speech and language ("S/L"), because in January 1999 the Student was in the average range and did not qualify for S/L. Tr. 334-35;Tr. 357.
7. On the Notice of Educational Evaluation/Reevaluation Plan and subsequent contact with the District, the Parent expressed concern about the Student's communication skills; the Parent believed the Student needed to be tested in speech. Tr. 77, Tr. 334; SD Ex. 51.
8. The District agreed to reevaluate the Student. Tr. 77, SD Ex. 23; Tr. 79.
9. When the District staff evaluated the Student, they were aware that he had repeated second grade. Tr. 160, 286.
10. The evaluation was completed on December 8, 2000. SD Ex. 36; Tr. 87. It showed that the Student's verbal IQ score was 97; his performance IQ score was 113; and his full-scale score is 105. SD Ex. 36, at 1.

11. Based on the results, the evaluation team concluded that Student met state eligibility criteria for a specific learning disability ("SLD"). SD Ex. 36 at 4 & 12; Tr. at 88. Specifically, the team concluded that Student met eligibility for a SLD in the areas of Broad Math and Broad Written Language. SD Ex. 36, at 4 & 12; Tr. 89. The evaluation team concluded that Student did not meet eligibility criteria for a SLD in the area of Broad Reading. Tr. 92, 301.
12. The Student needed a standard score of 83 to qualify for special education in the area of Broad Reading, and his score in Broad Reading was 89. SD Ex. 36, at 4 & 12; Tr. 91.
13. The evaluation team also concluded that the Student did not meet eligibility criteria for speech services. SD Ex. 36, at 12; Tr. 332, 341.
14. The evaluation team concluded that the Student's hyperactivity was average and did not suggest a conduct problem. Tr. 199; SD Ex. 36.
15. The Parent does not contest the appropriateness of the District's evaluation of the Student. Tr. 1078. The Parent did not raise the Student's evaluation in the pleadings. See SD Ex. 60.
16. The Parent's expert, Jennifer Brown could not opine on the adequacy of the District's evaluation of the Student. Tr. 1160-62; Tr. 1133; Tr. 1230, Tr. 1246.
17 The Parent's other expert, Arlene Sonday, could not testify about the adequacy of the District's evaluation. Tr. 1548, Tr. 1625, Tr. 1623.

**Change from Regular to AOM Reading class**

18. At the end of the first quarter of the 2000-2001 school year, the Parent and the District agreed to the transfer of the Student from regular class to Ms. Betsy Nordin's AOM class, because it offers a smaller class setting. Tr. 355, 365-66, 448; SD Ex. 22.
19. In the AOM class, Ms. Nordin worked with the Student on decoding skills, phonics, phonetic irregularities, syllables, fluency, phrasing, punctuation, and comprehension. Tr. 450-53; SD Ex. 93 at 2.

**December 13, 2000 IEP Meeting–Development of IEP**

20. On December 8, 2000, the District, through Michele Rydberg, case manager, informed the Parent of a meeting to discuss the evaluation results and consider the development of an IEP for the Student. SD Ex. 37; Tr. 93-94.
21. On December 13, 2000, the District gave the Parent the Student's

procedural safeguards brochure. The IEP team discussed the results of the Student's evaluation. All members of the team signed the final page of the evaluation report. The Parent did not indicate whether she disagreed with the team's result. SD Ex. 38; Tr. 95.

22. On January 19, 2001, the Parent requested an IEP meeting for the Student. SD Ex. 43. The Parent also informed the District that the Student was in the process of being evaluated by Drs. Lawrence Charnas and Davida Goldman of the University of Minnesota. The Parent further stated that "Once [she has] received the written report from Dr. Goldman [she would] share the results with the team so that [they] can develop an appropriate educational plan for [Student]. In the meanwhile, [she] would like to meet with the Team so that [they] can develop an interim IEP." SD Ex. 43; Tr. 101.
23. The private evaluation of the Student at the University of Minnesota was not completed. Tr. 1054, 1347-48, 1352.

**<u>January 31, 2001 IEP Meeting--Draft IEP</u>**

24. The document distributed on January 31, 2001 was merely a draft IEP. In keeping with the District's practice, Ms. Rydberg created a "draft" of an "interim IEP" for the Student, which she then brought to the January 31, 2001 meeting. SD Ex. 43, 44; Tr. 101, 111, 208, 547. The IEP was not intended to be a final IEP. Tr. 102. It was intended to engender input from the Parent. Tr. 208-9, 214-15. The draft IEP includes several handwritten notations. SD Ex. 44.
25. On February 1, 2001, Parent signed the Notice of Proposed Special Education Services form and wrote "I DO NOT AGREE" on it. SD Ex. 45; Tr. 108. The Parents would not specify whether she would attend one of the Student's IEP meetings.

**<u>Jennifer Brown Evaluation</u>**

26. Jennifer Brown, owner of the Learning Edge, evaluated the Student on March 4, 2001. P's Ex. GG; Tr. 1204.
27. Ms. Brown's evaluation report lists the Student's scores in terms of grade equivalents and age equivalents. P's Ex. GG. Ms. Brown does not know what the Woodcock Johnson Reading Mastery Test manual states in terms of how test results are to be reported, Tr. 1232.
28. The Parent did not disclose Ms. Brown's evaluation report five business days before hearing. Tr. 607, 610.

## March 20, 2001 IEP Meeting: Discussion of Programming.

29. A noticed IEP meeting was held on March 20, 2001 to develop an IEP for the Student. Tr. 116; SD Ex. 52. Many options were considered for the Student. The Parent was unwilling to consider options that did not include one-to-one reading instruction. Tr. 1272-73. The Parent alleges that the District pre-determined it decision prior to the IEP meeting; however, the evidence shows the reverse. Tr. 135, 232, 367, 490, 778.

## District's Effort to Schedule IEP Meeting

30. The District made further efforts to schedule another IEP meeting with the Parents. SD Ex. 54, at 15-16; SD Exs. 58,77. The Parent believed that subsequent meetings was "a waste of time." Tr. 138, 1084, 1390, 1394, 1424.
31. The District's April 27, 2001 letter, summarizes its efforts to schedule an IEP meeting. SD Ex. 77; Tr. 881-82. The Parent never expressed any disagreement with the summary. Tr. 882.

## May 1, 2001 IEP Meeting: Development of Proposed IEP

32. The IEP meeting was held as scheduled on May 1, 2001. Tr. 786-87. In accordance with the Parent's April 18, 2001 statement that she would not attend any further IEP meetings, the Parent did not attend the IEP meeting held on May 1, 2001. SD Ex. 84, at 1. Tami Knicker, the current IEP manager, brought a draft IEP to the meeting on May 1, 2001. Tr. 236. The IEP team developed the IEP goals and objectives at the meeting. Tr. 825-26. The goals and objectives in the IEP were targeted to the Student's needs. Tr. 532. The proposed IEP does not provide for one-to-one reading instruction. SD Ex. 84; Tr. 240.
33. The District staff on the IEP team proposed a higher level-2 resource room for the Student's reading instruction during the period of September 4, 2001 to February 28, 2002. Tr. 149, 248. The District does not have an AOM class for seventh grade students. Tr. 240. The higher level resource room is similar to the AOM classroom. Tr. 800, 1374.
34. The District believes that the Student will also be successful in the resource room next year. Tr. 240, 801.
35. The District proposed the level-2 resource reading room rather than a supported mainstream classroom because the resource room offers more ability to focus directly on phonics and to focus on the Student's specific

needs. Tr. 260.

## Extended School Year Services

36. Through the District's proposed IEP, it offered to provide the Student with ESY services during the summer of 2001. Tr. 268.
37. The IEP team proposed that the Student receive ESY services because of the probability that he would regress in some of his skills. Tr. 795.
38. The IEP team selected the goals and objectives for ESY by examining the areas in which he might regress. Tr. 795.
39. The District acknowledged that the Student might spend the summer with his father in state of Illinois. Tr. 270. As of now, there is no clarity regarding the Student's state of residence during the summer. Tr. at 889-90.

## Assistive Technology

40. The District believes that the Student does not need assistive technology. Tr. 150, 392-93. The District believes that the Student would be successful if he is provided with a palm sized, hand held spell checker and a calculator. Tr. 150, 793-94; SD Ex. 84 at 8.
41. On May 18, 2001, the Parent requested an AT evaluation for the Student. SD Ex. 90; Tr. 891. The Parent had not requested for a AT evaluation. Tr. 891. The District denied the Parent's request for an AT evaluation. SD Ex. 92; Tr. 896.
42. The Parent presented no reliable evidence to support her claim that the Student needs AT in order to receive FAPE at the hearing.

## Parent's Objections to the Proposed IEP

43. The Parent, here, objects to the proposed IEP because it does not provide for one-to-one reading instruction, and the Parent does not believe that the Sonday System Learning to Read is an appropriate curriculum for the Student. Tr. 1401-02.
44. The Parent seems to abandon her claim that Student needs a computer or other additional assistive technology.

## Methodology: The Sonday System Learning to Read ("SSLR")

45. The IEP team does not select the curriculum or instructional materials that will be used with a student. Tr. 265. The teacher has the discretion to select

the instructional materials. Tr. 265-66, 794.

46. The Parent asserts that the SSLR is inappropriate for the Student because it is designed for children reading below a fourth grade level. Tr. 1401-02.

47. Arlene Sonday created the SSLR. Tr. 1494. Ms. Sonday testified that the SSLR is an instructional methodology based on a strong philosophy of teaching. Tr. 1615. The SSLR utilizes a curriculum that focuses on phonics. Tr. 1522.

## Least Restrictive Environment ("LRE")

48. The proposed IEP states, "With the exception of [Student]'s mother, the IEP team believes that [Student] does not need one-on-one instruction to receive meaningful educational benefit and that one-on-one instruction would not be the least restrictive environment for [Student]." SD Ex. 84, at 3. During the meeting on May 1, 2001, every member of the team, other than the Parent, agreed with this statement. Tr. 391, Tr. 497-98, 828-29.

50. One-to-one instruction is more restrictive than the resource room. Tr. 257. There are no peers during one-to-one instruction. Tr. 257. Additionally, when one-to-one instruction is provided by a private agency, such instruction is "outside of the regular school day and outside of the regular school setting entirely." Tr. 257.

## One-to One Instruction

51. The district argues that Student does not need one-to-one reading instruction because he made significant progress in the small reading class during the 2000-2001 school year. Tr. 147-48, 241, 392, 495.

52. Since the Student's reading ability is within normative range compared to the same age peers, the Districts argues that it would be highly uncommon to afford that the Student a very specialized one-to-one instruction. Tr. at 656.

## Student Progress in Reading as Measured by Grades

53. The Student made progress in reading. Tr. 995, SD Ex. 13. During the 2000-2001 school year, the Student earned mostly "A's". Tr. 382, 478, 485 SD Ex. 72.

54. The Parent agrees that an "A" grade in reading shows that the Student made progress in reading class. Tr. 1298-99, 1301. The Student further earned a "B" in English. Tr. 382-33, 386, 424.

**Star Test Measure of Progress**

55. The STAR test is a computer adaptive test that assesses a student's vocabulary and reading comprehension skills. Tr. 636, 408.
56. Dr. Spicuzza, expert in STAR test, opined that the STAR test is a "good to very good assessment for building-level decisions on whether or not a student is making progress in reading." Tr. 636.
57. The Student took a STAR reading test on September 8, 2000, and the test showed that the Student's grade equivalent ("GE") was 3.4, meaning third grade and fourth months. Tr. 363; SD Ex. 15, at 1.
58. The Student took the STAR test on November 7, 2000, and the test showed that during the two month period from September 8, 2000 to November 7, 2000, the Student's GE in reading increased from 3.4 to 4.2. P. Ex. II.
59. Student took the STAR test again on January 23, 2001, shortly after the holiday break, Tr. 1313, and the test showed that Student's GE on that date had declined to 3.3. P Ex. II.
60. Student also took the January 23, 2001 STAR test at a time when, according to Parent, Student was at a "low point" because he had been told by another student that he was too dumb to read a Harry Potter book. Tr. 1303. Parent asserts that in January 2001, Student's self-esteem, confidence, and interest in reading were adversely effected by the other student's comment. Tr. 1304, 1306, 1313, 1454-56. Parent testified that Student had not regained his self-esteem, confidence, and interest in reading as of January 23, 2001. Tr. 1306-07.
61. The IHO is troubled by the decline in the Student's score. The District is not required to guarantee progress. However, the Student's performance on the January 23, 2001 STAR test may have been affected by the fact that he took STAR test shortly after the holiday break and at a time when, according to the Parent, his self-esteem, confidence and interest in reading were diminished. Tr. 1303-1313.

**Gates Test**

62. The Gates-MacGintie ("Gates") test measures a child's vocabulary and reading comprehension skills. Tr. 406, 646.
63. The Student took a Gates test in September 2000. Tr. 364; SD Ex. 15, at 2. The September 2000 Gates test showed that Student's GE at that time was 3.8, meaning third grade, eighth month. Tr. 364; SD Ex. 15, at 2. Student took a second Gates test in April 2001. Tr. 371; SD Ex. 70. The April 2001

Gates test showed that Student's GE at that time was 4.9, meaning fourth grade, ninth month. Tr. at 371; SD Ex. 70. Thus, according to the Gates test, in approximately seven months the Student's GE increased from 3.8 to 4.9. Tr. 372.

64. In reliance on the Gates test, the Student made progress. Tr. 373, 646.
65. The Parent does not dispute that the Student made progress in reading based on the results of the Gates test.

**Woodcock Johnson-Revised Measured**

66. The Student made some amount of growth as his same age peers in reading. Tr. 764-65. Student obtained a standard score of 87 in Broad Reading on the WJ-R in the fourth grade, and he obtained a standard score of 89 in Broad Reading on the WJ-R in the sixth grade. Tr. 767; SD Ex. 36 at 4; SD Ex. 10, at 3. On both tests, Student was in the normative group. Tr. 770-72.

67. The STAR test, Gates and WJ-R are comparable. Tr. 438, 657-659.

**Teachers Measured Progress**

Interest in Reading

68. At the start of the 2000-2001 school year, the Student did not show interest in reading but later he was able to sit and read independently. Tr. 333, 453-55, 456-9.

Reading Aloud

69. At the beginning of the 2000-2001 second quarter, the Student did not want to read aloud. Tr. 453-54, 459. However, in the third quarter, Student began to volunteer to read aloud in class. Tr. 459-60, 556-59.

## PRIVATE TUTORING PROVIDED BY STEPHANIE WEHMAN

70. Stephanie Wehman, the Student's tutor from the Learning Edge, could not testify at the hearing.
71. There was no reliable evidence presented at the hearing that the private tutoring was responsible for the student's progress.

## PRIOR WRITTEN NOTICE

72. On April 18, 2001, the Parent directly wrote to the District requesting "Prior Written Notice" regarding the District's decision in regard to her request for tutoring services. SD Ex. 75. This request contradicts the Parent's assertion that the District predetermined its decision prior to the March 20, 2001 IEP meeting. Tr. 1094-95. On the contrary, the District rejected the Parent's one-to-one reading instruction request. Tr. 789.

73. The District provided the Student with prior notice of IEP decision on May 16, 2001. SD Ex. 87, Tr. 952-53.

**Notice of Procedural Safeguards**

74. The Parent received her notice of procedural safeguards from the District on November 4, 1998. Tr. 75-76; SD Ex. 20.

## CONCLUSIONS OF LAW

The IHO has jurisdiction over this matter pursuant to Minn. Stat. § 125A.09. Appropriate weight of evidence was afforded to the testimony of all witnesses. The hearing was not concluded within 45 days. Good cause was shown for the delay and extensions were granted.

Minnesota Rule 3525.4100, subp. 1(C), states that the IHO "shall receive ...a copy of the pupil's current and proposed IEP." Information received under this Rule must be "made a part of the hearing record." Id. subp. 1(D). Additionally, the Rule states that upon receiving a copy of the proposed IEP, the IHO shall review the proposed IEP to determine whether it complies with the law. Id. subp. 2(A).

Under Minnesota Rule 3525.4300, one purpose of a due process hearing is to "develop evidence of specific facts concerning educational needs, current educational performance, or apparent disabilities of the person as it relates to the need for the proposed action."

The appropriateness of the evaluation conducted by the District in the fall of 2000 was not at issue for the hearing, Tr. 1078, because the Parent did not plead the issue. SD Ex. 60. Minn. Stat. § 125A.09, subd. 6, compels all issues for hearing be pleaded with specificity.

The IEP dated January 31, 2001 was a draft IEP intended to serve as a discussion tool for the IEP team.

The District did not "predetermine" the IEP team decision prior to March 20, 2001 meeting.

The District provided the Parent with timely notice of her procedural safeguards.

The District provided Parent with sufficient notice of the May 1, 2001 IEP meeting.

The Student made meaningful progress in reading during the 2000-2001 school year.

Student does not need one-to-one reading instruction in order to receive FAPE.

The District provided Parent with the timely and appropriate written notice of its decision to deny her request for one-to-one reading instruction.

Student does not need a computer to receive FAPE.

Student is not entitled to an assistive technology evaluation.

The District has the burden of showing by a preponderance of the evidence that it has offered Student FAPE and the District has meet that burden.

The District has the discretion to determine the methodology for the Student's instruction.

The District has not committed any procedural errors which compromised Student's right to an education.

Parent is not entitled to reimbursement for any costs associated with the Student's private tutoring.

## MEMORANDUM

### Introduction

The Parent, pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., requested a due process hearing on behalf of her son, Victor Grant , a child with a disability who resides in the Independent School District No. 11, Anoka-Hennepin.

## STATEMENT OF ISSUES

### Procedural Issues

1. Whether the District provided the Parent with a timely notice of her procedural safeguards between March 30, 2000 and March 30, 2001?
2. Whether the District "predetermined" the IEP team's decision on March 20, 2001 meeting?
3. Whether the District provided the Parent with sufficient notice of the IEP meeting held on May 1, 2001?
4. Whether the District provided the Parent with the prior written notice of its decision to deny her request for one-to-one reading instruction?

**Substantive Issues**

1. Whether the Student needs one-to-one reading instruction in order to receive FAPE?
2. Whether the Student needs a computer to receive FAPE?
3. Whether the Student is entitled to an assistive technology evaluation?
4. Whether the January 31, 2001 IEP is a draft IEP?
5. Whether the proposed IEP dated May 10, 2001 offered the Student FAPE in the least restrictive environment ("LRE")?

## DISCUSSION

School districts are required to provide a free appropriate public education ("FAPE") to disabled students who require special education services. 20 U.S.C. § 1412(a)(1)(A).

To determine whether FAPE has been met, the Hearing Officer must determine whether the District complied with the procedure in the above-referenced Act and whether the individualized educational program developed for the Student through the Act is reasonably calculated to enable the child to receive educational benefits. Board of Ed. of the Hendrick Hudson Sch. Dist. v. Rowley, 458 U.S. 176, 206-07 (1982).

It is well-settled that the School District bares the burden of proof as to all facts and all proposals concerning services to Student at the Level I due process hearing. See Id.

**Procedural Requirement**

An IEP would be set aside only if procedural inadequacies compromised the Student's right to an appropriate education, thereby seriously hampering the Parent's opportunity to participate in the formulation process, or caused a deprivation of educational benefits. Independent Sch. Dist. No. 283 v. S.D., 88 F.3d 556, 562 (8th Cir. 1996); Moubry v. Independent Sch. Dist. 696, 9 F. Supp.2d 1086, 1102 (D. Minn. 1998).

A copy of the procedural safeguards must be given to the parents of a child with a disability upon initial referral for evaluation; upon each notification of an IEP meeting; upon reevaluation of the child; and upon receipt of a request for a due process hearing. 34 C.F.R. § 300.504(a).

The failure to provide a parent with notice of the procedural safeguards does not constitute a *per se* denial of FAPE. However, if the lack of notice compromised the Student's right to an appropriate education, seriously hampered

the Parent's opportunity to participate in the formulation process, or caused a deprivation of educational benefits, then there is a violation of FAPE. Independent Sch. Dist. No. 283 v. S.D., 88 F.3d 556, 562 (8th Cir. 1996).

Here, the District provided the Parent with a timely notice of her procedural safeguards between March 30, 2000 and March 30, 2001. By the preponderance of the evidence, the District showed that it made reasonable effort to provide the Parent with the notice of procedural safeguards. Even if the District did not provided the Student with timely notice of procedural his safeguards, the Student was not denied FAPE. The primary issue is whether the Student's "draft" IEP is a the "proposed" IEP. There is no sufficient evidence to lead the IHO to conclude that the Student was denied the notice of procedural safeguard and this denial compromised the Student ability to receive FAPE from the District. Therefore, the Student's argument on this claim fails.

**Predetermination of IEP Decision**

The Parent claims that the District, through Linda Gardner, a special education consultant for the District, "pre-determined the IEP Team's decision regarding the Student's programming." The Parent was referred to Ms Gardner's statement that the District would not pay for private tutoring services for the Student. Tr. 862-63

The evidence shows that Ms. Gardner was offering an opinion during the March 20, 2001 meeting. Tr. 862-63. As a member of the District staff Ms. Gardner is entitled to an opinion. Moreover, overwhelming evidence shows that Ms. Gardner opinion did not influence the IEP team. District staff who attended the meeting uniformly testified that Ms. Gardner did not predetermine any IEP team decisions. Tr. 132-5, 231-2, 367, 490, 778. The staff also uniformly testified that they did not feel compelled by Ms. Gardner's opinion. Furthermore, no decision was reached at the IEP meeting because the Parent could not stay through the duration of the meeting. No predetermined decision was reached. Again, the Parent's argument here is fruitless and therefore must fail.

**Notice of IEP May 1, 2001 IEP Meeting**

The Parent claims that the District failed to provide her with sufficient notice of the IEP meeting held on May 1, 2001.

School District must ensure that the parent of a child with a disability is present at each IEP team meeting, or afforded the opportunity to participate in the IEP meeting. 34 C.F.R. §300.345(a). It is required that the District must be notified of an IEP meeting in enough time to ensure that the Parent would have an

opportunity to attend the meeting. Id. However, an IEP meeting may be conducted without a parent in attendance if the school district is unable to convince the parents that they should attend. 34 C.F.R. § 300.345(d).

Here, the record is replete with the District extensive efforts to secure the Parent's attendance at IEP meetings and the Parent awareness that IEP meetings were eminent. Tr. 137-38, 140, Tr. 784-85, 868, 1390, 1424; SD Ex 62-67, 71, 77, 78. The Parent was not interested in attending the May 1, 2001 IEP meeting. Logically, the District cannot be found liable for the Parent's voluntary absence from the meeting. In fact the evidence at the hearing shows that the Parent was not only afforded the opportunity to participate in her child's educational programing, it shows that some of the delay in the programing can be attributable to the Parent. Again, the Parent's argument here is unavailing and therefore fails.

**Prior Written Notice of Decision**

The Parent alleges that the District failed to provide her with a prior written notice regarding the denial of her request for two hours per week of one-to-one reading instruction for her son.

The District must provide the Parent with prior written notice when the District propose to initiate or change, or refuses to initiate or change, the identification, evaluation, educational placement, or provision of FAPE for the Student. See 34 C.F.R. § 300.503(a).

Here, after many contacts and discussions with the District, it provided the Parent with a May 16, 2001 letter. The May 16, 2001 letter was the District's prior written notice of the IEP team's decision regarding her request for one-to-one tutoring in reading. SD Ex. 87; Tr. 890. The District's letter contains all the required elements of prior written notice. See 34 C.F.R. § 300.503(b). Therefore, the IHO does not find the Parent's argument compelling.

## SUBSTANTIVE FAPE REQUIREMENT

**One-to-One Reading Instruction**

A disabled child is entitled to receive one-to-one instruction only if such instruction is necessary for the child to receive FAPE. See E.S. v. Independent Sch. Dist. No. 196, 135 F.3d 566, 569 (8th Cir. 1998). A school district is not required to provide one-to-one instruction in reading, unless the child needs such instruction to make progress in reading. See Board of Ed. v. Diamond, 808 F.2d 987, 991 (3d Cir. 1986)

Here, the evidence shows that the Student does not need one-to-one reading

instruction because the Student has made significant progress in his AOM reading class during the 2000-2001 school year. Tr. at 147-48, 241.

Based on the record, the IHO concludes that Student made significant progress in reading without one-to-one instruction, and, therefore, the Student does not require one-to-one reading instruction in order to make progress in reading.

**Violate the LRE Requirement.**

IDEA "creates a clear preference for public educational placement when that placement is not inconsistent with the mainstreaming provisions of the Act." Mark A. v. Grant Wood Area Ed Agency, 795 F.2d 52, 54 (8th Cir. 1986)

IDEA provides that "to the maximum extent appropriate," school districts must ensure that children with disabilities are educated with children who are not disabled, and that "special classes, separate schools, or other removal of children with disabilities from the regular education environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5); see also 34 C.F.R. § 300.550; Minn. Stat. § 125A.08(a)(1); Minn. R. 3525.0400.

Additionally, before removing a child from the regular education environment, there must be an indication that the pupil will be better served outside the regular program. Minn. R. 3525.0400; see also Minn. R. 3525.3900(F) & (G). The Eighth Circuit has described the LRE requirement as one of the most important provisions of the Act. See Mark A. v. Grant Wood Area Ed. Agency, 795 F.2d 52, 54 (8th Cir. 1986).

Here, with the exception of the mother, all members of the IEP team through the proposed IEP, oppose a more restrictive environment for the Student. SD Ex. 84; Tr. 391, 828-29. The mother does not offer the IHO reason to believe that the Student must be educated outside the mainstream, especially in light of the the Student's progress by way of AOM instruction. The Student's AOM teacher believes that Student receives benefits from receiving reading instruction in a class with other students, as opposed to one-to-one instruction. Tr. 497. The IHO agrees.

Therefore, the Parent's request for a more restrictive educational environment for the Student is denied. This order does not preclude the Parent from hiring tutors for the Student to enable the Student to reach goals projected by the Parents. However, the IHO will not compel the District to bare the cost of such an endeavor.

**Computer to Receive FAPE**

An "assistive technology device" is any item, piece of equipment, or product system, whether acquired commercially off the shelf, modified, or customized, that is used to increase, maintain, or improve functional capabilities of a child with a disability. 20 U.S.C. § 1401(1); 34 C.F.R. § 300.5. In developing a child's IEP, the IEP team must consider whether the child requires assistive technology devices and services. 34 C.F.R. § 300.346(a)(2)(v).

The District, by way of the IEP team, considered the Student's educational needs. Tr. 150, 392-93; SD Ex. 92. The District, through the IEP team concluded that the Student would be successful with a palm sized, hand held spell checker and a calculator. Tr. 150, 793-94; SD Ex. 84 at 8. This decision was offered as an alternative to a computer which the IEP team determined that it was not necessary for the Student to receive meaningful educational benefit. The District believed that the Student made significant progress during the 2000-2001 school year without a computer. Tr. 150, 263, 393, 498-99, 580.

The Parent's request here fails. The IHO notes that the Parent produced no reliable and credible evidence that the Student needed a computer against the recommendation of the IEP team.

**Assistive Technology ("AT") Evaluation**

On May 18, 2001, the Parent requested an AT evaluation for the Student. SD Ex. 90; Tr. 891. On May 22, 2001, the District denied the Parent's request for an AT evaluation. SD Ex. 92; Tr. 896.

The District obligation to provide assistive technology is limited to assistive technology which provide FAPE. See e.g., Letter to Noan, 22 IDELR 888, 889 (OSEP 1995); Letter to Hutcheson, 30 IDELR 708, 709 (OSEP 1998).

Here, since the Student was making progress without the AT requested by the Parents, the District has no obligation to provide such AT. The District's obligation is limited to the provision of FAPE. Being that the Student is making progress without AT, it is counterintuitive to compel the District to provide such technology. The parties must be reminded that IDEA does not require the District to maximize the Student's progress through complex technology. See id. Therefore the Parent's request here is denied.

**Draft IEP vs. Proposed IEP**

The Parent contends that on January 31, 2001, what the District purports to be a "draft" IEP was actually a "proposed" IEP.

By the preponderance of the evidence the District showed that the document distributed on January 31, 2001 was merely a draft IEP. See, SD Ex. 43, 44; Tr. 101-03, 105, 111, 208-09, 210-12, 214-15, 317-18, 323-24, 547, 855, 826-27, 983-84.

Minn. Stat. § 125A.09, subd. 6 does not require the District to defend a draft IEP. See also, Independent Sch. Dist. No. 432 v. J.H., 8 F. Supp.2d 1166, 1172 (D. Minn. 1998). It would be nonsensical to compel the District to defend an IEP it did not propose.

**May 10, 2001 Proposed IEP**

The Parent maintains that the May 1, 2001 IEP--"proposed" does not provide for one-to-one reading instruction for the Student. Furthermore the Parent argues that the Sonday System Learning to Read ("SSLR") is not an appropriate curriculum for the Student. Tr. 1401-02.

As has already been by ruled, the Student is not entitled to one-to-one instruction in reading and the District is not required to provide such services. Therefore, the proposed IEP need not be modified to include as one of the Student's goals, one-to-one instruction in reading.

The District has the discretion on the methodology of teaching the Student, specially where he is making progress. E.S. v. Independent Sch. Dist. No. 196, 135 F.3d 566 (8th Cir. 1998). See also Rowley, 458 U.S. at 208; Peterson v. Hastings Pub. Schs., 31 F.3d 705, 707-08 (8th Cir. 1994); Moubry v. Independent Sch. Dist. No. 696, 33 IDELR 92 (D. Minn. 2000).

Here, the Student made progress and it is left to the District to determine the method of instruction. Even if the Parent sought to challenge the proposed IEP on grounds other than the two that she raised for the hearing, the District showed that the proposed IEP is specific to Student's needs and calculated to provide the Student with educational benefit. Hence, the IHO is satisfied that the Student will benefit from a calculated proposed IEP that is designed to bring educational benefit for him. Therefore, the Parent cannot dictate the methodology used in instructing the Student.

**Reimbursement for Private Tutoring–The Learning Edge.**

Minnesota requires parents to plead their claims with "specificity." Minn. Stat. § 125A.09, subd. 6. Issues that the parties do not plead with specificity are deemed waived. Id.

Here, the Parent did not plead that she is seeking reimbursement for the Student's private tutoring.

It is well settled that a parent who unilaterally changes her child's placement during the pendency of IDEA review proceedings is entitled to reimbursement if the public placement violated IDEA and that the private placement was proper under the Act. Florence County Sch. Dist. Four v. Carter, 114 S. Ct. 361, 366 (1993); 20 U.S.C. § 1412(a)(10)(C)(i); See also, Klein Independent Sch. Dist., 29 IDELR at 677.

Here, the Parent cannot meet part of the Carter test because, as has already been ruled by the IHO, the District provided the Student FAPE. The Parent still has difficulty with the other test of showing that the private tutoring was appropriate for the Student. The Parent was unable to show that the progress made by the Student was directly the result of the private tutoring and not the District's instruction. The IHO understands the difficulty the Parent feels in this instant where she believes that the private tutoring made the Student make progress in school. Being that the Student's tutor Stephanie Wehman was unable to testify at the hearing and no adequate delineation was made by the Parent that the Student's progress was attributable to the tutor, the IHO denies the Parent's request.

**ORDER**

1. The Parent's request for one-to-one reading instruction is DENIED.
2. The Parent's request for a computer is DENIED.
3. The Parent's request for assistive technology evaluation is DENIED.

**ACCORDINGLY,** the Parent's requests are denied in its **ENTIRETY.**

September 17, 2001

Kenneth U. Udoibok
Independent Hearing Officer