# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Daniel Zigich, a minor by and through Daren Zigich and Lori Zigich, his parents and next friends,

Plaintiffs,

v.

Civil No. 99-1212 (DWF/SRN)

Independent School District No. 623, Roseville, Minnesota; Roseville Board of Education; and Dr. Jon Thein, Superintendent, in his representative capacity,

Defendants.

**MEMORANDUM OPINION AND ORDER**

---

Independent School District No. 623, Roseville,

Plaintiff,

v.

Civil No. 99-1215 (DWF/SRN)

Daniel Zigich, a minor by and through his parents and legal guardians, Daren and Lori Zigich,

Defendant.

---

Sonja D. Kerr, Esq., Kerr Law Office, 5972 Cahill Avenue, Suite 110, Inver Grove Heights, MN 55076, appeared for Plaintiff.

Paul C. Ratwik, Esq., and Michael J. Waldspurger, Esq., Ratwik, Roszak & Maloney, 300 Peavey Building, 730 Second Avenue South, Minneapolis, MN 55402, appeared for Defendants.

---

FILED JUL 13 2000
FRANCIS E. DOSAL CLERK
JUDGMENT ENTD JUL 13 2000
DEPUTY CLERK

EXHIBIT 5

## Introduction

The above-entitled matter is before the undersigned United States District Judge pursuant to cross motions for summary judgment. This action is an appeal of an administrative hearing review regarding the educational program of Daniel Zigich provided under the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq*. For the reasons set forth below, Plaintiff's motion is denied and Defendants' motion is granted.[1]

## Background

Plaintiff Daniel Zigich ("Danny") is nine years old. Danny has been diagnosed with a severe speech/language disorder and autism. He attends Central Park Elementary School in the Roseville School District ("the District") and lives with his parents, Lori and Daren Zigich ("Zigichs"). This dispute involves the District's obligation under IDEA to provide Danny with a free, appropriate public education ("FAPE").

Danny and his parents moved to Minnesota from Santa Fe, New Mexico, in March of 1997. Danny was enrolled in the District on April 7, 1997. At that time, pursuant to an agreement of the parties, Danny was placed in a kindergarten class even though he had been in a first grade class in New Mexico.

Because Danny's parents had been unhappy with Danny's individual education plan ("IEP") in New Mexico and because the District wanted an opportunity to evaluate Danny informally, the parties agreed not to implement the New Mexico IEP. The Zigichs and District staff met repeatedly during May and June of 1997, but were unable to agree upon an IEP for

---

[1] All references to "Plaintiffs" and "Defendants" reflect the status of the litigants in Civil File Number 99-1212. Thus the Plaintiffs are the Zigichs and the Defendants are the representatives of the School District.

Danny. In June of 1997, the parties agreed to have Danny's skills and needs formally assessed. In addition, the June, 1997, agreement provided for a "permissive" summer school program for Danny. Specifically, Danny was enrolled in a four-week Summer Discovery program, sponsored by the District, which met for 3 hours per day, 4 days per week. Danny was assigned an aide for that program.

The parties agreed to an interim IEP on August 28, 1997, and a formal assessment of Danny commenced in the fall of 1997. Among those involved in the formal assessment was a Communication Consultant who concluded that Danny's communication skills could be supplemented by the use of graphic symbols and that Danny might benefit greatly from a dynamic display assistive technology device. Specifically, the Communication Consultant recommended a trial period with the "DynaVox" dynamic display software.

The development of Danny's IEP during the 1997-1998 school year was a rocky road. The Zigichs and District staff met on numerous occasions, and the Zigichs drafted several letters detailing their objections to the proposed IEP's. The Zigichs and the District finally agreed on an IEP on February 27, 1998 ("the 1998 IEP"). The 1998 IEP provided for 60 minutes of direct and 60 minutes of indirect speech and language services per week; 1520 minutes (25 1/3 hours) of direct and 60 minutes of indirect special education services; 60 minutes of direct and 15 minutes of indirect occupational therapy services; 20 minutes of indirect developmental/adaptive physical education; and 30 minutes of indirect services by an integration specialist. The 1998 IEP further provided for extended school year ("ESY") services. The 1998 ESY services involved the services of an aide 3 hours per day, 4 days per week, for 4 weeks in the District's Summer Discovery program (in which Danny was enrolled during the summer of 1997). The summer 1998 program differed from the summer 1997 program in that specific goals and objectives from

Danny's IEP were selected to be worked on and there was more consultation between the aide and the Autism Specialist and Special Education Teacher.

Throughout July and August of 1998, the Zigichs voiced their concerns over Danny's situation. First, the Zigichs were unhappy with the ESY services Danny had received; they felt that Danny received no benefit from those services. Second, the Zigichs formally requested that the District consider implementing the Communication Consultant's recommendation by conducting a trial with Danny and a DynaVox-based augmentative communication device. Finally, the Zigichs continued to urge the District to add extended school day ("ESD") services to Danny's IEP.

Unable to reach an agreement with the District regarding the use of an augmentative communication device,[2] the Zigichs arranged to have Danny evaluated privately through the Courage Center in September of 1998. The Courage Center evaluation concluded that Danny's communication skills were not adequate to meet his communication needs. The evaluation further noted that Danny appeared, during the evaluation, to have the functional abilities necessary to use the DynaMyte mobile dynamic display device.[3] The Courage Center evaluation concluded that Danny should be given a DynaMyte on a trial basis to assess his motivation and functional abilities. The Zigichs rented a DynaMyte and obtained training from a private speech

---

[2] The District had begun using a graphic symbol system with Danny and had seen some improvement. Moreover, after the Zigichs requested a due process hearing, the District agreed to a trial period with the DynaVox software.

[3] DynaVox is an augmentative communication software package which can be run on a stationary computer system. The DynaMyte is a portable, self-contained device which uses the DynaVox software.

clinician at Courage Center. In a follow-up evaluation in December of 1998 and January of 1999, the Courage Center clinician recommended purchase of a DynaMyte for Danny.

A hearing before an Independent Hearing Officer ("IHO") was held in February of 1999. At that hearing, the District offered a draft IEP dated December 23, 1998. That draft, which had not been formally presented to the Zigichs, provided for 90 minutes of direct and 20 minutes of indirect adaptive physical education in a general education setting per week; 120 minutes of direct and 120 minutes of indirect speech and language services on a daily basis; 60 minutes of direct and 15 minutes of indirect occupational therapy on a bi-weekly basis; 1530 minutes (25 ½ hours) of direct and 120 minutes of indirect autism/general education/special education support; and 30 minutes of direct and 20 minutes of indirect autism/resource support on a weekly basis. ESY services similar to 1998 were also offered. Finally, the District indicated that they had obtained the DynaVox software and were in the process of installing it on a computer in Danny's classroom; the District indicated that the software would be "on trial" until the end of the 1998-1999 school year.

With respect to ESY services, the District argued that Danny did not really need ESY services, that he did not demonstrate significant regression over breaks from school and that what few skills he lost were recouped within a few days of returning to school. Nevertheless, the District pointed out that it had provided Danny with ESY services and would continue to provide Danny with ESY services as a compromise with parents. Nevertheless, the IHO concluded that the District had failed to consider other criteria for ESY service eligibility[4] and had failed to

[4] According to the IHO, such additional criteria include: degrees of impairment, the parents' ability to provide educational structure at home, the pupil's rate or progress, behavioral and physical problems, availability of alternative resources, pupil's ability to interact (continued...)

provide an appropriately individualized ESY program. The IHO ordered the District to provide Danny with ESY services in the summer of 1999 and ordered the parties to confer regarding which specific educational goals would be pursued in the ESY program.

With respect to ESD services, the IHO concluded that ESD services were not necessary to provide Danny with an appropriate education. Indeed, the IHO found that all credible testimony indicated Danny was "maxed out" at the end of the regular school day and was thus unlikely to benefit at all from ESD services. Thus the IHO concluded that there was no basis for ordering ESD services for Danny.

With respect to the DynaVox/DynaMyte systems, the IHO found that the Zigichs did not request either of these systems until August of 1998, several months after acceptance and implementation of the most recent IEP (the 1998 IEP). At the time of the IHO hearing, the District had obtained DynaVox software and had agreed to test Danny on that software. However, the IHO found that the Zigichs had not given the District any notice of their intent to test Danny on the DynaMyte and that the Zigichs had failed to test Danny's motivation and ability to use the DynaMyte in an educational environment. Until context-specific testing had been done, the IHO concluded it was premature to require the District to provide Danny with a DynaMyte. Moreover, the IHO concluded that the District was not required to consider the use of the dynamic assistive technology devices when Danny was making progress with less sophisticated assistive technology devices; accordingly, the IHO found that the District had not violated Danny's right to procedural FAPE.

---

[4](...continued)
with students without disabilities, curriculum areas that need continued attention, and pupil's transitional needs. The District disputes the applicability of these additional criteria.

The Zigichs appealed the IHO decision, and a Hearing Review Officer ("HRO") was appointed on May 7, 1999. The Zigichs requested a stay put determination from the HRO; the HRO concluded that the last agreed-upon IEP was the 1998 IEP, and that the 1998 IEP was the appropriate stay put placement. The HRO issued her decision on July 7, 1999.

With respect to ESY, the HRO noted the IHO's conclusion that the District had failed to follow the procedures required by IDEA, thereby denying Danny "procedural FAPE." During the HRO review process, the District proposed a summer program for summer of 1999. Specifically, the 1999 ESY program provided functional skills training at Brimhall Elementary School, for 4 hours per day, 4 days per week, for 6 weeks. The 1999 proposal involved 80 hours of direct service from a special education teacher and trained teaching assistants; 12 hours of direct speech/language services provided by a speech/language clinician; and door-to-door transportation for Danny. The parents objected to the 1999 proposal. The HRO concluded, however, that the 1999 proposal was appropriate given Danny's particular needs. While the HRO noted the need to evaluate Danny's progress and regression over the 1999 summer program to determine whether Danny required entirely uninterrupted summer services, the HRO found the 1999 proposal to be appropriate given the information the District had at that time.

With respect to ESD services, the HRO found that the District's failure to consider such services constituted a procedural violation of IDEA. Moreover, the HRO found that Danny's IEP was defective in that it failed to adequately address the acquisition of play skills. However, the HRO noted that the acquisition of play skills should not be limited to ESD services and concluded that the denial of ESD services was not a substantive violation of FAPE.

Finally, with respect to the assistive technology devices, the HRO determined that the District did err in failing to test a dynamic system in a timely manner (the District did not begin a

trial with DynaVox until February of 1999). Moreover, the HRO determined that, where the District was derelict in providing evaluative services, the parents were entitled to reimbursement for evaluation services even without notice to the school.[5] Thus, the HRO concluded that the District was required to reimburse the Zigichs for the evaluations of Danny conducted by the Courage Center. Further, the HRO concluded that the District would be responsible for at least partial payment for the DynaMyte if and when it becomes apparent that Danny will derive some educational benefit from the DynaMyte.

Ultimately, then, the HRO affirmed the decision of the IHO except in determining: (1) that the District was required to provide Danny with ESY services for the summer of 1999 and to evaluate whether such services were sufficient; (2) that the IEP team was required to modify Danny's IEP to include goals and objectives related to the acquisition of play skills; (3) that the District was required to reimburse the Zigichs and/or their insurer for the Courage Center evaluations in September of 1998, December of 1998, and January of 1999; and (4) that the District would be required to reimburse the Zigichs and/or their insurer for a proportionate share[6] of the cost of the DynaMyte if it was determined that Danny would benefit educationally from the DynaMyte.

---

[5] Although the Zigichs were reimbursed by their insurance carrier, they suffered financial loss because, they argued, the reimbursement reduced the total lifetime benefits available to Danny under the insurance policy.

[6] The proportion of the District's responsibility would be determined by the amount of use of the DynaMyte for education relative to other uses.

## Discussion

### 1. Standard of Review

The matters before the Court have been previously adjudicated through two tiers of review by the State of Minnesota Department of Children, Families, and Learning. The parties dispute the standard of review which this Court should apply to the determinations of the Independent Hearing Officer ("IHO") and the Hearing Review Officer ("HRO").

While this Court has an obligation to conduct an independent review of the record, it also has an obligation to give "due weight" to the underlying administrative proceedings. *Hendrick Hudson Dist. Bd. of Ed. v. Rowley*, 458 U.S. 176, 206 (1982); *Petersen v. Hastings Public Schools*, 31 F.3d 705, 707 (8th Cir. 1994) (a district court's review of an administrative hearing officer "is, in reality, quite narrow"); *Ind. School. Dist. No. 283 v. S.D.*, 948 F. Supp. 860, 869 (D. Minn. 1995), *aff'd* 88 F.3d 556 (8th Cir. 1996). Deference to credibility determinations of the IHO is particularly appropriate, given the IHO's unique opportunity to observe the demeanor of witnesses. On matters of substantive educational policy, the Court should give deference to the determinations of the HRO which is in a particular position to advocate notions of sound educational policy. *Id.* In showing such deference, the Court does not abdicate its responsibility to conduct an independent review of the factual and legal issues; rather, the Court merely recognizes the particular insight which the IHO and the HRO may bring to the matter at hand. As the Supreme Court has stated:

> The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at naught. The fact that § 1415(e) [of IDEA] requires that the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement that due weight shall be given to these proceedings.

*Rowley*, 458 U.S. at 206.

As a result, the Court has conducted an independent review of the record, giving some additional weight to those pieces of evidence which the IHO and HRO found most credible–so long as those credibility determinations seemed well-reasoned and grounded.

Ultimately, the Court's review of an IEP involves a two-step inquiry. First, the Court must determine whether the State has adequately complied with the procedures set forth in the Act. Second, the Court must determine whether the resulting individualized educational program is reasonably designed to enable the child to secure educational benefits. *Id.* at 206-207; *Peterson v. Hastings Public Schools*, 31 F.3d 705 (8th Cir. 1994). With respect to this second line of inquiry, the Court must be careful not to substitute its own "notions of sound educational policy for those of the school authorities." *Rowley*, 458 U.S. at 206.

**2. The District's Obligations Under IDEA**

It is uncontested that Danny is a disabled child within the meaning of Minn. Stat. § 125A.02 and IDEA. Under IDEA, the District is thus required to provide Danny with a "free appropriate public education," or "FAPE." 20 U.S.C. § 1412(a)(1)(A). A FAPE is defined as:

> special education and related services that–
> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education program required under section 1414(d) [of Title 20].

20 U.S.C. § 1401(8). The FAPE is crafted to meet the needs of each specific disabled child through the development of an Individual Educational Plan ("IEP"). The educational plan thus developed must be reasonably calculated to provide something more than trivial education

benefit to the child; however, the IEP need not be designed to maximize a student's education potential or to provide the best possible education for the child. *Board of Education v. Rowley*, 458 U.S. 176 (1982).

A. **Assistive Technology Services**

In the Fall of 1997, Danny underwent a formal assessment of his abilities. One of Danny's evaluators, a communication consultant, concluded: "Based on the matching assessment, I believe that it should be possible to utilize graphic symbols to supplement [Danny's] spoken language. I also believe [Danny] will have little difficulty with graphic symbols regardless of whether they are line drawings or photographs." The communication consultant further suggested that Danny might also benefit from the DynaVox software.

Danny's IEP team incorporated this assessment into Danny's IEP through use of the "BoardMaker" program. The record indicates that the BoardMaker program is a "low tech" communication system which uses pictures and graphic symbols; it is not a computer or software. Both the IHO and the HRO found, and the record supports the conclusion, that Danny made progress with his speech and language goals using this low tech program. Despite this progress, the Zigichs requested that Danny be evaluated on the DynaVox software or the DynaMyte device, undoubtedly hoping that such high-tech devices would yield still more progress for Danny. When the District did not oblige this request, the Zigichs obtained private evaluation and testing of Danny and purchased a DynaMyte themselves.

As the District points out, IDEA requires that the District provide Danny with a free, appropriate public education. That free, appropriate public education must provide Danny with non-trivial educational benefit. However, the District is not required to maximize Danny's educational benefit by providing him with the best possible services.

Here, the District properly evaluated Danny's communication needs and followed the Fall 1997 recommendation of the communication consultant that Danny's spoken language skills be enhanced through the use of a graphic display device. The District's obligation to provide assistive technology is limited to assistive technology which is necessary to provide FAPE. *See, e.g., Letter to Noan*, 22 IDELR 888, 889 (OSEP 1995); *Letter to Hutcheson*, 30 IDELR 708, 709 (OSEP 1998). Given that Danny was enjoying educational benefit from the low-tech BoardMaker program, the District had no obligation under IDEA to provide Danny with the DynaMyte or DynaVox systems, even if such systems would have enhanced the educational benefit Danny obtained.

Moreover, while there is no question that IDEA requires school districts to evaluate a student's need for assistive technology, that requirement, too, is only applicable where the child's particular circumstances indicate that such technology might be necessary to acquire FAPE. *See, e.g., Letter to Goodman*, 16 EHLR 1317 (OSEP 1990) (schools may not presumptively deny assistive technology, but must make determination on a case-by-case basis). Here, Danny was making progress and the District was providing Danny with a free, appropriate public education without using high-tech communications devices. Under these circumstances, the District had no obligation to provide Danny with assistive technology beyond that which they had already provided. It would make little sense to suggest that the District had an obligation to evaluate technology which they were then free to reject–regardless of the outcome of the evaluation. Given that Danny was provided with FAPE without the DynaVox or DynaMyte, the District had no obligation to evaluate Danny's "need" for these devices, and the District has no legal obligation to reimburse the Zigichs for the private evaluation they obtained.

The Court is deeply sympathetic with the desire of the Zigichs to obtain the best possible assistance for their son. The pain and frustration Danny must experience over his limited ability to communicate can be matched only by his parents' pain and frustration over their inability to help him. In an ideal world, there would be no barriers to obtaining the help that Danny needs; school districts would have the funds necessary to provide every child with all the tools and resources to allow them to live up to the highest level of their potential. However, the reality is that school districts are financially burdened, and the law recognizes their limited resources when it requires school districts to provide only "educational benefit," not "maximum educational benefit." Here, Danny receives educational benefit from the BoardMaker system. Accordingly, with respect to the issues of assistive technology, this Court concurs with the findings and conclusions of the Independent Hearing Officer and the IHO's decision is reinstated.

**B. Extended School Day Services**

The Zigichs have requested extended school day services ("ESD services") for Danny so that Danny might have an opportunity to develop play skills. The IHO found that the District's obligation to provide FAPE was met without ESD services. The HRO found that the FAPE requirements obliged the District to develop some means of teaching Danny play skills, though those skills need not be taught in the context of ESD services.

At the outset, the Zigichs argue that the District's position constitutes a denial of procedural FAPE. The Court disagrees. The record indicates, and the IHO found, that Danny's IEP team did consider ESD services and engaged in lengthy debate with the Zigichs over those services. The Zigichs have not identified any specific procedural defect in the manner in which the District considered ESD services.

Even if the Court were to conclude that the District did commit some procedural error, such error would not provide a basis for the Zigichs to prevail. As the HRO noted, "procedural violations that are de minimus or did not impact the Student's substantive FAPE or impair parents [sic] ability to participate in student's education will not result in the award of compensatory education services." HRO Conclusion 9. Both the IHO and the HRO found that denial of ESD services did not, in and of itself, constitute a substantive denial of FAPE. As the IHO made clear, the record indicates that Danny is generally tired at the end of the regular school day; there is no evidence to suggest that Danny would benefit from spending longer hours in instruction. The HRO adopted this finding of the IHO, and, as there is no evidence in the record to contradict it, this Court does as well.

The HRO did conclude that the more general failure of the District to address play skills in Danny's IEP constituted a denial of substantive FAPE.[7] This Court disagrees. The HRO found that play skills were an important component of Danny's education because they would assist him in developing language. However, as noted above, the HRO found that Danny's IEP did provide him with educational benefit in the area of communication and language. While play skill development might improve Danny's communication skills still further, the District met its FAPE obligations without providing such skills.

Indeed, while play skills training might enhance Danny's communication skills, the record suggests that there are serious potential drawbacks to such training under these circumstances. Providing play skill training in the context of an ESD program might wear

[7] In other words, the HRO determined that the Zigichs and the District should focus on the goal of providing Danny with play skills rather than on the ESD context in which the Zigichs requested that those skills be developed.

Danny out. Replacing existing components of Danny's curriculum with play skills might compromise other educational goals. The Court is not inclined to substitute its judgment for that of the District with respect to weighing the costs and benefits of adding play skill training to Danny's curriculum. So long as Danny is obtaining educational benefit in the area of communication from his existing IEP, which both the IHO and HRO agree he is, then the District is meeting its obligation to provide FAPE, and this Court will not interfere.

While the Court would not suggest that the District cease considering a way of working play skills into Danny's curriculum–it is undisputed that Danny would benefit from enhanced communication skills–there is nothing in the record to indicate that Danny is deprived of FAPE in the absence of play skill training or that ESD services are necessary to Danny's educational benefit. In short, the Court concludes that the IHO was correct in holding that the District did not violate IDEA in denying the Zigichs' request for ESD services.

**C. Extended School Year Services**

This last issue presents a particular problem for the Court. The Zigichs argue that the District deprived Danny of FAPE by not providing him with extended school year (ESY) services in 1997 and 1998.[8] The District argues that Danny was not eligible for such services. The debate seems academic in light of the fact that Danny did receive summer school services, which did–by all accounts–provide Danny with educational benefit. To the extent that the Zigichs argue those 1997 and 1998 services were insufficient to provide Danny with substantive FAPE, the record does not support that assertion; as the IHO noted in her decision, Danny's teachers all remarked on his easy transition back into regular classes following the 1997 and

---

[8] Summer 1999 services are discussed below.

1998 summer breaks. To the extent that the IHO concluded the District denied Danny procedural FAPE (because of the timing of consideration of ESY services and the permissive nature of those services during 1997), those procedural violations do not give rise to a claim for compensatory education because there is no showing that the procedural violations affected Danny's substantive FAPE: Danny *did* receive ESY services and obtain educational benefit from them. Thus the Court finds that Danny was not denied FAPE for the summers of 1997 and 1998.

The Zigichs also contest the services provided by the District in the summer of 1999. The most recent adopted IEP is the 1998 IEP, which provided for ESY services. Specifically, as noted above, the 1998 ESY services involved the services of an aide 3 hours per day, 4 days per week, for 4 weeks in the District's Summer Discovery program (in which Danny was enrolled during the summer of 1997). The summer 1998 program differed from the summer 1997 program in that specific goals and objectives from Danny's IEP were selected to be worked on and there was more consultation between the aide and the Autism Specialist and Special Education Teacher.

When the HRO reviewed the IHO's decision, the HRO was in possession of a proposed IEP for 1999 which included 1999 ESY services. The 1999 ESY program provided functional skills training at Brimhall Elementary School, for 4 hours per day, 4 days per week, for 6 weeks. The 1999 proposal involved 80 hours of direct service from a special education teacher and trained teaching assistants; 12 hours of direct speech/language services provided by a speech/language clinician; and door-to-door transportation for Danny. Even though the IEP had not been approved–indeed, the parents objected to it–the HRO determined that it was a more appropriate summer educational plan for Danny and ordered its implementation. The District

contracted with a private speech and language clinic for provision of the speech/language services and otherwise complied with the 1999 proposal.

The Zigichs continue to object to the 1999 ESY services as being inadequate. Moreover, they learned that the speech/language clinician provided by the private clinic was not appropriately licensed in Minnesota. The Zigichs contend that the lack of a licensed speech/language clinician further compromised Danny's substantive FAPE.

First, the Court reiterates its agreement with the IHO that the ESY services provided for in the 1998 IEP and effectively provided in the summer of 1997 constitute substantive FAPE. Accordingly, the provision of additional services in 1999 must similarly satisfy IDEA.

Second, the Court notes that, while the mix-up regarding licencing of the clinician is both unfortunate and embarrassing, there is nothing in the record to suggest that the District intentionally denied Danny the services ordered by the HRO or that the clinician's lack of a license had any real impact on the quality of services Danny was provided. Moreover, the private clinic responsible for the mistake reimbursed the District for its expenses and the District offered Danny an additional 12 hours of direct services with a *licensed* clinician. Ultimately, there is nothing in the record to suggest that Danny suffered any loss of educational benefit as a result of this unfortunate incident.

While the Court agrees with the IHO that a FAPE for Danny must involve ESY services, the ESY services outlined in the 1998 IEP are sufficient to that end and there is no evidence in the record to suggest that Danny has received any fewer services during the 1997, 1998, or 1999 summers. Accordingly, the Court finds that the decision of the IHO with respect to ESY services should stand and grants summary judgment to the District on that issue.

### 3. Conclusion

The Court is compelled to note its sympathy for the Zigichs' position. As discussed above, the Court understands the Zigichs' frustration with Danny's condition and their desire to provide him with the best possible education. It is indeed unfortunate that school districts cannot afford to provide services and equipment which would allow every student, from the most gifted to the most disadvantaged, to achieve their highest potential. The reality, though, is that school districts must stretch limited funds to meet just the basic needs of their students.

The Roseville School District here has met its legal obligations to Danny. They have provided him with a free, appropriate public education--even if, in doing so, they have engaged in incremental decision-making and some degree of trial and error. Could the District do more? Perhaps. But the courts are not in a position to step in and micromanage schools, to dictate that the needs of this child outweigh the needs of the other children in the District.

The Court hopes that the Zigichs and the District will continue to work together amicably to provide Danny with the best education his parents, his teachers, and the District administrators can provide. While the District has done for Danny what the law requires, the Court recognizes that decency and compassion may require even more. The Court commends the Zigichs for fighting for Danny and hopes that they will continue to do so--and that circumstances will allow the District to meet the Zigichs at least halfway.

For the reasons stated, **IT IS HEREBY ORDERED:**

1. Plaintiff Daniel Zigich's Motion for Summary Judgment (Civil File No. 99-1212, Doc. Nos. 17 and 28 ) is **DENIED**;

2. Defendants Independent School District No. 623, Roseville Board of Education, and Dr. Jon Thein's Motion for Summary Judgment (Civil File No. 99-1212, Doc. No. 22) is **GRANTED**; and

3. The **COMPLAINTS** are **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: July 15th, 2000

DONOVAN W. FRANK
Judge of United States District Court