**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

---

VICTOR GRANT[1],
by his parent, Kelley Sunderlin

Plaintiff,

v.

**RECORD**[2]
STATE OF MINNESOTA, et al

Defendants.

Civil No. 02-795 ADM/AJB

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT ON THE ADMINISTRATIVE**

---

## INTRODUCTION

Plaintiff Grant is a student with a disabilities and a named representative plaintiff in this lawsuit. Class status was denied. Doc. Entry No. 51. *Reinholdson v. State of Minnesota and ISD 11*, 37 IDELR 213 (D. MN 2002). The Court severed the individual claims and limited the case to certain individual claims restricted solely to the Plaintiffs' claims against Defendant ISD 11. The Eighth Circuit reversed the District Court concerning its Rule 42 order. Doc. Entry No. 69. *Reinholdson v. State of Minnesota and ISD 11*, 37 IDELR 213, (D. MN 2002), vacated and remanded, 346 F. 3d 847 (8th Cir. 2003). After the Eighth Circuit's order, the District Court denied any discovery in the case. Doc. No. 84. Thereafter, on November 16, 2004, ordered that the parties could file dispositive motions on the individual claim of Plaintiff Grant. Doc. Entry

---

[1] Counsel is obligated to utilize the title of the case imposed by the Court but notes that no such case actually exists. Plaintiff Grant's claims are included in *Reinholdson v. State of Minnesota*, the civil file number of which is 02-795 (ADM/AJB).

[2] Plaintiffs were prevented from conducting any discovery in this case by various

No. 122, Order of Magistrate Boylan, (Nov. 16, 2004). Plaintiffs preserve all claims and argument concerning the status of the case as a whole and the District Court's continuing severance of this matter. This Memorandum is filed accordingly.

**THE ADMINISTRATIVE RECORD**

The facts and circumstances described herein relate to Plaintiff Victor's education with Defendant ISD 11 as a result of an administrative hearing, MDCFL Case No. 429. The administrative record of MDCFL Case No. 429 was filed with the Court by the Minnesota Department of Education with a Certified Inventory on July 5, 2002. Doc. Entry No. 42. The record is held at the Clerk's office. Doc. Entry No. 66, 67. Within the administrative record, the Court is referred to the HRO Decision, dated October 31, 2001. (HRO Decision). The facts underlying this situation are amply identified within the Student's posthearing proposed findings of fact and are summarized herein. References are made to the administrative transcript and to exhibits contained within the administrative record.

**ESSENTIAL FACTS IN THE RECORD**

At the time of the dispute, Plaintiff Victor was a 13 year old student scheduled to attend seventh grade in the fall of 2001-2002. He had repeated second grade and thus, was, at the time of the hearing, chronologically an eighth grader. (P. Ex. R.)

There is no dispute between the parties that Victor has an average to above average IQ. (D. Ex. 33). On November 28, 2000, Victor demonstrated a full scale IQ of 105 with a verbal IQ of 97 and a performance IQ of 113. (D. Ex. 33)

Despite Victor's average intelligence, Victor has significant trouble with reading. The

---

orders of the Court.

ISD 11's testing of Victor's reading skills included the following information from a test called the "Star Test" which was learned during the hearing (but was not necessarily discussed at all IEP meetings.) Victor was given the Star Test primarily to measure his reading comprehension. The Star Test results for Victor ranged from a grade equivalent of grade 3 from September to March of the 2000-2001 school year. (P. Ex. II). The scores were reported to have then increased to grade level 4.8, and grade 5.5. by the close of May, 2001. (P. Ex. II). These scores were concerning to Ms. Sunderlin because they fluctuate from low to high, low to high and demonstrate a significant reading problem for a student scheduled for seventh grade, who had repeated second grade. The Star Report results confirm that, at best, Victor's reading skills are scattered. (T. 1169-1170, P. Ex. II) Ms. Sonday testified that the scores did not show any upward trend. (T. 1554-1555) Another measure of Victor's reading level that the ISD 11 proposed is from the Woodcock Johnson Test of Achievement. On that testing, Victor scored a 4.9 in Broad Reading. (D. Ex. 36, pg. 5) The ISD 11 did not test word attack. (D. Ex. 36, pg. 5)

The testimony of witnesses for the parents at the hearing is summarized below.

**Jennifer Brown** is a teacher and the owner of The Learning Edge. Her testimony is found at T. 1105 and ff. The Learning Edge is a tutoring service that has been in existence for four years. (T. 1112; P. Ex. AA, P. Ex. 1108) She testified at the due process hearing as to the services that The Learning Edge provided Victor Grant and the educational services that she believes Victor needs. (T. 1104-1285**)** Brown has a degree in elementary education K-6 and is also trained specifically in reading and English language arts. (T. 1106) Brown has been a teacher for six years and has worked as a teacher in the public schools of Minnesota and elsewhere. (T. 1106-1107) She is familiar with IEPs and has attended IEP meetings. (T. 1112)

Ms. Brown tested Victor because the parent expressed a need to find out grade level, age level, what deficiencies he had in reading and what he needed work in. (T. 1112) She conducted a battery of tests to find out a broad reading range, specifics within that and then more specifics to figure out exact areas to focus on. (T. 1113) According to testing conducted by Ms. Brown on March 4, 2001, during Victor's exposure to sixth grade, and during what would be his seventh grade year chronologically, and at age 13, Victor's reading skills on the Woodcock Johnson Reading Mastery by grade level and age were at a total reading level of Grade 4.1 or age 9.4:

| | |
|---|---|
| Word identification | 2.8/8.10 |
| Word attack | 5.2/10.4 |
| Word comprehension | 4.7/10.2 |
| Passage comprehension | 4.2/9.7 |
| **Total Reading:** | **4.1/9.4** |

(P. Ex. GG) **In other words, even though he was in sixth grade, Plaintiff Victor was reading at best, at the beginning fourth grade level.** Victor's easy reading level was grade 3 and his failure reading level was grade 5.1. (T. 1119) Victor needs to be taught syllabication concepts so he can break down words to find out how they are said. (T. 1122) Ms. Brown recommended that Plaintiff Victor receive direct reading instruction.

While the hearing was pending, the parents obtained private services from Ms. Brown for Plaintiff Victor. The cost of those services is referenced at P. Ex. BB. (T. 1151-1152) The hourly rate is $48.00 per hour. (T. 1152) All the bills have been paid. (T. 1152) Ms. Brown repeatedly testified that Victor has a severe reading problem and requires one-to-one instruction to receive educational benefit. She stated that Victor had a "definite deficiency in his reading

skills." (T. 1114) She characterized Victor's reading as a whole as "severely deficient." (T. 1129) According to Ms. Brown, "..the problem with Victor's reading in my opinion is that he is missing key parts that will help him be a reader at a higher level, meaning that he doesn't have the skills to decode words sixth grade and beyond; maybe even fifth grade....he doesn't possess the knowledge of these sounds that will help him sound out these words. " (T. 1130) He is not proficient in reading and he is "severe" in his difficulties. (T. 1139) As a past teacher, she explained that Victor's situation would "raise enough red flags" that school staff should go deeper into the problem and find out was is causing the problem. Victor has been retained and he is two years behind grade level even though he has been retained; this tells her that there is definitely something not processing there. (T. 1134) Ms. Brown believes one-on-one at this point is necessary because of Victor's severity. (T. 1166, 1168-1169) One reason is efficiency to target specific reading problems. Another reason is to protect Victor's self-esteem; he is self-conscious about his reading. (T. 1166-1167) Ms. Brown testified that Victor will need to have one-on-one instruction to have meaningful benefit from his school program. (T. 1171) He needs at least three hours a week, or 25 minutes-30 minutes a day five days a week. (T. 1171)

**Victor Grant**, age 13, and the student in question testified about his educational experience. Victor felt uncomfortable at school reading out loud because if he "messed up" on a word, people would stare at him and then he would get all frustrated. (T. 1660) He felt his work with Stephanie from The Learning Edge was a good experience and would like it to continue. (T. 1663) He identified the work samples from his tutoring with Stephanie. (P. Ex. DD) Victor testified that someone worked with him at school on a one-to-one basis during the school year for about a two week period. He could not recall the teacher's name. (T. 1665-1666) He felt he

had improved most in reading because Stephanie helped him with it. (T. 1667) Victor believed that he did better when he was working one to one and that his schoolwork was easier then. (T. 1669) He felt that he learned more with Stephanie than in class. (T. 1670-1671) He explained that "Mrs. Nordin tries telling us stuff that I already know, because [of] Stephanie." (T. 1671) Mrs. Nordin made Victor say some of the vowel sounds. He had been working with cards with Stephanie and Ms. Nordin would tell him he was then getting ahead of the class. (T. 1673) Victor did not like his grades before he started working with Stephanie. (T. 1671) Mrs. Nordin gave him progress reports to bring home like every four weeks. (T. 1672) Victor did not know what he was graded on when he received "A's." (T. 1673) (T. 1657-1675)

Evidence at the hearing proved that Victor received modified grades in his regular education classes although no IEP team ever discussed the use of modified grades for Victor. (P. Ex. M, U)

**Scott Sunderlin**, Victor's stepfather, testified. (T. 977 and ff) Mr. Sunderlin attended the January 31, 2001 meeting. (P. Ex. L. ) He remembered a discussion at the meeting about whether Victor was going to get reading services. (T. 978) Staff told the parents that Victor did not qualify for reading services. (T. 979) At the end of the meeting Michele Rydberg wrote it on there at the top at the very end of the meetng. (T. 980) Mr. Sunderlin specifically asked Ms. Rydberg what "draft" meat. Ms. Rydberg said this was a draft copy and Mr. Sunderlin asked why. Ms. Rydberg said because there was handwriting on it. Rydberg said that the document needed to be typed and then it would be final copy. (T. 980) The parents then asked for the page to deny the IEP. (T. 980) They wanted to sign right there that they didn't agree. (T. 980) He was of the impression that the only thing that "Draft" meant was that they were going to type in the

other stuff. They were not going to add anything else to it. (T. 980) Mr. Sunderlin tried to clarify if this was the proposal; he asked Ms. Rydberg whether except for the typing changes there was nothing else to be added or taken off and in response to that question, Ms. Rydberg said yes. (T. 981, 984) It was the parents' belief at the end of the January 2001 meeting that Victor was absolutely not getting anything; Mr. Sunderlin was concerned about that because Victor has trouble reading. (T. 1000) At the end of the meeting, the parents had decided they did not like what was offered. (T. 987)

At the January 31, 2001 the options discussed were the AOM class or the resource class. (T. 988-989).D. Ex. 44 is the ISD 11's version of the IEP from January 31, 2001. P. Ex. L is the parents' version of the IEP from January 31, 2001. The ISD's IEP from January 31, 2001 causes concern because the reading is not targeted. (T. 1165)

The evidence about ESY presented at the hearing was in Plaintiff Victor's favor. There was no discussion about ESY for Victor at the January 31, 2001 meeting. (T. 1029) However, Ms. Sunderlin did tell the team that she was concerned about ESY for Victor because he would be in Illinois with his father for the summer and she was concerned about services. Victor goes to Illinois for visitation due to a court order. (T. 1029) Ex. 44 suggests that the issue of ESY would be "determined later" but Ms. Sunderlin had no information as of the January 31st meeting when "later" would be. (T. 1030). D. Ex. 84 is the IEP from the May 2001 meeting that Ms. Sunderlin did not attend. (T. 1030) This document states that ESY is from June 18 to August 2. Prior to May 2001, the ISD did not request any information from Ms. Sunderlin about what Victor's schedule would be for the summer. (T. 1030-1031)

The evidence about procedural safeguards presented favored Plaintiff Victor. The first

time that Ms. Sunderlin received a notice of procedural safeguards regarding Victor was with the May 10, 2001 IEP that she received from Ms. Gardner. (T. 1031) Ms. Sunderlin had first received procedural safeguards notice for her youngest son, who is in special education, in December of 200. (T. 1032) Victor had an IEP (called a case conference summary) from Indiana. (T. 1035) But, when Victor was evaluated during fall 2000, no one from the ISD 11 really asked about his prior services. (T. 1036)

Mr. Sunderlin believes Victor needs one-to-one reading services to make progress in reading. (T. 990, 991-992) When Mr. Sunderlin hears Victor read, he stumbles, and has trouble with words. (T. 993) Mr. Sunderlin explained that he did not want Victor pulled out of regular classes and instead felt the tutoring at home would be good to avoid Victor being teased. (T. 994-997)

**Arlene Sonday** is an experienced reading consultant, professor, author and curriculum writer. (T. 1475) Her testimony is found at T. 1475 and ff. Ms. Sonday has a Master's Degree in special education. (T. 1476) She has worked with children who have learning disabilities for 36 years. Ms. Sonday estimates she has taught thousands of children to read over the years. (T. 1476) She teaches teachers how to work with children with learning disabilities. (T. 1477) Ms. Sonday explained that learning to read is a "complex process." (T. 1486) Ms. Sonday explained that the National Institute of Health and Human Services has funded a large number of studies to research reading instruction. (T. 1482) The research tells us that there should be a phonetic instructional component for kids with learning disabilities. (T. 1483) There needs also to be phonological awareness. (T. 1482-1484)

Ms. Sonday created the Sonday System. This was written primarily for people who don't

know how to teach a phonic approach to read. (T. 1495; T. 1492-1494) About 50-60% of kids don't read as well as they should. About 15% of those kids are learning disabled. The Sonday system was designed for those kids who are "between the 15 and 50." (T. 1496) It is not for the children who are severely disabled. (T. 1497) (P. Ex. Z.) Having reviewed D. Ex. 36, the ISD's evaluation of Victor, Ms. Sonday does not believe that the information in that report about reading would be enough to help design a reading program. (T. 1498-1499) Having reviewed D. Ex. 44, the January 2001 IEP and D. Ex. 84, the May 2001 IEP for Victor, and P. Ex. II, and P. Ex. GG, Ms. Sonday's opinion (1499-1504) is that there are "many holes" in Victor's continuum. She described his skills as "somewhat scattered." And, Ms. Sonday noted that Victor appears to be quite severely behind. She would not recommend the Sonday System because Victor is at the "top parameters" of it. He is ready to go to more advanced language than is covered by the Sonday System. At the time of the hearing, the Sonday System was only designed to teach readers up to the beginning of fourth grade. (T. 1511-1513) Victor is at about that level according to the Defendant ISD 11's testing. Ms. Sonday did NOT recommend the use of the Sonday System for Victor. (T. 1528-1529) She recommended Victor have one-to-one because he is a bright kid who has a lot of catching up to do. (T. 1538) It's not harmful to teach Victor one-to-one. It would be helpful because kids of that age are so conscious of who is watching and what's going on around them. (T. 1539) One-to-one is appropriate for Victor. He's way behind and he needs to catch up. He needs to catch up in the most efficient, effective way with somebody who can identify the holes in his background, fill in the gaps. (T. 1542) He needs one-to-one, a well trained teacher to find the reading gaps and the Sonday System is not appropriate for him. (T. 1563-1564)

**STANDARD OF REVIEW**

The role of a reviewing Court is to determine whether the local hearing officer and local officials have complied with IDEA. *Flour Bluff Indep. Sch. Dist. v. Katherine M.*,91 F.3d 689, 693 (5th Cir. 1996), cert. denied, 519 U.S. 1111 (1997). The Supreme Court has explained that: "Therefore, a court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? and second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Board of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982) (footnotes omitted). Thus, the Court must decide if the process below complied with the procedures of the IDEA and whether the IEP developed through those procedures was reasonably calculated to result in meaningful benefit to Victor. *Cedar Rapids Community Sch. Dist. v. Garret F. by Charlene F.*, 526 U.S. 66 (1999); *Ridgewood v. N.E.*, 30 IDELR 41 (3rd Cir. 1999).

The IDEA requires the hearing review officer (HRO) to issue an independent decision after a complete review of the entire record in this cause. 34 CFR 300.510(b)(2). The HRO cannot simply approve the findings of the IHO just because the IHO was the initial fact finder. Indeed, a long line of administrative case law supports the view that the *final agency* decision making may rule adversely to the initial factfinder. The final agency officer, here the HRO, must make his findings only after he has completely considered and appraised the evidence which justifies those findings. *Morgan v. U.S.*, 298 U.S. 468 (1936).

Where, as here, the IHO has erred, especially having made errors of law, the HRO was

required to reverse and correct the IHO. Since the HRO failed to do so, the Court must ensure that Victor Grant is provided a free appropriate public education. *Moubry v. ISD 696*, 24 IDELR 119 (D. Ct. MN 1996). The Court must determine that the IHO is correct in all determinations, both factually and legally, in order to sustain the decision. Specifically, the HRO has an affirmative duty based on 34 CFR 300.510, to: 1) Examine the entire hearing record; 2) Ensure that the procedures at the hearing were consistent with the requirements of due process; 3) Seek additional evidence if necessary. If a hearing is held to receive additional evidence, the rights in 300.509 apply; 4) Afford the parties an opportunity for oral or written argument, or both, at the discretion of the reviewing official; 5) Make an independent decision on completion of the review. Minnesota law requires the HRO to issue a decision that is 1) in writing; 2) include findings and conclusions and 30 be based upon the standards in section 125A.08, and in the rules of the state board. Minn. Stat. Sec. 125A.09, Subd. 9. The HRO was to "conduct an appellate review and issue a final decision based on an impartial review of the local decision and the entire record." Minn. Stat. Sec. 125A.09, Subd. 9. By state law, this is deemed to be a trial "de novo." *In re E.N. v. Special School Dist. No. 1, Minneapolis*, 31 IDELR 160 (MN Ct. Appls. 1999).

## ARGUMENT

### I. THE HRO ERRONEOUSLY APPROVED AN IHO DECISION BECAUSE OF SERIOUS PROCEDURAL VIOLATIONS BY THE IHO.

The IHO committed procedural errors which were upheld by the HRO. These errors lead to a 'skewed' decision based not upon the evidence received and on the law, but on the whim or desire of the agency and a process inconsistent with the IDEA. As such, the HRO decision is arbitrary and capricious and must be set aside. *Grapevine-Colleyville Indep. Sch. Dist. v. Danielle R. by Mr. and Mrs. Mark R.,* 31 IDELR 103 (N.D. Tx 1999).

**A. The IHO Heard Evidence on the Wrong IEP by Admitting a May 10, 2001 IEP .**

A special education hearing is to focus on what prompted the hearing. 34 CFR 300.507 provides that a hearing may be held on "any matter" related to the child's identification, evaluation, program or provision of a free appropriate public education. This case was essentially a dispute about Plaintiff Victor's initial eligibility for special education services. However, due to the IHO's handling of the matter, it became a case about whether the Defendant ISD 11's program was appropriate.

The dispute began when Ms. Sunderlin rejected an IEP from **January, 2001,** returning it to the ISD 11 on February 1, 2001. (P. Ex. L. ) The parents' request for hearing is dated **March 29, 2001.** (P. Ex. R.) In this instance, the IHO heard evidence on the wrong IEP, a **May 10, 2001** IEP that was created AFTER the hearing was requested and which deemed Plaintiff Victor eligible and offered minimal services. The HRO notes that the parent raised this issue on appeal but found that because the May 10, 2001 IEP was the "only IEP" proposed by the Defendant ISD 11it was properly the subject of the hearing, rather than the IEP the parent rejected in January which lead to the hearing request in March of 2001. HRO Decision, pg. 8.

Notably, after the hearing request, the Defendant ISD 11 recognizing the weakness of the January 2001 IEP, scheduled more IEP meetings. The hearing date was extended. The parent contended she was not given proper notice of some of the meetings. Eventually, Defendant ISD 11 created an IEP dated May 10, 2001 and this is the IEP that the ISD 11 and the IHO decided would be the issue at hearing, rather than the January 2001 IEP that prompted the due process hearing request in March, 2001. The parents filed a motion to completely exclude the May 10, 2001 IEP. The IHO ruled against the parents.

School districts cannot be allowed to extend hearing dates and then create new IEPs for the purpose of improving their position at hearing. This is completely anathema to the entire concept and purpose of the IDEA. When a parent requests a due process hearing, the IEP that should be litigated is the IEP that prompted the parents' request for hearing. In this case, that IEP that should have been litigated was the IEP from January. This IEP, unlike the May 10, 2001 IEP, did not include a reading goal or reading services. This made a difference in the parents' ability to show that Victor had been denied a FAPE. Instead of litigating what the ISD 11 had done or failed to do from the time of Victor's evaluation in December of 2000 through the January 2001 IEP, the parents were required to go to hearing over an IEP created MONTHS later. This is wholly unfair to the parents.

Case law does not support this gross distortion of the process and the law. The IDEA specifically states that parents are to have the opportunity to complain about any matters concerning the child's identification, evaluation, or provision of a free appropriate program of education. 34 CFR 300.507. If parents cannot have a hearing about the real IEP in dispute, then they are not provided the hearing that they requested. *Digre v. I.S.D. No. 623*, Civ. No. 4-87-746 (D. Minn. Dec. 17, 1987); *I.S.D. No. 623 v. Digre*, 893 F.2d 987, 991 (8th Cir. 1990). After the fact IEPs, developed after the parents have requested a due process hearing, should not be admitted into evidence in any way in the hearing. Otherwise, the parents' right to a full and fair hearing on the IEP that prompted the parents' hearing request, will never be heard.

**B. The IHO Extended the Decision Date on His Own Motion and Without Good Cause.**

The hearing in this case was requested in March of 2001, completed on July 23, 2001 but no decision was rendered until September 17, 2001. The hearing was extended both before and

after the evidentiary hearing was actually held. The hearing request was made in March of 2001. The hearing did not proceed to evidentiary hearing until late summer.[3] No decision was rendered until September 17, 2001.

This is notable because certain extensions benefitted the Defendant ISD 11. During the hearing, the parents were unable to bring forth a critical witness, the child's tutor, because she was giving birth. The IHO absolutely refused to extend the time to complete the hearing any further, effectively precluding this witness.

Yet, on the last day of the hearing, the district lawyer demanded not only a posthearing brief, but a posthearing reply brief. This resulted in additional time being scheduled and over a month's delay in the decision date solely for briefing purposes and despite the objection of the parents. The parents' counsel expressed concern that the decision be rendered at least before school began for Victor. The IHO assured the parents, on the record, that the decision would be issued August 31, 2001, still over a month from the completion of the actual testimony at the hearing. (T. 1692) The last transcript was completed on or about July 27, 2001.

But, on August 7, 2001, the ISD 11 requested an extension on the briefing schedule because the lawyer was going to be on vacation. The request was received by parents' counsel at 16:26 on August 7, 2001. The ruling granting the request was issued by the IHO less than one hour later, at 17:22 on August 7, 2001 and came not from the IHO but from the school lawyer's office. The new decision date set was September 7, 2001.

Next, and again without notice to the parents, the IHO extended the decision date on his

---

[3] Counsel acknowledges that a portion of the delay prior to the hearing was counsel's own illness; however, Defendant ISD 11 should not have been permitted to keep

own from September 7, 2001 to September 17, 2001. The IHO requested this sua sponte. Once again, the parents could not respond before any decision on the point was rendered. This time the IHO's sua sponte letter came at 18:15 on September 6, 2001, the ISD 11 lawyer responded at 11:30 a.m. on September 7, 2001 and at 15:47 on September 7, 2001, the IHO granted himself an extension of ten (10) days to September 17, 2001.

An untimely decision can be and should be voided. 34 CFR 300.511 requires that not later than 45 days after the receipt of a request for a hearing a final decision is reached in the case. Case law has suggested that a delay in holding the hearing may be permissible where there are scheduling conflicts of witnesses[4] or additional evidence is needed. *Letter to Kerr*, 22 IDELR 364 (OSEP 1994) ("...in circumstances where a full and fair hearing requires additional evidence and it cannot be immediately secured or the schedule of parties or counsel requires a continuance, a party may wish to request a specific extension.") The extension of the decision date from the close of the hearing on July 23, 2001 until September 17, 2001 for purposes of briefing is not acceptable, especially where one of the extensions was *sua sponte* from the IHO, and where the parents had requested an extension to hear a witness which was denied. In *Letter to Kerr*, the U.S. Department of Education specifically told Minnesota hearing officers that "A hearing officer may grant specific extensions of time beyond the 45 day timeline at the request of either party, *but cannot extend the timeline on his or her own initiative*, or pressure a party to request an extension." (Emphasis added.) Delayed hearings, or wrongful extensions of time,

---

changing the record by creating the new IEP in the meanwhile.

[4] Even a witness conflict is not necessarily a good cause reason for an extension. *Encinitas Union Sch. Dist*., 31 IDELR 198 (SEA CA 1999) (denying continuance to district in order to obtain a witness.)

especially those which are *sua sponte*, and not because of the scheduling of witnesses or additional evidence are not permissible. *Blackman v. District of Columbia*, 28 IDELR 1053 (D. Ct. D.C. 1998); *Gonzalez v. Puerto Rico*, 26 IDELR 985 (D.Ct. P. Rico, 1997). *Engwiller v. Pine Plains Cent. Sch. Dist.*, 33 IDELR 90, (S.D.N.Y. 2000). The Court may take any appropriate action, including voiding the HRO and IHO decision because of the lateness of the decision and the process used to obtain the extension. Nothing in the IDEA requires parents to even submit a posthearing brief. To extend the decision date over a month from the completion of the hearing and then again in September to accommodate briefing is totally contrary to the intent of the IDEA's 45 day time line. This is especially true where the IHO refused to permit a short extension to hear a witness the parent sought to have testify who was unavailable because she was giving birht. At a minimum, Plaintiff Victor is entitled to compensatory education in an amount equal to the delay from July 23, 2001 to September 17, 2001. See, *Chichester School Dist*., 33 IDELR 290 (SEA PA 2001).

**C. The IHO Erred in Claiming the Parents' Did not Oppose the Motion in Limine.**

One of the Ms. Sunderlin's objections for the hearing was that she had requested Victor be provided special education services in the fall of 1998. The ISD 11 found him ineligible. Ms. Sunderlin contended she had not been provided her procedural safeguards throughout the denial of special education services in 1998 and moving forward. The ISD 11 brought a motion in limine to exclude evidence on this point. Contrary to the IHO's assertion on pg. 1 of his decision, the parents did oppose the motion in limine. Rather than spend excessive attorney time and funds to address the motion, believing the issue to be clearly already resolved by numerous hearing decisions in Minnesota, the parents' counsel simply referred the IHO to those decisions and

asked for a ruling as to the length of time at issue.

In a letter dated May 15, 2001, the parents noted that they did not oppose the motion in limine per se, but asked the IHO to rule as a factual matter with respect to the beginning of the time frame. Counsel stated: “It remains a factual issue for this IHO to determine at hearing if Victor’s parent was aware of her rights back in 1998 when Victor first moved to the ISD 11. We are confident the IHO is very familiar with the statute of limitations argument and issue and see no point in spending additional time explaining those concepts to the IHO. We do not oppose the motion in limine as far as the outside date of March 30, 2001, so long as no evidence past that date is accepted from either party. “ (Letter Kerr to IHO, May 15, 2001.) The IHO erred in determining that the parents’ did not oppose the motion in limine and also erred in finding that the statute of limitations was a one year period. The Eighth Circuit has clearly ruled as have numerous hearing officers that the statute of limitations is at least two years and possibly three. *Birmingham v. Omaha Sch. Dist.*, 220 F.3d 850, 856, 33 IDELR 29, (8th Cir. 2000) (holding that the three-year statute of limitations applicable to § 1983 actions in Arkansas governed IDEA claims); *Strawn v. Missouri Bd. of Educ*. 210 F.3d 954 (8th Cir. 2000) (two year statute of limitations.) A three year statute of limitations, as set forth in *Birmingham*, would have permitted Ms. Sunderlin to raise claims from the school year of 1998-1999 through 2000-2001. The IHO must be reversed on this point. In addition, since the IHO precluded this information throughout the IDEA hearing, and it was a specific issue raised by the parent in her statement of objections which the parent was not permitted to litigate,  the Court must find for the parents.

The IHO and HRO erred also because the ISD 11 was allowed to introduce evidence regarding PlaintiffVictor’s earlier evaluation in the district while simultaneously preventing the

parent from litigating that period of time. See, IHO dec. at pg. 3, FF 1- 4; pg.11; Appl Item No. 5). School districts cannot deny parents full hearings on all issues. *Digre v. I.S.D. No. 623*, Civ. No. 4-87-746 (D. Minn. Dec. 17, 1987); *I.S.D. No. 623 v. Digre*, 893 F.2d 987, 991 (8th Cir. 1990).

**D. The HRO and the IHO Ignored the Student's Testimony.**

Plaintiff Victor Grant testified in the proceeding. Prior to his testimony and after, the IHO criticized the parents' counsel for presenting Victor as a witness. The IHO appeared not to take Plaintiff Victor's testimony seriously during the hearing process. The IHO then completely ignored Plaintiff Victor's testimony throughout his decision. Plaintiff Victor's testimony was just as relevant and just as important as all of the other witnesses. The IHO gives no explanation for completely ignoring Victor's testimony. The HRO did likewise. HRO Dec. Pg. 9. In general, Victor testified that he learned to read and to do spelling/written work from his tutor, Stephanie Wehman, and not from the teachers at school. Since neither the IHO nor the HRO did so, the Court should review Victor's testimony and give his testimony due weight.

**II. THE HRO FAILED TO CORRECT IHO FINDINGS OF FACT.**

The IHO erred in FF 5-74. The facts, as written by the IHO, are simply not supported by the evidence in the record. The HRO did not determine whether each fact cited is a fact that is established by a preponderance of the evidence. Rather, the HRO summarily approved the facts found by the IHO and then summarily adopted other portions of the IHO decision as "facts." HRO Dec. Pg. 3. There are many errors. The following errors are notable:

FF 5: The parent was unable to attend the child study meeting in 2000. Correction: The parent asked for a different time due to a conflict and this was refused.

FF 11: The team did not consider a team override to qualify the student for special education reading services. No facts were presented to establish this fact.

FF 12: The team relied on one test, the Woodcock Johnson to determine Victor's eligibility for special education services.

FF 15: The parent did contest the Defendant ISD 11's evaluation and cannot be denied a hearing on it as required under 34 CFR 300.507. Moreover, the Defendant ISD 11 put on various witnesses about the appropriateness of the evaluation, thus raising the issue itself. The parents witnesses, Jennifer Brown and Arlene Sonday both testified the evaluation was not sufficient. The references to the transcript are taken wholly out of context.

FF 21: The parent requested an IEP meeting for Victor; however the IHO ignores the District's failure to hold such a meeting itself and develop an IEP. The IHO ignores the fact that the ISD 11 never developed an interim IEP for Victor from January 2001 forward.

FF 24: The January IEP was not just a draft according to the testimony of Ms. Sunderlin and the testimony of her husband, Scott until the parents indicated that they would be objecting to it.

FF 28: Ms. Brown's testimony was not given until late in the hearing process. The gist of Ms. Ms. Brown's report had previously been shared by the parent with the ISD 11 at a meeting on March 20, 2001.

FF 29: The testimony and the transcript of the meeting, S.D. Ex. 52 establishes that the parent asked what options the school district had. The school district staff indicated that they did not have one-to-one instruction for Victor. The most accurate proof is not the testimony after the fact as the IHO relies mostly upon; the most accurate proof is the

meeting itself where Linda Gardner, the administrator and school staff said they could not provide Victor one-to-one reading instruction.

FF 31: The parents did not agree with the school district's April 27, 2001 letter. The parents' counsel responded to this letter and this information was ignored by the IHO.

FF 32-35: These facts are about the May 1, 2001 IEP meeting. As earlier stated, the parents objected to evidence about this IEP by a motion to exclude it. If considered, the HRO should note that the goals and objectives in this IEP were deemed inappropriate, at least in part, by both of the parents' experts.

FF 36-39: ESY. The IHO misses the point. No ESY proposal was made until May 10, 2001.

FF 40-42, 44: Assistive Technology. The parent did present credible evidence about AT. The parent had requested an AT evaluation which the ISD 11 refused to do and which the IHO refused to consider.

FF 43-46: Methodology. Ms. Sonday testified that the SSLR was not appropriate for Victor.

FF 48-50: The determination by the IHO that based upon a witness the "one to one instruction" is more restrictive is an incurrate reliance upon a **fact** witness to make a **legal** determination. Ms. Sonday and Ms. Brown both testified that Victor needs one-to-one because of his age and sensitivity to not being able to read well. Victor testified he wants one-to-one.

FF: 51-52: The IHO erred in relying on facts related to whether it would be "highly uncommon" to provide one to one.

FF 53-69: The only evidence considered by the IEP team in December, and January was the Woodcock Johnson. Therefore, the IHO erred in considering evidence including

grades, the Star Tests, the Gates Test, and the informal information from teachers. The parents repeatedly objected to this information being presented where 1) it had not been considered by the IEP team BEFORE the ISD 11 refused 1:1 at the March 20, 2001 meeting; 2) where it had not been considered at the December or January IEP meetings; 3) where the Star Tests were not available to the parents until far into the IEP process and actually showed decline.

FF 70-71: Private tutoring. The IHO prevented Ms. Wehman, a tutor from testifying. The ISD 11 refused telephone testimony and the witness was having a baby and could not attend in person. In addition, Jennifer Brown testified as did Victor and his parent that the increase in his reading skills was attributable to the private tutoring. The only services that changed from second quarter to third were the services with Ms. Wehman.

FF 72-73: Prior written notice. Prior written notice is to be provided in a timely fashion. The IHO ignored the fact that prior written notice had to be requested by the parent and was not provided until May 16, 2001. As of March 20, 2001, the ISD 11 gave an oral refusal of one-to-one tutoring–because according to SD Ex. 52–the school did not have such a program.

FF 74: The IHO precluded evidence prior to March 2000; therefore, a determination of whether the parent had received her procedural safeguards in 1998 should not have been included. The parent testified that she signed to acknowledge her presence at a meeting and that she did not actually get the information.

## III. THE HRO AND IHO ERRED IN DEEMING ISSUES WAIVED.

The IHO erred in concluding that Minn. Stat. Sec. 125A.09, Subd. 6 applies where that statute is contrary to federal law. The HRO erred in approving this conclusion. Thus, the hearing officers denied Victor and his parent a full due process hearing by limiting issues and limiting remedies based upon Minn. Stat. Sec. 125A.09, which, contrary to the IDEA at 34 CFR 300.507, requires specificity of issues (or same are waived) and notification of specific remedies. The IHO erred in complaining that the parents had not sufficiently stated issues for hearing, where the parents object that Minn. Stat. Sec. 125A.09, Subd. 6 violates their rights under 34 CFR 300.507. The IHO also erred in first demanding more specification of remedies and then rejection of all remedies, apparently in reliance on Minn. Stat. Sec. 125A.09, Subd. 6, again contrary to the IDEA at 34 CFR 300.507. Finally, the IHO erred in numerous evidentiary ways as already pointed out in this brief.

Given the changing nature of the District's actions in this case which made such specification impossible for the parent, the parents response is that the IHO denied them a full due process hearing. 34 CFR 300.507 is clear and unequivocal that a parent's right to a hearing cannot be delayed or denied for failure to provide the more general notice set forth in the federal regulation. Clearly, the parents' right to complain about issues being deemed waived where the IHO relied on the more exacting Minnesota rule violates 34 CFR 300.507. The parents contend they complied with 34 CFR 300.507. Therefore, the IHO had no right to exclude issues throughout the course of the hearing, as happened. IHOs cannot simply rely upon state law. IDEA regulations are controlling. Where a hearing officer, as here, has denied a full and fair hearing, parents are entitled to have the HRO rule in their favor and award an appropriate

remedy. *Digre v. Roseville*, 16 EHLR 420, 893 F. 2d 987 (8th Cir. 1990).

## IV. THE HRO AND IHO ERRED IN RELYING ON DR. SPICUZZA.

The Defendant ISD 11 put forth the testimony of Dr. Spicuzza as an expert. Spicuzza had neither met Victor nor evaluated him. The IEP process envisioned by the IDEA supposes that any experts who testify about the student will have some knowledge of the student. Dr. Spicuzza had not even met Victor. This is consistent with general practice under *Daubert*. For this reason, the parents objected. Nonetheless, his testimony was permitted. This was error.**V. THE HRO AND IHO ERRED IN DENYING VICTOR AN ASSISTIVE TECHNOLOGY EVALUATION.**

Children with learning disabilities like Plaintiff Victor often utilize various assistive technology in their education. This may take the form of certain computer software or assistance and instruction in using such equipment. Here, Ms. Sunderlin requested an assistive technology evaluation for Plaintiff Victor. The IHO refused to consider this request after the ISD 11 refused to provide it. The HRO held that such evaluation was not necessary. HRO Dec. Pg. 7.

The IDEA provides that children with disabilities may need certain assistive technology devices to assist them with their education. 34 CFR 300.5, 300.6. Assistive technology services include evaluation of the child for assistive technology. 34 CFR 300.6. The IDEA envisions that students who may need assistive technology should receive evaluations to determine their needs in that area. To do otherwise, is an automatic exclusion of assistive technology without evaluation, contrary to the law and general practice in school districts. *School City of E. Chicago*, 31 IDELR 45 (SEA ILL 1998); *Board of Educ. of the City of Beacon*, 30 IDELR 937 (SEA NY

1999); *Hillsboro Sch. Dist.*, 4 ECLPR 111, (SEA OR 1998); *Houston School Dist.*, 30 IDELR 68 (SEA TX 1998). This Court has previously held that where a parent requests an assistive technology evaluation, it is incumbent upon the school district to take appropriate action. *Pachl v. ISD 11*, 36 IDELR 363 (D. MN 2002). In *Pachl*, the parent made a written request for an assistive technology evaluation. The Defendant ISD 11 delayed completion of the evaluation for about a year. This Court held that such action was a denial of the child's free appropriate public education. The HRO erred as a matter of law and must be reversed.

**VI. EXTENDED SCHOOL YEAR.**

Plaintiff Victor was not offered ESY until the "11th hour" of the school year, 2000-2001, specifically, May 10, 2001. By this point in time, his required visitation with his father–out of state–had already been set. The Defendant ISD 11 knew that Victor would need to go visit his father but did not make any efforts to deal with that issue. Two things are clear and unfair. First, if this decision holds, then any child who is in a situation of a divorced family will not be able to insist upon adequate ESY. The ISD 11 will not be held responsible for services out of state. The non-custodial parent will always want the summer visits. Thus, children of divorced parents will have less access to ESY services. Second, if this decision holds, then school districts will be encouraged to wait until as late as possible to make any offer of ESY services knowing that any appeal of those services through a due process hearing and Level II will be futile. This is precisely the situation that the Court saw in *Reusch et al. v. Fountain*, et al., 21 IDELR 1107, 872 F. Supp. 1421 (D. Ct. MD. 1994) and struck down as violating the right to FAPE. ESY services must be offered in a timely manner, particularly where the child's are divorced and additional arrangements may be necessary.

## VII. THE HRO ERRED IN DENYING ONE TO ONE TUTORING IN READING.

The HRO sustained the IHO's finding that Plaintiff Victor did not need 1:1 tutoring in reading. HRO Dec., pg. 16. The IHO's finding is inconsistent with the administrative record.

The parents presented evidence from several sources. Both Ms. Brown, a qualified tutor, and Ms. Sonday, an expert reading specialist, testified that Victor needed one-to-one reading instruction.

Ms. Sonday is the creator of a reading system known as the Sonday System. Sonday had interviewed Plaintiff Victor and informally considered his reading problems. She spoke of Victor's need to increase his ability to read and to spell. Notably, Defendant ISD 11 proposed the use of the Sonday System at one point. Ms. Sonday's testimony, as the actual creator of the system, and who had met and interviewed Plaintiff Victor, was ignored.

Ms. Brown, who owned a private reading tutoring service had evaluated Plaintiff Victor. She testified that Plaintiff Victor needed reading assistance on a daily basis.

The parents also offered the testimony of Ms. Wehman, Plaintiff Victor's private tutor. Ms. Wehman could not testify because she was pregnant and gave birth during the hearing. The IHO refused to allow a brief continuance to hear her testimony, notwithstanding the other continuances granted at the request of the Defendant ISD 11 or on the IHO's own motion.

The Court must reverse the HRO on the reading decision.

## VIII. THE HRO IGNORED DEFENDANT ISD 11'S PROCEDURAL VIOLATIONS.

The IHO made various procedural errors that limited the parent's and Victor's right to a fair hearing. In addition, the IHO condoned and the HRO condoned various procedural violatios committed by the Defendant ISD 11. Defendant ISD 11 failed to comply with prior written

notice, ensure that Ms. Sunderlin was given timely Notice of Procedural Safeguards, and adequate notice of IEP meetings.

**A. Prior Written Notice.**

The HRO found that the Defendant ISD 11 had provided prior written notice as to its decision to deny one to one reading instruction on May 16, 2001. HRO Dec., pg. 6. The HRO missed the point of prior written notice.

The IDEA demands that school districts provide parents with prior written notice about any proposes or denials of services. 34 CFR 300.503. Ms. Sunderlin did not receive prior written notice in this instance until AFTER her request for a hearing. The hearing was requested in March 2001 and the HRO found that prior written notice was given on the reading issue in May of 2001.

The purpose of prior written notice is to give the parent information BEFORE a proposal is implemented, and before hearing is requested so that the parent may understand the district's reasoning and rationale. The federally mandated regulation requires that written notice be given "a reasonable time before the public agency" proposes to initiate or change or refuses to initiate or change the provision of FAPE. 34 CFR 300.503(a). Ms. Sunderlin did not receive prior written notice.

- C **Prior written notice must include a description of the action refused**. 34 CFR 300.503(b)(1). In January, that refusal was any reading service allegedly because Victor did not qualify for services under Minnesota's very restrictive discrepancy

formula.[5] However by March, 2001 that refusal was one-to-one reading services and private tutoring services at district expense. By May 16, 2001, that refusal changed to a vague proposal for some reading services.

- **Prior written notice must include an explanation of why the agency proposes or refuses to take the action**. 34 CFR 300.503(b)(2) In January, the refusal for any reading services was allegedly based on state criteria. During the March 20, 2001 meeting, the refusal for one-to-one was based on the lack of such services in the district. By May 16, 2001, the refusal was now because of Victor's "needs."
- **Prior written notice must include a description of any other options considered and rejected**. 34 CFR 300.503(b)(3) No options were given in January, 2001. Only class based options were discussed in March, 2001. And, by May, 2001 only school based options continued.
- **Prior written notice must include a description of each evaluation procedure, test, record, or report the agency used as a basis for the proposed or refused action**.34 CFR 300.503(4) In January, 2001 at the meeting, only the Woodcock Johnson was relied upon and a denial of services given orally. In March, 2001, at the meeting, there is oblique reference to the Star tests but none are fully discussed by the team. (SD Ex. 52) At the May, 2001 meeting, there was apparently some discussion of the Gates tests, but the Star Tests were not

---

[5] The parents objected to this formula during the hearing; the IHO did not permit much testimony regarding it. The parents believe that the IHO erred in this regard; if the discrepancy formula was not relevant then the parents would have been told in December that Victor qualified for special education services in reading.

provided to the parents even prior to the hearing. Ms. Sunderlin heard about some of the Star Test results from the teacher for the first time when the teacher was testifying! Finally, Dr. Spicuzza's information is not incorporated into this prior written notice. any reading services.

C **Prior written notice requires a description of any other factors that are relevant to the agency's proposal or refusal**. 34 CFR 300.503(b)(5) The ISD 11 proffered at hearing, and the IHO relied upon how Victor did in comparison to others and whether it was common to provide a student like Victor with one-to-one. Neither of these two factors were disclosed in January, in March and only possibly obliquely in May.

The Defendant ISD 11 violated prior written notice. Where prior written notice is violated, a child has been denied a free appropriate public education. The HRO should find that Victor's parent was denied prior written notice and that as a result, she went out and purchased tutoring to help him. Had the ISD 11 taken even minimal steps to comply with prior written notice in January or again in March, this cost would not perhaps have been necessary. But when a parent is told in December, and January and March that the ISD 11 will not provide reading help to the student, a parent will act. The parents position should be upheld on the private tutoring in part because of prior written notice.

**B. The Draft IEP.**

The IDEA permits school districts to bring draft IEPs to IEP meetings. However, if a school district does so and the IEP is given to the parents, nothing in the IDEA distinguishes that IEP from a real or proposed IEP. An IEP is an IEP. Here, the parents received the IEP at the

January meeting and even specifically clarified that this is the IEP that the ISD 11 intended for Victor. Yet, after they rejected this proposal and asked for a hearing, the ISD 11 claimed that this IEP was not the "real" IEP and proposed the May 10, 2001 IEP. There is not one federal regulation that specifically states the ISD 11 can do what it did to this family. Not one.

In fact, the Appendix to Chapter 300 states that agency staff may come to an IEP meeting prepared "with evaluation findings and proposed recommendations regarding IEP contents." (App. A, Ques. 32) This regulation does not envision that such documents as IEPs will be given to parents, who reject them and then and only then are told that the documents are "drafts." The reason, of course, is that the IEP is to be developed, reviewed and revised with the parents. *Burlington Sch. Comm. v. Dept. Ed.*, 471 U.S. 359 (1985); 34 CFR 300.347. The HRO must be reversed; to the extent that the document in January was represented as "the real" IEP when the parents specifically asked about it, then it was the proposed IEP as of that point in time.

Finally, whether viewed as the 'draft' of January or the proposed IEP of May, 2001, the IEP is not consistent with the Congressional mandate that it meet Victor's needs and be measurable. Insufficient progress is projected, there is a misuse of percentages, and there are vague, meaningless or not really measurable goals. *ISD No. 283*, 22 IDELR 47 (1994); *ISD No. 204*, 22 IDELR 380 (1994); See, e.g., *Better IEPs*, Barbara Bateman (pg. 73-74).

**CONCLUSION**

The Court should reverse the decision of the Hearing Review Officer and award Plaintiff Grant all appropriate relief.

Dated this 15th day of February, 2005.

/s/ Sonja D. Kerr

Sonja D. Kerr, Bar Number 18777x
KERR LAW OFFICE

Disability Law Center of AK
3330 Arctic Blvd., Suite 103
Anchorage, AK 99503
Tel: 907-565-1002; fax: 565-1000

/s/Mary S. Josefson

Mary Josefson, Bar Number 0052772
1821 Rhode Island Ave. N.
Golden Valley, MN
Tel: 763-544-5390

/s/Judith Gran

Judith Gran, Bar Number 40134
Public Interest Law Ctr. of Phil.
125 S. 9th St., Suite 700
Philadelphia, PA 19107
Tel: (215)-627-7100

Counsel for Plaintiffs Reinholdson
Including Plaintiff Grant and K. Sunderlin