**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

---

VICTOR GRANT[1],
by his parent, Kelley Sunderlin

Plaintiff,

v.

**RECORD**[2]
STATE OF MINNESOTA, et al

Defendants.

Civil No. 02-795 ADM/AJB

**PLAINTIFFS' MEMORANDUM IN RESPONSE TO DEFENDANT ISD 11'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE**

---

## INTRODUCTION

Plaintiff Grant is a student with a disabilities and a named representative plaintiff in this lawsuit. Class status was denied. Doc. Entry No. 51. *Reinholdson v. State of Minnesota and ISD 11*, 37 IDELR 213 (D. MN 2002). The Court severed the individual claims and limited the case to certain individual claims restricted solely to the Plaintiffs' claims against Defendant ISD 11 pursuant to the IDEA. The Eighth Circuit reversed the District Court concerning its Rule 42 order. Doc. Entry No. 69. *Reinholdson v. State of Minnesota and ISD 11*, 37 IDELR 213, (D. MN 2002), vacated and remanded, 346 F. 3d 847 (8th Cir. 2003). After the Eighth Circuit's order, the District Court denied any discovery in the case. Doc. No. 84. Thereafter, on November 16, 2004, ordered that the parties could file dispositive motions on the individual claim of

---

[1] Counsel is obligated to utilize the title of the case imposed by the Court but notes that no such case actually exists. Plaintiff Grant's claims are included in *Reinholdson v. State of Minnesota*, the civil file number of which is 02-795 (ADM/AJB).

[2] Plaintiffs were prevented from conducting any discovery in this case by various

Plaintiff Grant. Doc. Entry No. 122, Order of Magistrate Boylan, (Nov. 16, 2004). Plaintiffs preserve all claims and argument concerning the status of the case as a whole and the District Court's continuing severance of this matter.

Defendant ISD 11 has filed a motion entitled Motion for Judgment on the Administrative Record/Summary Judgment. This Memorandum is filed in response.

## THE ADMINISTRATIVE RECORD

The facts and circumstances described herein relate to Plaintiff Victor's education with Defendant ISD 11 as a result of an administrative hearing, MDCFL Case No. 429. The administrative record of MDCFL Case No. 429 was filed with the Court by the Minnesota Department of Education with a Certified Inventory on July 5, 2002. Doc. Entry No. 42. The record is held at the Clerk's office. Doc. Entry No. 66, 67. Within the administrative record, the Court is referred to the Hearing Review Officer Decision, dated October 31, 2001. (HRO Decision) or the Independent Hearing Officer Decision (IHO Decision). The facts underlying this situation are amply identified within the Student's posthearing proposed findings of fact and are summarized herein. References are made to the administrative transcript and to exhibits contained within the administrative record.

## ESSENTIAL FACTS IN THE RECORD

At the time of the dispute, Plaintiff Victor was a 13 year old student scheduled to attend seventh grade in the fall of 2001-2002. He had repeated second grade and thus, was, at the time of the hearing request[3], chronologically a seventh grader. (P. Ex. R.) Evidence at the hearing

---

orders of the Court.

[3] Defendants assert, without explanation, that when Plaintiff Sunderlin requested

proved that Victor received modified grades in his regular education classes although no IEP team ever discussed the use of modified grades for Victor. (P. Ex. M, U)

There is no dispute between the parties that Victor has an average to above average IQ. (D. Ex. 33). On November 28, 2000, Victor demonstrated a full scale IQ of 105 with a verbal IQ of 97 and a performance IQ of 113. (D. Ex. 33)

Despite Victor's average intelligence, Victor had significant trouble with reading. The ISD 11's testing of Victor's reading skills included the following information from a test called the "Star Test" which was learned during the hearing (but was not necessarily discussed at all IEP meetings.) Victor was given the Star Test primarily to measure his reading comprehension. The Star Test results for Victor ranged from a grade equivalent of grade 3 from September to March of the 2000-2001 school year. (P. Ex. II). The scores were reported to have then increased to grade level 4.8, and grade 5.5. by the close of May, 2001. (P. Ex. II). These scores were concerning to Ms. Sunderlin because they fluctuate from low to high, low to high and demonstrate a significant reading problem for a student scheduled for seventh grade, who had repeated second grade. The Star Report results confirm that, at best, Victor's reading skills are scattered. (T. 1169-1170, P. Ex. II) Witnesses testified that the scores did not show any upward trend. (T. 1554-1555) Another measure of Victor's reading level that the ISD 11 proposed is from the Woodcock Johnson Test of Achievement. On that testing, Victor scored a 4.9 in Broad Reading. (D. Ex. 36, pg. 5) The ISD 11 did not fully evaluate Plaintiff Victor's reading and did not test for word attack, which impacts Plaintiff Victor's basic reading abilities. (D. Ex. 36, pg.

---

the underlying administrative hearing in this case, that this was the third due process hearing she had requested during the 2000-2001 school year. Def. Memo, pg. 3. What Defendants fail to mention is that the other two hearings involved Plaintiff Victor's brother, a student with autism.

5)

The testimony of witnesses for the parents at the hearing is summarized below.

**Jennifer Brown** is a teacher and the owner of The Learning Edge. Her testimony is found at T. 1105 and ff. The Learning Edge is a tutoring service that has been in existence for four years. (T. 1112; P. Ex. AA, P. Ex. 1108) She testified at the due process hearing as to the services that The Learning Edge provided Victor Grant and the educational services that she believes Victor needs. (T. 1104-1285**)** Brown has a degree in elementary education K-6 and is also trained specifically in reading and English language arts. (T. 1106) Brown has been a teacher for six years and has worked as a teacher in the public schools of Minnesota and elsewhere. (T. 1106-1107) She is familiar with IEPs and has attended IEP meetings. (T. 1112) Ms. Brown tested Victor because the parent expressed a need to find out Plaintiff Victor's grade level, age level in reading, what deficiencies he had in reading and what he needed work in. (T. 1112) She conducted a battery of tests to find out a broad reading range, specifics within that and then more specifics to figure out exact areas to focus on. (T. 1113)

Ms. Brown tested Victor on March 4, 2001, during Victor's exposure to sixth grade, and during what would be his seventh grade year (eighth grade chronologically). At that time, and at age 13, Victor's reading skills on the Woodcock Johnson Reading Mastery by grade level and age were at a total reading level of just Grade 4.1 or age 9.4:

| | |
|---|---|
| Word identification | 2.8/8.10 |
| Word attack | 5.2/10.4 |
| Word comprehension | 4.7/10.2 |
| Passage comprehension | 4.2/9.7 |

**Total Reading: 4.1/9.4**

(P. Ex. GG) **In other words, even though he was in sixth grade, and was a seventh grader chronologically, Plaintiff Victor was reading at best, at the very beginning fourth grade level.** Victor's failure reading level was grade 5.1. (T. 1119) Victor needs to be taught syllabication concepts so he can break down words to find out how they are said. (T. 1122) Ms. Brown recommended that Plaintiff Victor receive direct reading instruction.

While the hearing was pending, the parents obtained private services from Ms. Brown for Plaintiff Victor. The cost of those services is referenced at P. Ex. BB. (T. 1151-1152) The hourly rate is $48.00 per hour. (T. 1152) All the bills have been paid. (T. 1152) Ms. Brown repeatedly testified that Victor has a severe reading problem and requires one-to-one instruction to receive educational benefit. She stated that Victor had a "definite deficiency in his reading skills." (T. 1114) She characterized Victor's reading as a whole as "severely deficient." (T. 1129) According to Ms. Brown, "..the problem with Victor's reading in my opinion is that he is missing key parts that will help him be a reader at a higher level, meaning that he doesn't have the skills to decode words sixth grade and beyond; maybe even fifth grade....he doesn't possess the knowledge of these sounds that will help him sound out these words. " (T. 1130) He is not proficient in reading and he is "severe" in his difficulties. (T. 1139) As a past teacher, she explained that Victor's situation would "raise enough red flags" that school staff should go deeper into the problem and find out was is causing the problem.

Victor was retained in second grade. Despite retention, Victor was some two years behind grade level. This indicates a significant problem. (T. 1134) Ms. Brown believes one-on-one at this point is necessary because of Victor's severity. (T. 1166, 1168-1169) One reason is

efficiency to target specific reading problems. Another reason is to protect Victor's self-esteem; he is self-conscious about his reading. (T. 1166-1167) Ms. Brown testified that Victor will need to have one-on-one instruction to have meaningful benefit from his school program. (T. 1171) He needs at least three hours a week, or 25 minutes-30 minutes a day five days a week. (T. 1171)

**Victor Grant**, age 13, and the student in question testified about his educational experience. Victor felt uncomfortable at school reading out loud because if he "messed up" on a word, people would stare at him and then he would get all frustrated. (T. 1660) He felt his work with Stephanie from The Learning Edge was a good experience and would like it to continue. (T. 1663) He identified the work samples from his tutoring with Stephanie. (P. Ex. DD) Victor testified that someone worked with him at school on a one-to-one basis during the school year for about a two week period. He could not recall the teacher's name. (T. 1665-1666) He felt he had improved most in reading because Stephanie helped him with it. (T. 1667) Victor believed that he did better when he was working one to one and that his schoolwork was easier then. (T. 1669) He felt that he learned more with Stephanie than in class. (T. 1670-1671) He explained that "Mrs. Nordin tries telling us stuff that I already know, because [of] Stephanie." (T. 1671) Mrs. Nordin made Victor say some of the vowel sounds. He had been working with cards with Stephanie and Ms. Nordin would tell him he was then getting ahead of the class. (T. 1673) Victor did not like his grades before he started working with Stephanie. (T. 1671) Mrs. Nordin gave him progress reports to bring home like every four weeks. (T. 1672) Victor did not know what he was graded on when he received "A's." (T. 1673) (T. 1657-1675)

Evidence at the hearing proved that Victor received modified grades in his regular education classes although no IEP team ever discussed the use of modified grades for Victor. (P.

Ex. M, U)

**Scott Sunderlin**, Victor's stepfather, testified. (T. 977 and ff) Mr. Sunderlin attended the January 31, 2001 meeting. (P. Ex. L. ) He remembered a discussion at the meeting about whether Victor was going to get reading services. (T. 978) Staff told the parents that Victor did not qualify for reading services. (T. 979) At the end of the meeting Michele Rydberg wrote it on there at the top at the very end of the meetng. (T. 980) Mr. Sunderlin specifically asked Ms. Rydberg what "draft" meat. Ms. Rydberg said this was a draft copy and Mr. Sunderlin asked why. Ms. Rydberg said because there was handwriting on it. Rydberg said that the document needed to be typed and then it would be final copy. (T. 980) The parents then asked for the page to deny the IEP. (T. 980) They wanted to sign right there that they didn't agree. (T. 980) He was of the impression that the only thing that "Draft" meant was that they were going to type in the other stuff. They were not going to add anything else to it. (T. 980) Mr. Sunderlin tried to clarify if this was the proposal; he asked Ms. Rydberg whether except for the typing changes there was nothing else to be added or taken off and in response to that question, Ms. Rydberg said yes. (T. 981, 984) It was the parents' belief at the end of the January 2001 meeting that Victor was absolutely not getting anything; Mr. Sunderlin was concerned about that because Victor has trouble reading. (T. 1000) At the end of the meeting, the parents had decided they did not like what was offered. (T. 987)

At the January 31, 2001 the options discussed were the AOM class or the resource class. (T. 988-989).D. Ex. 44 is the ISD 11's version of the IEP from January 31, 2001. P. Ex. L is the parents' version of the IEP from January 31, 2001. The ISD's IEP from January 31, 2001 causes concern because the reading is not targeted. (T. 1165)

The evidence about ESY presented at the hearing was in Plaintiff Victor's favor. There was no discussion about ESY for Victor at the January 31, 2001 meeting. (T. 1029) However, Ms. Sunderlin did tell the team that she was concerned about ESY for Victor because he would be in Illinois with his father for the summer and she was concerned about services. Victor goes to Illinois for visitation due to a court order. (T. 1029) Ex. 44 suggests that the issue of ESY would be "determined later" but Ms. Sunderlin had no information as of the January 31st meeting when "later" would be. (T. 1030). D. Ex. 84 is the IEP from the May 2001 meeting that Ms. Sunderlin did not attend. (T. 1030) This document states that ESY is from June 18 to August 2. Prior to May 2001, the ISD did not request any information from Ms. Sunderlin about what Victor's schedule would be for the summer. (T. 1030-1031)

The evidence about procedural safeguards presented favored Plaintiff Victor. The first time that Ms. Sunderlin received a notice of procedural safeguards regarding Victor was with the May 10, 2001 IEP that she received from Ms. Gardner. (T. 1031) Ms. Sunderlin had first received procedural safeguards notice for her youngest son, who is in special education, at an earlier time. (T. 1032) Victor had an IEP (called a case conference summary) from Indiana prior to moving to Minnesota. (T. 1035) But, when Victor was evaluated during fall 2000, no one from the ISD 11 really asked about his prior services. (T. 1036)

Mr. Sunderlin believes Victor needs one-to-one reading services to make progress in reading. (T. 990, 991-992) When Mr. Sunderlin hears Victor read, he stumbles, and has trouble with words. (T. 993) Mr. Sunderlin explained that he did not want Victor pulled out of regular classes and instead felt the tutoring at home would be good to avoid Victor being teased. (T. 994-997)

**Arlene Sonday** is an experienced reading consultant, professor, author and curriculum writer. (T. 1475) Her testimony is found at T. 1475 and ff. Ms. Sonday has a Master's Degree in special education. (T. 1476) She has worked with children who have learning disabilities for 36 years. Ms. Sonday estimates she has taught thousands of children to read over the years. (T. 1476) She teaches teachers how to work with children with learning disabilities. (T. 1477) Ms. Sonday explained that learning to read is a "complex process." (T. 1486) Ms. Sonday explained that the National Institute of Health and Human Services has funded a large number of studies to research reading instruction. (T. 1482) The research tells us that there should be a phonetic instructional component for kids with learning disabilities. (T. 1483) There needs also to be phonological awareness. (T. 1482-1484)

Ms. Sonday created the Sonday System. This was written primarily for people who don't know how to teach a phonic approach to read. (T. 1495; T. 1492-1494) About 50-60% of kids don't read as well as they should. About 15% of those kids are learning disabled. The Sonday system was designed for those kids who are "between the 15 and 50." (T. 1496) It is not for the children who are severely disabled. (T. 1497) (P. Ex. Z.) Having reviewed D. Ex. 36, the ISD's evaluation of Victor, Ms. Sonday does not believe that the information in that report about reading would be enough to help design a reading program. (T. 1498-1499) Having reviewed D. Ex. 44, the January 2001 IEP and D. Ex. 84, the May 2001 IEP for Victor, and P. Ex. II, and P. Ex. GG, Ms. Sonday's opinion (1499-1504) is that there are "many holes" in Victor's continuum. She described his skills as "somewhat scattered." And, Ms. Sonday noted that Victor appears to be quite severely behind. She would not recommend the Sonday System because Victor is at the "top parameters" of it. He is ready to go to more advanced language than is

covered by the Sonday System. At the time of the hearing, the Sonday System was only designed to teach readers up to the beginning of fourth grade. (T. 1511-1513) Victor is at about that level according to the Defendant ISD 11's testing. Ms. Sonday did NOT recommend the use of the Sonday System for Victor. (T. 1528-1529) She recommended Victor have one-to-one because he is a bright kid who has a lot of catching up to do. (T. 1538) It's not harmful to teach Victor one-to-one. It would be helpful because kids of that age are so conscious of who is watching and what's going on around them. (T. 1539) One-to-one is appropriate for Victor. He's "way behind" and he needs to catch up. He needs to catch up in the most efficient, effective way with somebody who can identify the holes in his background, fill in the gaps. (T. 1542) He needs one-to-one, a well trained teacher to find and assist him with the reading gaps. (T. 1563-1564)

**STANDARD OF REVIEW**

The role of a reviewing Court in an IDEA action is to review the entire record and to form an independent decision as to whether or not the administrative hearing officers were correct. In doing so, a Court is free, however, to decide the case on the preponderance of the evidence and is not simply bound by the earlier decisions of the hearing officers. *Doyle v. Arlington County School Board*, 953 F.2d 100, at 105 (4th Cir. 1991); *Independent School District. No. 283 v. S.D.*, 88 F. 3d 556 (8th Cir. 1996). The Court cannot simply abdicate judicial function in favor of the administrative hearing officers. *Nein v. Greater Clark County*, 95 F. Supp. 2d 961 (S.D. IN 2000). To so restrict the Court would render meaningless the entire process of administrative review and, ultimately, the judicial review. *School Board v. Malone*, 762 F. 2d 1210 (4th Cir. 1985). In *Flour Bluff Indep. Sch. Dist. v. Katherine M.*, 91 F.3d 689, 693 (5th Cir. 1996), cert. denied, 519 U.S. 1111 (1997). The Supreme Court has explained that:

"Therefore, a court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? and second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Board of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982) (footnotes omitted). Thus, the Court must decide if the process below complied with the procedures of the IDEA and whether the procedures was reasonably calculated to result in meaningful benefit to Victor. *Cedar Rapids Community Sch. Dist. v. Garret F. by Charlene F.*, 526 U.S. 66 (1999); *Ridgewood v. N.E.*, 30 IDELR 41 (3rd Cir. 1999).

The IDEA requires the hearing review officer (HRO) to issue an independent decision after a complete review of the entire record in this case. 34 CFR 300.510(b)(2). The HRO cannot simply approve the findings of the IHO just because the IHO was the initial fact finder. Indeed, a long line of administrative case law supports the view that the *final agency* decision making may rule adversely to the initial factfinder. The final agency officer, here the HRO, was required to and failed to make findings only after a complete consideration and appraisal of the evidence. *Morgan v. U.S.*, 298 U.S. 468 (1936). Where, as here, the IHO has erred, especially having made errors of law, the HRO was required to reverse and correct the IHO. Since the HRO failed to do so, the Court must ensure that Victor Grant is provided a free appropriate public education. *Moubry v. ISD 696*, 24 IDELR 119 (D. Ct. MN 1996).

Pursuant to the IDEA, the HRO had an affirmative duty based on 34 CFR 300.510, to: 1) Examine the entire hearing record; 2) Ensure that the procedures at the hearing were consistent with the requirements of due process; 3) Seek additional evidence if necessary. If a hearing is

held to receive additional evidence, the rights in 300.509 apply; 4) Afford the parties an opportunity for oral or written argument, or both, at the discretion of the reviewing official; 5) Make an independent decision on completion of the review.

Minnesota law in place at the time required the HRO to issue a decision that was: 1) in writing; 2) include findings and conclusions and 3) based upon the standards in section 125A.08, and in the rules of the state board. Minn. Stat. Sec. 125A.09, Subd. 9. The HRO was to "conduct an appellate review and issue a final decision based on an impartial review of the local decision and the entire record." Minn. Stat. Sec. 125A.09, Subd. 9. By state law, this is deemed to be a trial "de novo." *In re E.N. v. Special School Dist. No. 1, Minneapolis*, 31 IDELR 160 (MN Ct. Appls. 1999). As the HRO did not act in the fashion contemplated by the state statutes or the IDEA, the Court cannot sustain the findings of the HRO.

## ARGUMENT

### I. THE IHO AND HRO APPROVED AN "AFTER THE FACT" IEP.

Defendants argue that the hearing officers found that the Defendant ISD 11's IEP provided Plaintiff Victor with a free appropriate public education. Def. Memo, pg. 8 -21.

However, it is clear that the seminal starting point for any special education due process hearing would be the proposed IEP. In this instance, the parents objected to an IEP from January 2001. This is the IEP that was at issue when the parents requested the hearing on March 30, 2001. (P. Ex. R.) This IEP and the concerns generated in the hearing request were virtually ignored by the IHO. In P. Ex. R, the parents stated they did not agree with the January 31, 2001 IEP for lack of reading services, that they wanted to know if Victor needed assistive technology, including a spell checker and appropriate computer with appropriate software, and that they

believed the district had failed to provide Victor services when he first came to the district in the fall of 1998. (P. Ex. R. ) Rather than addressing this issue, and because the District requested and obtained a continuance, the IHO in the summer of 2001 held a hearing about an IEP from May of 2001. See, HRO Decision. The IHO and HRO then concluded that the Defendant had offered FAPE based upon the "after the fact" IEP of May 2001.

A special education hearing is to focus on what prompted the hearing. 34 CFR 300.507 provides that a hearing may be held on "any matter" related to the child's identification, evaluation, program or provision of a free appropriate public education. This case was essentially a dispute about Plaintiff Victor's initial eligibility for special education services and an appropriate initial IEP. However, due to the IHO's handling of the matter, it instead became a case about whether the Defendant ISD 11's program was appropriate after eligibility.

The dispute began when Ms. Sunderlin rejected an IEP from **January, 2001,** returning it to the ISD 11 on February 1, 2001. (P. Ex. L. ) The parents' request for hearing is dated **March 29, 2001.** (P. Ex. R.) In this instance, the IHO heard evidence on the wrong IEP, a **May 10, 2001** IEP that was created AFTER the hearing was requested and which deemed Plaintiff Victor eligible and offered minimal services. P. Ex. L, the January 2001 IEP was not litigated at the hearing. The HRO notes that the parent raised this issue on appeal but found that because the May 10, 2001 IEP was the "only IEP" proposed by the Defendant ISD 11it was properly the subject of the hearing, rather than the IEP the parent rejected in January and which lead to the parent's hearing request in March of 2001. HRO Decision, pg. 8.

The IEP is the centerpiece of the special education system. *Honig v. Doe*, 484 U.S. 305 (1988). The IDEA provides that a free appropriate public education is statutorily defined as special education and related services that:

(A) have been provided at public expense

(B) meet the standards of the state educational agency

(C) include an appropriate school

and (D) "are provided in conformity with the individualized education program required under section 1414(d)."

20 U.S.C. 1401(8). Where, as here, the IHO and HRO acknowledged that the "only IEP" offered was an IEP provided "after the fact" of a hearing request, it is inconceivable that the hearing officers could conclude that Plaintiff Victor was provided a FAPE by an IEP developed five months after his parents objected to the January IEP and two months after they filed for a hearing. The hearing officers erred that the May 2001 IEP provided FAPE to Plaintiff Victor in September, October, November, December of the 2000-2001 school year. The hearing officers erred in concluding that the May 2001 IEP provided FAPE to Plaintiff Victor in January, February, March, April and May of 2001. Plaintiff Victor was denied a hearing about the real IEP in dispute or the lack of an IEP at all. *Digre v. I.S.D. No. 623*, Civ. No. 4-87-746 (D. Minn. Dec. 17, 1987); *I.S.D. No. 623 v. Digre*, 893 F.2d 987, 991 (8th Cir. 1990). Because the IHO heard the case on the wrong IEP, the hearing officers must be reversed.

## II. PLAINTIFFS' EVIDENCE AT HEARING ESTABLISHED PLAINTIFF VICTOR'S NEED FOR 1:1 READING.

Predetermination of services by a school district will render an IEP invalid. The Defendants claim that Plaintiff Victor did not need 1:1 reading instruction contending that Plaintiff Victor made progress in a non-special education class during the 2000-2001 school year. Def. Memo, pg. 8 -10. Defendants rely in large part on "STAR" testing completed by the school staff which was not even provided to the parents until the hearing was already in session and on

an expert, Dr. Richard Spicuzza, a psychologist, who had never met or evaluated Plaintiff Victor. However, in this instance, the parents asked the district for 1:1 tutoring. The district rejected it out of hand, they "didn't do it."

The parents paid for some private tutoring and then, at hearing, the parents presented evidence of more individualized testing and by persons who had actually worked directly with Plaintiff Victor. That evidence showed that Plaintiff Victor's reading skills at age 13 were at about age 9 level. (P. Ex. GG.) Even though Plaintiff Victor was in sixth grade, and had been retained in second grade, he was reading at best at the fourth grade level. (T. 1119.) He could not break down words to find out how they are said. (T. 1122.) Ms. Brown, a private tutor, who had evaluated Plaintiff Victor, testified that Plaintiff Victor had a severe reading problem and required one-to-one instruction to receive educational benefit. (T. 1114). Ms. Sonday, a reading expert, testified Plaintiff Victor needed one-to-one reading assistance. (T. 1538, 990-992). Notably, Plaintiff Victor himself stated that while at Defendant ISD 11's school, someone worked with him on a 1:1 basis for a two week period. (T. 1665-1666). The Defendant ISD 11 put forth no evidence to explain why such services were started or discontinued. Plaintiff Victor believed he did better with 1:1. (T. 1670-1671). The weight of the evidence is in favor of the student in this regard and the hearing officers should be reversed.

A school district cannot predetermine services as the Defendant ISD 11 did. In *Deal v. Hamilton*, 42 IDELR 109 (6th Cir. 2004), the Court held that to reject a proposed program of education suggested by the child's parents is inconsistent with the intent of the IDEA and erroneously predetermines services. Here, it is clear that at least one reason for rejecting 1:1 services for Plaintiff Victor was a predetermination about that by the school district. When

reading was discussed, the only options offered were either a resource class or an Assurance of Mastery Class. Tutoring could not be an option according to the school district. (T. 988-989; D. Ex. 44, P. Ex. L, T. 1165). The hearing officers erred and the Court must reverse.

## III. PLAINTIFF VICTOR WAS DENIED ASSISTIVE TECHNOLOGY EVALUATION BY ADMINISTRATION, NOT HIS IEP TEAM.

Defendants contend that Plaintiff Victor was not entitled to an assistive technology evaluation. Notably, Defendants concede that the decision to deny Plaintiff Victor an assistive technology evaluation came not from his IEP team, but from outside that team process. Def. Memo, pg. 10-13. The hearing officers erred on this point and the Court should reverse.

The IDEA defines assistive technology service as "any service that directly assists a child with a disability in the selection, acquisition, or use of an assistive technology device. The term includes (a) the evaluation of the needs of a child with a disability, including a functional evaluation of the child in the child's customary environment; (b) purchasing, leasing or otherwise providing for the acquistion of assistive technology devices by children with disabilities; (c) selecting, designing, fitting, customizing, adapting, applying, maintaining, repairing or replacing assistive technology devices; (d) coordinating and using other therapies, interventions or services with assistive technology devices, such as those associated with existing education and rehabilitation plans and programs; (e) training or technical assistance for a child with a disability or, if appropriate, the child's family; and (f) training or technical assistance for professionals who provide services to, employ, or are otherwise substantively involved in the major life functions of the child. 20 U.S.C. 1401(2); 34 C.F.R. 300.6. The decision of whether a child needs assistive technology devices and services is to be made by the IEP team. 34 C.F.R. 300.346 (a)(2) and (b).

If there is a question about whether a student needs a particular service, the IEP team must conduct an evaluation. 34 C.F.R. 300.533(a)(2). A parent can request the IEP team to conduct a reevaluation at any time and that request should be honored. 34 C.F.R. 300.536.

Ms. Sunderlin initially raised the question of assistive technology at the January 31, 2001 meeting when she asked about a spell checker. The staff told her that they were unsure if such a device was available in the district. Then, in her letter of March 20, 2001, Ms. Sunderlin asked again about a Spell Check device and assistive technology, including appropriate computer software. (P. Ex. R.) Here, Defendants assert that Kelley Sunderlin did not request an assistive technology evaluation for Plaintiff Victor until May 20, 2001. D. Ex. 90. Def. Memo, pg. 12. Factually, the parent clearly started asking in January, not May of 2001. More notably, the Defendant ISD 11's school administrator denied the parents request for an assistive technology evaluation without reconvening another IEP team meeting to discuss it. S. D. Ex. 92. It is the IEP team that must make decisions in response to parental requests, not administrators. 20 U.S.C. 1414(d) requires that the IEP team decide whether the child needs evaluation or not, rather than an administrator.

Defendants presume that the parents had the responsibility to "prove" that Plaintiff Victor needed assistive technology <u>before</u> Plaintiff Victor could be evaluated for the possible use of assistive technology. This puts the cart before the horse. It is, effectively, a predetermination that a student must first "show" that he or she needs assistive technology before the district will conduct an assistive technology evaluation. This is not the law. In Plaintiff Victor's case, assistive technology could well mean software to assist him with his learning disabilities. Defendants never considered this nor evaluated to determine what would be helpful.

This is not the first time that the Defendant ISD 11 has refused to provide an assistive technology evaluation or delayed such an evaluation. In *ISD 11 v. Pachl,* 36 IDELR 263 (D. MN 2002), the Court found that the district had denied a child a free appropriate public education where, as here, the district did not conduct a timely assistive technology evaluation. Without conducting such an evaluation, particularly where, as here, the parent requested one, the Defendant ISD 11 is essentially predetermining that the student does not need assistive technology. Predetermination violates IDEA. *Deal v. Hamilton*, 42 IDELR 109 (6th Cir. 2004).

Defendants argue that because Plaintiff Victor had "good grades" and good handwriting, he did not need assistive technology. In this regard, they rely upon the *Zigich v. ISD No. 623,* Civ. No. 99-1212 at 12 (D. MN 2000) (unpublished), but *Zigich* is distinguishable in two respects. First, in the *Zigich* case, the school district had conducted at least all or part of an assistive technology evaluation for the student and determined that a change in assistive technology was not necessary to provide FAPE. Second, in the *Zigich* case, the school district produced objective evidence of progress on the particular goal at issue.

Neither of these facts were present in Plaintiff Victor's situation. The Defendant ISD 11 did not conduct any assistive technology evaluation at all. Plaintiff Victor's grades were modified and thus were not reliable indicators of his skill levels. (P. Ex. M, U) Plaintiff Victor was not yet on an IEP, therefore, his IEP progress was not offered into evidence at all. Even if he had reasonably good grades, this did not preclude Plaintiff Victor, a student with a learning disability, from having a need in the area of assistive technology. Without an evaluation, it is impossible for the Court to determine whether Plaintiff Victor needs assistive technology and if so, what technology is needed. The Court must find for Plaintiff Victor and order such an evaluation.

## IV. PLAINTIFF VICTOR'S ESY CLAIM IS BEFORE THE COURT.

Defendants urge the Court to ignore Plaintiff Victor's ESY claim as being outside of the Court's jurisdiction. Def. Memo, pg. 13-14.

ESY is not an "adjunct" to special education and related services. Rather, ESY is to be considered by the IEP teams for children with disabilities and conscious decisions made, rather than leaving the ESY issue unresolved. Plaintiffs asserted that the Defendants had an illegal ESY policy and had not addressed ESY in a timely or appropriate manner for Plaintiff Victor.

Extended School Year services means special education and related services that are provided to a child with a disability beyond the normal school year of a public agency. These services are generally provided during the summer months, June, July and August. The hearing in this case was held on May 30, June 7, 8, 15, and July 16, 17, and 23, 2001 in response to the parent's hearing request of March 30, 2001 (P. Ex. R.).

ESY services are to be provided:

> "In accordance with the child's IEP."

34 CFR 300.309(b)(1)(ii). And ESY services are to:

> "Meet the standards of the SEA."

34 CFR 300.309 requires that

> "Each public agency shall ensure that extended school year services are available as necessary to provide FAPE, consistent with paragraph (a)(2) of this section.

Defendant ISD 11 apparently concedes that neither the January 2001 IEP or the "after the fact" IEP of May 2001 followed any discussion of ESY services. Defendant ISD 11 argues that ESY is outside the scope of the court's review because plaintiffs did not "exhaust" it before the

hearing officer.

Notably, the IDEA does not subrogate a decision about ESY to a later time or a separate process than the traditional IEP team as the team is writing up the IEP for the school year. In fact, the intent of the rule seems to be the opposite for it states that ESY is to be "in accordance with the child's IEP" which can hardly be done outside of the IEP team process where the IEP is reviewed, written and discussed.

The District produced no evidence at hearing to show that it had specifically discussed ESY at an IEP meeting prior to the parents' request for hearing.

Defendant ISD 11 seeks to foist responsibility for this failure on the parents. The Defendant ISD 11 claims that because the parent did not TELL the Defendant ISD 11 about a desire for ESY services or attend meetings about same, the parent had no right to a hearing on that issue. This analysis is inconsistent with the IDEA's hearing provision which requires that a parent has the right to a due process hearing on "any issue" related to the child's receipt of a free appropriate public education. 34 CFR 300.507(a). Services for a child in the summer must be determined by his IEP team and consistent with that program of education and the IDEA.

Moreover, the Defendant ISD 11's ESY policy was restrictive. First, the policy directed teachers to consider only two basis for ESY - "regression/recoupment "or "loss of self-sufficiency." ESY cannot be limited to just two reasons. *Alamo Heights Ind. Sch. Dist. v. State Board of Education*, 790 F.2d 1153 (5th Cir. 1986); *Johnson v. ISD No. 4 of Bixby*, 921 F.2d 1022 (10th Cir. 1990).

The Defendant ISD 11's ESY policy recommended determination of ESY services by April 1, 2001. Determination of such services by April 1, 2001 effectively eliminate Plaintiffs

ability to seek procedural redress of any contested ESY services before summer. At the time of the case, Minnesota had a two tier process that required some 105 days to complete (45 days for the initial hearing decision, 30 days for either party to appeal and 30 days for the second tier decision). Even if Plaintiffs received ESY services notification right on April 1, if they disagreed with it, a final hearing decision at the second tier could not be completed before summer began. This unreasonable delay in the determination of ESY by Defendant ISD 11 essentially eliminated Plaintiffs ability to complain about the ESY services. *Reusch v. Fountain*, 21 IDELR 1107, 872 F. Supp. 1421 (D. Md. 1994). In fact, even though Plaintiffs hearing was requested in March 2001, the hearing decision was not issued until September, 2001.

Plaintiffs had no answer as to ESY even by the time the case proceeded to hearing and thus, determination of ESY was not premature but rather, clearly overdue. The Court must reverse the hearing officers on the issue of ESY.

**V. PLAINTIFF VICTOR WAS NOT TIMELY EVALUATED IN READING, AT, AND FOR ESY.**

Defendants claim that identification of Plaintiff Victor's needs and status as a special education student, specifically timely evaluation in reading, assistive technology and for ESY were not before the IHO. Def. Memo, pg. 15. Assistive technology and ESY have already been addressed. However, the failure to timely and fully evaluated Plaintiff Victor's reading skills is just as serious. The responsibility to ensure evaluation is that of district staff, not the parent. *ISD 11 v. Pachl*, 36 IDELR 263 (D. MN 2002). Parents do not need to have the knowledge about what to ask for in terms of assistive technology or any other type of special education service. The parents role is to ask the question and raise the need, which Ms. Sunderlin did. *M.C. v. Central*

*Regional School District*, 81 F.3d 389 (3rd Cir. 1996).

Defendant's evaluation for reading was not completed in a timely and comprehensive way. Instead, the Defendant ISD 11 primarily relied upon a series of classroom tests known as "STAR" tests. Defendant ISD 11 did not adequately test Plaintiff Victor's "word attack" or basic reading. 34 C.F.R. 300.541(a)(2)(iv) requires that a student be tested for "basic reading skill." Basic reading skills cannot be determined without identifying word attack. A student suspected of having a learning disability must be timely evaluated in basic reading as well as reading comprehension. 34 CFR 300.541(a)(2)(iv) and (v). Defendant ISD 11 did not provide any proof of having evaluated Plaintiff Victor in word attack or basic reading skill using a measure designed to do so. Evaluation procedures must be standardized and must have been validated for the specific purpose for which they are used. 34 C.F.R. 300.532 (c). Defendants provided no proof that the "STAR" tests were designed to measure basic word aack and determine eligibility for reading services.

The hearing officers erroneously relied upon the STAR testing, a general measure of reading skills used in a typical education classroom. This is less than what the IDEA requires.

**VI. PLAINTIFF VICTOR'S PARENT DENIED PROCEDURAL SAFEGUARDS.**

Defendant ISD 11 asserts that it substantially complied with providing procedural safeguards to Plaintiff's mother. Def. Memo, pg. 19-21. Defendant's argument is that it provided Ms. Sunderlin with a copy of procedural safeguards in November of 1998. Def. Memo, pg. 20. Providing this information to Ms. Sunderlin at an earlier time, possibly in relation to her other son, does not establish or meet the Defendant's proof to have provided Ms. Sunderlin with notice of her rights during the 2000-2001 school year concerning Plaintiff Victor's needs. The parents

contended that as of March 30, 2001, when the parent asked for the hearing, she had yet to receive Notice of Procedural Safeguards regarding Victor. (P. Ex. R)

34 C.F.R. 300.504 requires that a copy of the procedural safeguards be provided to the parents:

(1) upon initial referral for evaluation.

(2) upon each notification of an IEP meeting.

(3) upon reevaluation of the child.

(4) upon receipt of a due process hearing request.

20 U.S.C. 1415(d). Ms. Sunderlin testified that she did not understand what her rights were with respect to insisting that Plaintiff Victor receive special education services in Defendant ISD 11 as he had in other states. As a result, she took no action to protect his rights until the 2000-2001 school year. During the January 2001 meeting, Plaintiff did not have knowledge of her rights. Obviously, had she been aware of rights, Ms. Sunderlin could have acted earlier to get Plaintiff Victor qualified for services. Because she did not know, and because Plaintiff Victor is a minor, Plaintiff Victor did not qualify for special education services between 1998 and 2000-2001. This "seriously hampered her opportunity to participate in the formulation process" and thus, impaired Ms. Sunderlin's rights and denied Plaintiff Victor a free appropriate public education. *ISD No. 283 v. S.D.*, 88 F.3d 556 (8th Cir. 1996).

## VII. PLAINTIFF VICTOR'S PARENT DENIED PRIOR WRITTEN NOTICE TO DENY 1:1 READING REQUEST.

The purpose of prior written notice is to help ensure that the parents of children with disabilities are equal participants in the IEP team process. If parents are not provided information

by the school district about why it will or will not provide a particular service, then parents are not equal partners. A school district cannot simply reject, without consideration, a parent's ideas about services for their student. The school district staff must have an open mind and consider what the parents are suggesting. In *Deal v. Hamilton*, 42 IDELR 109 (6th Cir. 2004), the Court held for the parents of a student with autism because the school district staff refused to even consider the parent's idea of certain services for their child with autism. Here, the school district did not have an open mind as to reading services for Plaintiff Victor. As a result, the parents were reduced to receivers of what the school district would do, rather than the collaborative process envisioned by the IDEA. The Supreme Court has recognized that a private placement or an out of school placement, such as private one-to-one tutoring, is an option that school IEP teams can and should discuss. *Burlington Sch. Comm. v. Dept. Ed.*, 471 U.S. 359 (1985). In this instance, the parents asked about private one-to-one tutoring at the January 2001 meeting, were told no, and then the district essentially moved into defensive reasoning for why those services could not be provided to Plaintiff Victor.

Defendant ISD 11 asserts that it provided Plaintiff Victor's parent, Kelley Sunderlin, with prior written notice that it was going to deny the 1:1 reading instruction request. Def. Memo, pg. 16-18. The IHO ignored the fact that prior written notice had to be requested by the parent and was not provided until May 16, 2001. As of March 20, 2001, the ISD 11 gave an oral refusal of one-to-one tutoring–because according to SD Ex. 52–the school did not have such a program. The HRO found that the Defendant ISD 11 had provided prior written notice as to its decision to deny one to one reading instruction on May 16, 2001. HRO Dec., pg. 6. The HRO missed the point of prior written notice.

The IDEA demands that school districts provide parents with prior written notice about any proposes or denials of services. 34 CFR 300.503. Ms. Sunderlin did not receive prior written notice in this instance until AFTER her request for a hearing. **The hearing was requested in March 2001 and the HRO found that prior written notice was not given on the reading issue until May of 2001.**

The purpose of prior written notice is to give the parent information before a proposal is implemented, and before hearing is requested so that the parent may understand the district's reasoning and rationale. In this way, the parent can then be an equal participant in the development of the child's IEP. The federally mandated regulation requires that written notice be given "a reasonable time before the public agency" proposes to initiate or change or refuses to initiate or change the provision of FAPE. 34 CFR 300.503(a). Ms. Sunderlin did not receive prior written notice.

1. **Prior written notice must include a description of the action refused**. 34 CFR 300.503(b)(1). In January, 2001 refusal was any reading service allegedly because Victor did not qualify for services under Minnesota's very restrictive discrepancy formula.[4] However by March, 2001 the refusal was one-to-one reading services and private tutoring services at district expense. By May 16, 2001, that refusal changed to a vague proposal for some reading services.

2. **Prior written notice must include an explanation of why the agency proposes**

---

[4] The parents objected to this formula during the hearing; the IHO did not permit much testimony regarding it. The parents believe that the IHO erred in this regard; if the discrepancy formula was not relevant then the parents would have been told in December that

**or refuses to take the action**. 34 CFR 300.503(b)(2) In January, the refusal for any reading services was allegedly based on state criteria. During the March 20, 2001 meeting, the refusal for one-to-one was based on the lack of such services in the district. By May 16, 2001, the refusal was now because of Victor's "needs."

3. **Prior written notice must include a description of any other options considered and rejected**. 34 CFR 300.503(b)(3) No options were given in January, 2001. Only class based options were discussed in March, 2001. And, by May, 2001 only school based options continued.

4. **Prior written notice must include a description of each evaluation procedure, test, record, or report the agency used as a basis for the proposed or refused action**.34 CFR 300.503(4) In January, 2001 at the meeting, only the Woodcock Johnson was relied upon and a denial of services given orally. In March, 2001, at the meeting, there is oblique reference to the Star tests but none are fully discussed by the team. (SD Ex. 52) At the May, 2001 meeting, there was apparently some discussion of the Gates tests, but the Star Tests were not provided to the parents even prior to the hearing. Ms. Sunderlin heard about some of the Star Test results from the teacher for the first time when the teacher was testifying! Finally, Dr. Spicuzza's information is not incorporated into this prior written notice.

5. **Prior written notice requires a description of any other factors that are relevant to the agency's proposal or refusal**. 34 CFR 300.503(b)(5) The ISD 11 proffered at hearing, and the IHO relied upon how Victor did in comparison to

---

Victor qualified for special education services in reading.

others and whether it was common to provide a student like Victor with one-to-one. Neither of these two factors were disclosed in January, in March and only possibly obliquely in May.

The Defendant ISD 11 violated prior written notice. Where prior written notice is violated, a child has been denied a free appropriate public education. The HRO should find that Victor's parent was denied prior written notice and that as a result, she went out and purchased tutoring to help him. Had the ISD 11 taken even minimal steps to comply with prior written notice in January or again in March, or to recognize the parents' concerns and have a discussion about them, this cost would not perhaps have been necessary. But when a parent is told in December, and January and March that the ISD 11 will not provide reading help to the student, a parent will act. The parents position should be upheld on the private tutoring in part because of prior written notice

**VIII. PLAINTIFF'S COMPLAINTS PURSUANT TO SECTION 1983 and SECTION 504.**

Defendants urge the Court to ignore other related claims pursuant to Section 1983 and Section 504. Def. Memo, pg. 22-26. This Court did dismiss Plaintiffs claims pursuant to Section 1983 and Section 504. *Reinholdson v. State of Minnesota et al.*, 2002 WL 31026580, 37 IDELR 13 (D. MN 2002) ordering Plaintiffs claims severed and permitting only Plaintiffs IDEA claims to proceed and to proceed only against the Defendant ISD 11 (not the Defendant State of Minnesota). The Eighth Circuit Court of Appeals modified the decision with respect to severance. *Reinholdson v. State of Minnesota, et al.*, 346 F. 3d 847 (8th Cir. 2003). Counsel agrees, however, that at this stage, the Federal Court has dismissed the claims pursuant to Section 1983 and Section 504 and, as the Court has not permitted refiling of those claims, or any discovery on those claims, the matter awaits a return to the Eighth Circuit. Plaintiff Victor

reserves all rights and arguments as to these claims given the District Court's ruling.

**CONCLUSION**

The Court should reverse the decision of the Hearing Review Officer and award Plaintiff Victor Grant all appropriate relief.

Dated this 15th day of March, 2005.

/s/ Sonja D. Kerr

Sonja D. Kerr, Bar Number 18777x
KERR LAW OFFICE
c/o Disability Law Center of AK
3330 Arctic Blvd., Suite 103
Anchorage, AK 99503
Tel: 907-565-1002; fax: 565-1000

/s/Mary S. Josefson

Mary Josefson, Bar Number 0052772
1821 Rhode Island Ave. N.
Golden Valley, MN
Tel: 763-544-5390

/s/Judith Gran

Judith Gran, Bar Number 40134
Public Interest Law Ctr. of Phil.
125 S. 9th St., Suite 700
Philadelphia, PA 19107
Tel: (215)-627-7100

Counsel for Plaintiffs Reinholdson
Including Plaintiff Grant and K. Sunderlin