UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Victor Grant, by his
parent Kelley Sunderlin,

Plaintiff,

v.

State of Minnesota, et al.,

Defendant.

Court File No. 02-795 (ADM/AJB)

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD/ SUMMARY JUDGMENT**

## INTRODUCTION

Defendant Independent School District No. 11, Anoka Hennepin, submits this memorandum in opposition to Plaintiff's Motion for Judgment on the Administrative Record.

## ARGUMENT

### I. THE HRO DID NOT ERR IN UPHOLDING THE IHO'S DECISION

#### A. The IHO correctly admitted the May 10, 2001 IEP.

The Parent argues that the Independent Hearing Officer (IHO) erred by admitting the IEP proposed by the School District on May 10, 2001 into evidence at the hearing. As the Parent notes, the IHO considered briefs by both parties on this issue prior to the hearing. See Ex. A and Ex. B. On ---, the IHO issued an order ____. See Ex. C.

Parent asserts that the IHO erred in admitting the District's proposed IEP and that when a parent requests a hearing, the IEP that should be litigated is the one that prompted the parent to request a hearing. P. Br. at 8-9. Parent is seeking to litigate a draft IEP. As discussed above, Parent does not have the right to challenge a draft IEP, and the District is not required to defend a draft IEP.

As discussed below, the IEP correctly admitted the District' proposed IEP dated May 10, 2001.

The IHO was required to admit the District's proposed IEP into evidence and determine whether it offers FAPE.

Minnesota Rule 3525.4100 states that five days before the commencement of a due process hearing, the IHO "shall receive . . . a copy of the pupil's current and proposed IEP." Minn. R. 3525.4100, subp. 1(C). Information received under this Rule must be "made a part of the hearing record." Id. subp. 1(D). Additionally, the Rule states that upon receiving a copy of the proposed IEP, the IHO shall review the proposed IEP to determine whether it complies with the law. Id. subp. 2(A). The District proposed an IEP for Student on May 10, 2001. This is the only IEP the District has ever proposed for Student. Tr. 234-35. Thus, pursuant to Minnesota Rule 3525.4100, the IHO was obligated to consider the District's proposed IEP, to make it part of the hearing record, and to determine whether it complies with the law.

Additionally, Minnesota Rule 3525.4100, subpart 2(E), states that upon receiving a copy of a school district's proposed IEP, the hearing officer "may require the district to propose an alternative IEP." Given that hearing officers have jurisdiction to require school districts to propose an alternative IEP after a parent requests a hearing, common sense dictates that hearing officers must have jurisdiction to review an IEP proposed after a parent requests a hearing.

Parents must give a school district an opportunity to provide FAPE

"A parent who seeks educational services for a child must give the School District an opportunity to provide those services before administrative or judicial relief may be sought or provided." Independent Sch. Dist. No. 432 v. J.H., 8 F. Supp.2d 1166, 1175 (D. Minn. 1998) (citing Evans v. District No. 17, 841 F.2d 824, 831-32 (8th Cir. 1998)). Here, Parent has sought to deny the District that opportunity and has impermissibly sought to frustrate the District's significant efforts to provide FAPE. See Doe v. Defendant I, 898 F.2d 1186, 1191 (6th Cir. 1990)

(school district was frustrated in its efforts to provide FAPE due to lack of parental cooperation). "[T]here can be no showing of inadequate services or the denial of FAPE where a school district is not afforded a sufficient opportunity to formulate or revise an IEP." Independent Sch. Dist. No. 432 v. J.H., 8 F. Supp.2d 1166, 1175 (D. Minn. 1998) (citing Schoenfeld v. Parkway Sch. Dist., 138 F.3d 379, 382 (8th Cir. 1998)).

Parent has repeatedly acted to frustrate the District's efforts to meet and complete the development of an IEP. The IHO found that "the record is replete with [evidence of] the District's extensive efforts to secure the Parent's attendance at IEP meetings . . . ." IHO Decision at p.15. The IHO further found that "some of the delay in the programming can be attributable to the Parent." Id.

If the IHO had excluded the proposed IEP from evidence, Parent would have been rewarded for her stall tactics and uncooperative conduct. Attempts to protract litigation should not be condoned, nor should conduct which is contrary to the cooperative process envisioned by IDEA.

The proposed IEP—the only IEP offered by the District—is the single most important document in the hearing, and it is the only document which provides an accurate view the Student's proposed program of education. The ultimate purpose of a due process hearing is to determine whether the school district has met its obligation to offer the child a free appropriate public education. Without consideration of the proposed IEP, the ultimate purpose of the hearing would be frustrated. This is precisely why Minnesota Rule 3525.4100, subpart 1(C) mandates that the IHO receive a copy of the pupil's current and proposed IEP.

Incredibly, Parent argues that it will be futile to request due process hearings if a school district is permitted to continue working through the IEP process to develop an IEP that appears to address the child's needs. P. Br. at 9. Thus, Parent is essentially arguing that rather than

continue working to develop an appropriate IEP, school districts must abort the IEP team process once a parent requests a hearing.

Contrary to the arguments made by Parent's counsel, a school district's obligation to provide FAPE is not suspended the day a parent requests a due process hearing. See Town of Burlington v. Department of Education, Commonwealth of Massachusetts, 736 F.2d 773, 794 (1st Cir. 1984); Norma P. v. Pelham School District, 19 IDELR 938, 939 (D.N.H. 1993) (citing Burlington) ("To prohibit a school district from making continual efforts to fashion placement plans during the pendency of litigation would in effect require a school district to violate established statutory duties"). The parents in Norma P. argued that allowing review of the subsequent IEP unfairly diverted their energies and resources from the original disputed IEP. The court rejected this argument and found that any additional burden on the parents did not justify bringing the "entire process to a standstill." Id. Similarly, in the instant case, Parent's attempt to exclude the proposed IEP from the hearing is an attempt to bring the "entire process to a standstill" and to block the District's efforts to cooperatively develop an appropriate program of education for Student. It is in Student's best interests to allow the process of developing IEPs to freely proceed after a parent has requested a due process hearing.

In support of her argument that the IHO erred by admitting the May 10, 2001 IEP, the Parent asserts "This case was essentially a dispute about Plaintiff Victor's initial eligibility for special education services." Pl. Memorandum at 12. This bald assertion is completely unsupported by any evidence in the record. During the hearing, the Plaintiff did not present any evidence regarding the Student's initial eligibility for special education services. CHECK TRUE?

Furthermore, prior to the hearing, the School District brought a motion in limine to limit evidence presented at hearing. Plaintiff did not oppose.

The Plaintiff also asserts, "School districts cannot be allowed to extend hearing dates and then create new IEPs for the purpose of improving their position at hearing." In fact, a careful review of the entire record indicates that initial delays were at the request of Plaintiff's counsel. Examples

**B. The IHO did not err by extending the decision date.**

Parent's assertion that the IHO erred in extending his decision date is, at best, disingenuous. The IHO procedural record and the substantive record both show that at nearly every turn Parent acted to protract the proceedings and caused months of delay..

Parent requested a due process hearing on March 30, 2001. See SD Ex. 60. On April 5, 2001, the MDCFL appointed Kenneth Udoibok to preside as the IHO. A prehearing conference was not held until April 19, 2001, because Parent's counsel stated that she was not available until that date. During the prehearing conference, Parent's counsel, who claimed to have a temporary disability because of a shoulder injury, objected to beginning the hearing before June 10, 2001, which marked the end of the 2000-2001 school year. See Prehearing Conf. Tr. at 20-21, 32. District counsel repeatedly asserted that although a reasonable extension to the 45-day deadline could be granted, the District had a right to have the hearing conducted before the end of the 2000-2001 school year. Id. at 6-10, 16-17, 20. Parent's counsel stated:

> So, you know, the parents knew that I was on disability when they made those requests [for a hearing], but nonetheless, it's their choice to choose the attorney that they want. The knew I was laid up and whatever. . . .
>
> But I think as far as the 45 day rule, the 45 day rule, according to the interpretation given by the Office of Special Education [Programs] in Letter to Kerr is that the hearing officer retains the right to determine what is good cause.
>
> And, you know, I think that we have—we have granted extensions because people have vacations, because people have other things pending . . . . And so I think a medical reason is a very viable one, and I think it's well within the hearing officer's discretion. My clients don't prefer to we have to delay things. On the other hand, they prefer my expertise. So, you know, that's the choice they're making.

Id. at 14-15 (emphasis added). When the District continued to assert its right to have the hearing completed before the end of the 2000-2001 school year, Parent's counsel threatened to sue the District for violating her rights "as a temporarily disabled person."[1] Id. at 21.

In an attempt to find some middle ground, the District offered to begin the hearing during the last week in May and to complete the hearing on days that Parent's counsel did not have a conflict during the first two weeks in June. Id. at 22-23. Parent's counsel stated: "My position is well—is as indicated and I feel there's nothing more I can say and that the school district is going to get its way so I have nothing more to say." Id. at 32. The IHO ultimately scheduled the hearing to begin on May 30, 2001, and continue on June 7, 8, 14, and 15, 2001. Post-hearing briefs were initially due on June 29, 2001. See IHO's Hearing Schedule and Order, dated April 19, 2001.

On May 30, 2001, the parties were in hearing for less than two hours because the IHO had a conflict in the morning, Parent's counsel asserted that she could only work half a day, and Parent asserted that she had day-care issues in the afternoon. Tr. 6. No testimony was taken on June 14, 2001, because the IHO's father suffered a heart attack that morning. Despite this tragic event, the IHO was present for hearing on June 15, 2001. Additional hearing dates were scheduled for July 16, 17, and 23, 2001. These dates were selected by Parent's counsel who represented that Parent's witnesses would be available on those dates. See IHO Procedural Record (Letter from Kerr to Udoibok, dated June 18, 2001; Letter from Waldspurger to Udoibok, dated June 25, 2001; Letter from Kerr to Udoibok, dated June 27, 2001; Letter from Waldspurger

---

[1] On April 26, 2001, the MDCFL wrote Ms. Kerr a letter responding to her request for accommodations and stating that Rule 1.16 of the Rules of Professional Conduct appeared applicable. That rule states, in pertinent part, that "a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if . . . the lawyer's physical or mental condition materially impairs the lawyer's ability to represent the clients." A copy of the MDCFL's letter was copied to the IHO and should be part of the IHO procedural record.

to Udoibok, dated July 13, 2001). During an off-the-record discussion, Parent specifically represented to the IHO that the hearing could not be completed in June because Arlene Sonday, one of Parent's "expert" witnesses, was on vacation for until late July 23, 2001. During her testimony, Ms. Sonday confirmed she had been out of town for an extended period of time. Tr. 1634.

At 3:00 p.m. on July 16, 2001, Parent's counsel chose to end for the day and not call another witness. Tr. 1009. District counsel, who had repeatedly objected to the delay in the proceedings, responded by stating:

> We have hearings [scheduled] from 9:00 to 4:30. We don't start until 10:00 and then we quit at 3:15. And in the very beginning of this I said, Judge, I was concerned about how this was going to drag out. I was upset that we weren't scheduling it within the time lines required. Now we're way the heck out. I've been patient. When an emergency comes up, that I understand. Even the first day we had day-care issues come up, that I understand. When there's no good reason not to proceed with the day, that I don't understand.

Tr. 1012-13. The IHO nonetheless granted Parent's request to conclude for the day at 3:00 p.m. Id.

On the last day of hearing, the parties established a briefing schedule. In discussing the due date for the IHO's decision, Parent's counsel stated: "You need to give yourself more time. I don't have any problem with that." Tr. 1685.

When the briefing schedule was established, District counsel inadvertently overlooked longstanding vacation plans that extended to August 13, 2001. See IHO Procedural Record: Letter from Waldspurger to Udoibok, dated 8/7/01. Consequently, on August 7, 2001, the District requested a four-day extension of the deadline for submitting post-hearing briefs. Id. In making this request, the District noted that the IHO had granted each of the Parent's requests for long extensions, including an extension of nearly one month to accommodate the vacation schedule of Parent's expert witness, which resulted in the hearing being protracted from March

30, 2001 until July 23, 2001. Id. District counsel explained that he could not have anticipated that the hearing, which was requested on March 30, 2001, would extend over the period of a vacation previously scheduled for August 2001. Id.

The IHO granted the District's request for an extension. Because the electricity was out in the part of St. Paul where the IHO's office was located, the IHO signed the District's proposed order and sent it to District counsel by messenger with instructions to immediately fax a copy to Parent's counsel. District counsel complied with the IHO's instruction.

On September 6, 2001, the IHO wrote to the parties requesting an extension of time to complete his decision because he deemed this to be a large and complex case. See Letter from Udoibok to Kerr and Waldspurger, dated 9/6/01. The IHO specifically requested an extension until September 17, 2001. Recognizing that the case involved over 100 exhibits, nearly 1700 pages of transcript, and numerous legal issues, the District wrote to the IHO on September 7, 2001 and moved, for good cause, to extend the decision date to September 17, 2001. See Procedural Record.

In sum, Parent caused literally months of delay in order to accommodate the availability of her attorney and the vacation schedule and availability of her witnesses. Parent cannot now be heard to claim that she has been prejudiced[2] by a four-day extension to accommodate District counsel's longstanding family vacation, or a subsequent ten-day extension to permit the IHO to complete his decision. Given the months of delay that Parent caused, it would be absurd to conclude that an additional fourteen-day delay in receiving the IHO's decision compromised Student's right to FAPE, seriously hampered Parent's opportunity to participate in the IEP formulation process, or caused a deprivation of educational benefits. Moreover, an alleged

---

[2] This is not a case where the IHO found that the parent's proposal was appropriate and, thus, the delay in the decision delayed the implementation of the parent's proposal. Here, the IHO clearly ruled that the District's actions were appropriate and that its proposed IEP offered Student FAPE.

violation of the 45-day deadline is not actionable under IDEA. Nieuwenhuis v. Delavan-Darien Sch. Dist., 996 F. Supp. 855, 868 (E.D. Wis. 1998) (finding IHO's retroactive extension of 45-day deadline was proper and alleged violation of the 45-day deadline is not actionable).

The IHO denied Parent's request for an extension to call witness because Why was Parent witness denied

### C. The IHO correctly determined the Parent did not oppose the District's Motion in Limine.

The Parent argues that IHO erred by finding that the Parents did not oppose the District's May 7, 2001 motion in limine regarding the exclusion of evidence at hearing. On April 19, 2001, Hearing Officer Udoibok issued a prehearing scheduling order in this matter. The order provided that "All motions must be filed on or before [May] 7, 2001. Responses to the motions must be filed on or before May 10, 2001." Ex. E. On May 7, 2001, the School District filed a motion in limine requesting that the IHO limit the evidence at hearing to "that which is relevant to the appropriateness of the Student's education during the one-year period preceding the Parent's March 30, 2001 request for a due process hearing." Ex. F. The Parent did not file a response to the District's motion by the deadline provided in the IHO's scheduling order. On May 14, 2001, however, counsel for the Parents wrote a letter to the IHO stating, "We do not oppose the motion in limine per se, but do ask that the IHO rule as a factual matter with respect to the beginning of the time frame." The letter continued, "We do not oppose the motion in limine as far as the outside date of March 30, 2001, so long as no evidence past that date is accepted from either party." See Ex. G. The Parent now claims that she failed to respond to the District's motion to avoid spending "excessive attorney time and funds." This after-the-fact justification does little to change the evidence in the administrative record. The IHO correctly ruled that the Parents did not oppose the District's motion in limine on this point. See Ex. H

The Parent next argues that the IHO erred in holding that a one-year statute of limitations applied to the Student's claims. Although the Plaintiff now provides case law opposing a one-year statute of limitations, this information was never included in the administrative record because the Plaintiff failed to respond to the District's motion in limine. More importantly, the Plaintiff failed to appeal the statute of limitations ruling to the Hearing Review Officer, and therefore waived the ability to challenge this issue. CITE

Finally, the Parent alleges the IHO and the HRO erred because the District "was allowed to introduce evidence regarding Plaintiff Victor's earlier evaluation in the district while simultaneously preventing the parent from litigating that period of time." The Parent, however, never requested litigate the Student's earlier evaluation. No testimony about it at hearing? In hearing request? What evidence did District introduce and for what purpose?

**D. The IHO and the HRO did not ignore the Student's testimony.**

The Parent next asserts that the IHO and the HRO "completely ignored" the Student's testimony in this case. Simply because the IHO did not rule in the Parent's favor does not mean that he "completely ignored" the Student's testimony. The District offered ___ witnesses who testified that . Contrary to the Plaintiff's assertion, the Student <u>did not</u> testify that he learned to read and to do spelling/written work from his tutor, not from the teachers at school. This assertion is simply unsupported by the record. The Student <u>did</u> testify that he had a good experience working with Stephanie, his private tutor, and that he wanted it to continue. Tr. at 1663. He also testified that he improved in reading during the year because "because Stephanie helped me with that." Tr. at 1667. Finally, the Student testified that he found his reading class "kind of boring…because I mostly know a lot in there." Tr. at 1668. The IHO's role is to evaluate *all* of the testimony presented at hearing, weigh the credibility of the witnesses, and determine --. The Court should not second guess the credibility determinations made by the IHO

during hearing. CITE The IHO and the HRO did not err by finding that a preponderance of the evidence supported that District's argument that that Student benefited from the reading instruction provided by the School District.

## II. THE HRO CORRECTLY UPHELD THE IHO'S FINDINGS OF FACT

## III. THE HRO AND IHO CORRECTLY DETERMINED THE PARENT HAD WAIVED CERTAIN ISSUES

Although she does not identify the issues that were deemed waived, Parent asserts that the IHO erred in determining that she had waived issues that she had not pleaded with specificity pursuant to Minnesota Statutes section 125A.09, subdivision 6. See P. Br. at 13-14. Among other things, Parent argues that section 125A.09, subdivision 6, violates her rights under 34 C.F.R. § 300.507.

Hearing Review Officer Wright has already rejected Parent's argument. Student v. ISD No. 11, MDCFL Case No. 423-2, at 6-7 (SEA 2001). There, HRO Wright held:

> The Student argues that she is not required to identify issues for a due process hearing with specificity because the Minnesota law requiring specificity is in conflict with federal law. Minnesota law provides that "the party requesting the hearing shall plead with specificity as to what issues are in dispute and all issues not pleaded with specificity are deemed waived. Minn. Stat. Sec. 125A.09, subd. 6. The regulation relied on by the Student, 34 C.F.R. 300.507, is not in conflict with Minnesota law and does not support the assertion that specificity is not required. The regulation clearly provides that the notice must include a description of the issues, including facts relating to the issues, 34 C.F.R. 300.507(c)(2)(iv). Federal courts as well as hearing review officers in Minnesota have held that issues must be identified with specificity. See Independent Sch. Dist. No. 432 v. J.H., 8 F. Supp.2d 1166 (D. Minn. 1988)(explaining that law requires the parties to precisely frame the issues).

Id. Accordingly, in the instant case, IHO Udoibok properly excluded issues that were not pleaded with specificity pursuant to Minnesota law.

Parent also asserts that the changing nature of the District's actions made specification impossible. Parent's assertion is at odds with the facts. Pursuant to the Scheduling Order, Parent

was permitted to amend her issues any time on or before May 23, 2001. The District proposed its IEP on May 10, 2001. Thus, Parent had thirteen days to amend her issues to address the proposed IEP. She chose not to do so. Parent did inform the District that she objected to the IEP on the ground that it did not provide one-to-one reading instruction; that the Sonday System Learning to Read was an inappropriate methodology for Student; and that an AT evaluation had not been conducted. See SD Exs. 86, 90. Parent was permitted to present evidence on those issues at hearing, where she abandoned her claim regarding AT.

## IV. THE IHO PROPERLY ADMITTED DR. SPICUZZA'S TESTIMONY

The Parent argues, weakly, that the IHO erred by allowing the testimony of Dr. Spicuzza because he had "neither met nor evaluated" the Student. Dr. Spicuzza, however, testified as an expert on educational assessments and evaluations. His testimony focused on the meaning and appropriateness of the District's evaluations of the Student, and therefore, the Student's progress based on those evaluations. This testimony was well within the parameters of expert testimony. Interestingly, the Parent's own "expert" witness, Arlene Sonday also had never evaluated or tested Student. Tr. 1542-43, 1603. Ms. Sonday has never tutored Student. Tr. 1556, 1565, 1602. The first and only time Ms. Sonday ever met ever met Student was the day she testified at hearing. Tr. 1598, 1603.

The Parent's argument that Dr. Spicuzza should not have been allowed to testify because he had not met or evaluated the Student has been soundly rejected by other Minnesota hearing officers. See e.g., [Student] v. Independent Sch. Dist. No. 11, MDCFL Case No. 390, at 29-30 (LEA 2000) (Jay, IHO) (explaining that the opinion of an expert who had never met the student would not be excluded, and that the IHO would determine the appropriate weight to give the expert's testimony) Ex. __(attached). IHO Jay noted that there is not precedent requiring exclusion of testimony at a due process hearing level, and that it has been the practice of

Minnesota Hearing Officers to admit opinions of experts based on a records review. Id. (citing [Student] v. SSD No. 1, MDCFL Case No. 248 (1997)). Plaintiff's argument that the IHO erred by allowing Dr. Spicuzza's testimony is completely without merit.

## V. THE IHO AND HRO CORRECTLY DETERMINED THE STUDENT WAS NOT ENTITLED TO AN ASSISTIVE TECHNOLOGY EVALUATION

Neither the IHO nor the HRO erred in determining that that Student was not entitled to an assistive technology evaluation. As argued extensively in the School District's Motion for Judgment on the Administrative Record, the School District was not obligated to evaluate the Student for, or provide, assistive technology.

The United States District Court for the District of Minnesota has held that a school district's "obligation to provide assistive technology is limited to assistive technology which is necessary to provide FAPE." Zigich v. Independent School District No. 623, Civ. No. 99-1212 at 12 (D. Minn. 2000) (unpublished opinion). The record in this case is replete with evidence that the Student received FAPE without assistive technology. For example, during the 2000-20001 school year, the Student earned a B and three A's in Reading. Tr. at 382, 478, 485. He also earned four B's in English (Tr. at 382, 386) and two C's and a B in Math. (Tr. at 382.) The Student's teachers testified that he has neat handwriting, (Tr. at 222), nice penmanship (Tr. at 377) and "excellent writing." (Tr. at 499, 580). Dr. Johnson, the school psychologist, testified that, after evaluating the Student, he found the Student was "able to form letters. He's able to write them quickly enough. There is no problem with legibility." Tr. at 264. The Parent agreed that the Student does not have any physical impairment that would prevent him from writing by hand. Tr. at 1408. Furthermore, at hearing the Parent presented no testimony or other evidence regarding the function she believes a computer would serve for Student, or why she believes Student needs a computer. Accordingly, pursuant to the Minnesota Federal District Court's decision in Zigich, the District does not have any obligation to conduct an AT evaluation of the

Student to determine whether he needs a computer or other assistive technology. See Zigich, Civ. No. 99-1212, at 12 .

Distinguish Pachl cite by Parent

## VI. EXTENDED SCHOOL YEAR

## VII. THE RECORD ESTABLISHES THE STUDENT DID NOT NEED ONE-TO-ONE READING INSTRUCTION TO RECEIVE FAPE

The Parent argues that the IHO's finding that the Student did not need one-to-one reading instruction is inconsistent with the administrative record in this matter, citing as support the testimony of Parent's witnesses Ms. Sonday and Jennifer Brown. In fact, Ms. Brown's testimony supports the assertion that the Student did not need one-to-one reading instruction to receive FAPE. Ms. Brown testified that if Student were making progress in reading at school, she would change her opinion regarding whether he needs one-to-one reading instruction. Tr. 1189-90. She specifically stated, "If [Student] were making progress at school, there wouldn't be an issue. I would not believe he needed one-on-one if he was having his needs met." Tr. 1190. Ms. Brown further acknowledged that if Student had made progress in school without one-to-one instruction, then her opinion that he needs one-to-one instruction would be incorrect. Tr. 1216. Finally, Ms. Brown admitted that she does not know whether Student made progress in school, and that she assumed he did not because that is what Parent told her. Tr. 1187, 1189, 1255.

Like Ms. Brown, Ms. Sonday admitted that she does not know whether Student made progress during the past year, Tr. 1591, but she was told by Parent or her counsel that Student was not making progress. Tr. 1600-01. Ms. Sonday never evaluated or tested Student. Tr. 1542-43, 1603. Ms. Sonday has never tutored Student. Tr. 1556, 1565, 1602. Ms. Sonday has never observed Student at school, and she has never observed Student interact with other students at school, nor has she observed whether he benefits from receiving instruction in a

classroom with other students. Tr. 1603. Ms. Sonday has never attended any IEP meetings for Student. Tr. 1641. The first and only time Ms. Sonday ever met Student was the day she testified at hearing. Tr. 1598, 1603.

In contrast, District staff, who regularly work with the Student, testified that he does not need one-to-one reading instruction because he made significant progress in the small group setting of his Assurance of Mastery (AOM) class, a non-special education remedial reading program, during the 2000-2001 school year. Tr. at 147-48, 241, 392, 495. Buttressing this testimony, the record overwhelmingly demonstrates that, based on numerous measures, the Student has undeniably made progress in reading during the 2000-2001 school year without one-to-one instruction. For example, the Student made progress as measured by the unmodified grades he earned in Reading. During the 2000-2001 school year, the Student earned the following quarterly grades in Reading: B, A, A, A. Tr. at 382, 478, 485; S.D. Ex. 72. In addition, the Student improved his scores on the STAR reading test, a computer adaptive test that assesses vocabulary and reading comprehension skills. Tr. at 636, 408. The Student took the STAR reading test on September 8, 2000, and the test showed that on that date the Student's grade equivalent ("GE") was a 3.4, meaning third grade, fourth month. Tr. at 363; S.D. Ex. 15. As of November 7, 2000, the Student's GE in reading increased from 3.4 to 4.2. P. Ex. II.[3] The Student took the STAR test again on January 23, 2001, shortly after the District's holiday break and the test showed that the Student's GE had declined to 3.3. P. Ex. II. This variation could be explained by the Student's motivation or attention when taking the test. Tr. at 712. From January 23, 2001 to April 6, 2001, the Student's grade equivalent increased from 3.3 to 4.8. Tr. at 1313; P Ex. II. Based on his review of the Student's STAR tests, Dr. Richard Spicuzza, a licensed school psychologist and Ph.D. with extensive research experience involving the STAR

test, testified "with certainty" that the data show the Student made gains in reading between September 2000 and April 2001. Tr. at 639-40; 714. Ms. Nordin, the Student's AOM reading teacher, testified that an increase from a 3.4 GE at the beginning of the year to a 4.8 GE at the end of the year shows "a great increase" in Student's reading comprehension and vocabulary and "a great amount of growth." Tr. at 470. By this measure, the Student's progress over the year was 1.4 grade levels, an extraordinary achievement for any student.

Similarly, the Student's scores on Gates-MacGintie reading tests demonstrate progress in reading. The Gates-MacGintie tests measures a child's vocabulary and reading comprehension skills. Tr. at 406; 646. The Student's September, 2000 Gates test showed that the Student's GE at that time was 3.8. Tr. at 364; S.D. Ex. 15 at 2. The Student took the Gates test again in April, 2001 and scored a 4.9. Tr. at 371, S.D. Ex. 70. Both Dr. Spicuzza and the Student's sixth grade regular education teacher, Ms. Kleppe, provided reliable and uncontested testimony that the Gates tests show the Student made substantial progress in reading. Tr. at 646, 373. Finally, in addition to formal tests, the Student's teachers monitored his reading comprehension by listening to him read, asking him questions about the materials to determine whether he understood them, and having the Student summarize readings in a journal to verify that he was comprehending what he read. Tr. at 462; 456-57.

Having assessed the credibility of the witnesses and weighed the evidence, IHO Udoibok found that the Student made significant progress in reading without one-to-one instruction. See Ex. 1 at p. 15-16. This conclusion is amply supported by the IHO's detailed findings of progress. See Ex. 1, FF 53-71. As the HRO correctly held, "The record here is replete with evidence, including test results, grades, and teacher observations, that all indicate the Student made significant progress in reading without

---

[3] "P. Ex." refers to exhibits introduced by the Parent during the due process hearing. These exhibits were

one-to-one instruction." Ex. 2, page 6 at ¶ 16. The IHO and the HRO considered the testimony of each of the witnesses presented at hearing and properly concluded the Student does not need one-to-one reading instruction to receive FAPE. This Court should uphold those decisions.

## VIII. THE HRO CORRECTLY RULED THAT THE DISTRICT DID NOT COMMIT PROCEDURAL VIOLATIONS OF IDEA

### A. The Parent received appropriate prior written notice with respect to one-to-one reading instruction

On April 23, 2001, Parent filed an amendment to her statement of objections. See Letter from Kerr to IHO Udoibok and M. Waldspurger, dated 4/23/01. Parent alleged that the District failed to provide her with prior written notice regarding her request for two hours per week of one-to-one reading instruction. Id. Parent further alleged that the District had orally refused her request at the IEP meeting held on March 20, 2001. Id. In her amended statement of objections, Parent did not allege that the District had failed to provide her with prior written notice regarding an alleged refusal to provide reading services in January 2001.

In her appellate brief, Parent alleges and argues—for the first time—that the District failed to provide prior written notice of an alleged refusal to provide reading services in January 2001. Because this issue was neither pleaded nor argued before the IHO, it is deemed waived. See Minn. Stat. § 125A.09, subd. 6; see also Moubry v. Independent Sch. Dist. No. 696, 9 F. Supp.2d 1086, 1100 (D. Minn. 1998) ("At a minimum, the failure to raise, and to preserve, an issue in the administrative process . . . constitutes a waiver of such an issue in a subsequent civil action.").

Moreover, the evidence of record shows that the District did not refuse to provide reading services in January 2001. Rather, during the IEP meeting on December 13, 2001, the team

---

filed with the Court by the Minnesota Department of Education (MDE) upon Plaintiff's appeal.

discussed options that would be available in terms of reading services. Tr. 204. The team also discussed reading options at the IEP meeting on January 23, 2001. See SD Ex. 54 at 1-2 ("I was at our last meeting and what we discussed at that time with [Parent] was that there were two options that he could receive his reading through the AOM teacher which is what he has been doing or he could be in a resource reading class."). A few days after the January 23, 2001 IEP meeting, the case manager and Parent talked more about the reading services available at Northdale Middle School. Tr. 131.

Parent also argues, as she has in the past, that the District failed to provide her prior written notice of its alleged refusals to provide one-to-one reading instruction in March 2001 and May 2001. Parent's argument lacks merit.

The prior written notice requirement applies when a school district proposes to initiate or change, or refuses to initiate or change, the identification, evaluation, educational placement, or provision of FAPE for a child with a disability. See 20 U.S.C. § 1415(b)(3); 34 C.F.R. § 300.503(a).

On April 18, 2001, Parent wrote a letter to the District requesting "Prior Written Notice" of the District's decision on her request for tutoring services. SD Ex. 75. Parent testified that she wrote this letter because she "wanted to know if they weren't going to provide tutoring services at home for [Student]." Tr. 1094-95. Parent's statement that she did not know what the District's decision was on April 18, 2001, belies her assertion that the team had reached a decision at the IEP meeting on March 20, 2001. By Parent's own admission, the prior written notice requirement was not triggered as a result of the March 20, 2001 IEP meeting.

After the meeting on March 20, 2001, the District made "extensive efforts to secure the Parent's attendance at IEP meetings" for the purpose of addressing Parent's request for one-to-one reading instruction and completing an IEP for Student. See IHO Decision at p. 15 & IHO FF

30-31. On April 18, 2001, Parent informed the District that she did not intend to attend any further IEP meetings; she believed further meetings were a "waste of time." See IHO FF 30-31.

At a duly noticed IEP meeting on May 1, 2001, District staff on the IEP team rejected Parent's request for one-to-one reading instruction. Tr. 789. The team reached the following conclusion: "With the exception of [Student]'s mother, the IEP team believes that [Student] does not need one-on-one instruction to receive meaningful educational benefit and that one-on-one instruction would not be the least restrictive environment for [Student]." SD Ex. 84, at 3. During the meeting on May 1, 2001, every member of the team affirmatively expressed agreement with this statement, except for Parent who was not present. See IHO FF 48.

By letter dated May 16, 2001, the District provided Parent with prior written notice of the IEP team's decision regarding her request for one-to-one tutoring in reading. IHO FF 73; SD Ex. 87; Tr. 890. The District's letter contains all the required elements of prior written notice. See 34 C.F.R. § 300.503(b); IHO Decision at p.15.

Based on the foregoing, the HRO must adopt the IHO's finding that the District provided Parent with timely and appropriate written notice of its decision to deny her request for one-to-one reading instruction. However, in the event that the HRO disagrees, the District asserts that the record contains no evidence to support a conclusion that Student's right to an education has been compromised, that Parent's ability to participate in the planning of Student's program has been seriously hampered, or that Student has been deprived of educational benefits to which he is entitled. Even if the District had not provided any prior written notice whatsoever, under the circumstances Parent could not show that any harm has occurred because, as discussed below, Student clearly does not need one-to-one reading instruction in order to receive FAPE.

**B. Draft IEP**

Having assessed the credibility of the witnesses and weighed their conflicting testimony, the IHO found that the case manager, in keeping with her practice, created a "draft" of an interim IEP for Student and distributed it at the IEP meeting on January 31, 2001. IHO FF 24 & IHO Decision at p.17-18. The IHO further found that the draft, which contained several handwritten notations, was intended to engender input from Parent. Id. FF 24. Parent again asks the HRO to reassess the credibility of the witnesses and accept the Parent's testimony that the draft IEP, which stated "Draft" on the top of every page, was the "real" IEP. P. Br. at 11, 20. The IHO's finding is amply based on a preponderance of the evidence of record, see SD PFF 39-54, and must be affirmed.

Indeed, the following evidence shows that the document was only a draft. First, consistent with the school's practice, Ms. Rydberg explained that the document was a "draft" when she distributed at the start of the meeting. Tr. 317-18; see also Tr. 547 ("I remember Ms. Rydberg saying that it was a draft IEP."). Second, District staff uniformly testified that they did not intend the document to be a proposed IEP. Tr. 102, 208. Third, during the meeting, the case manager repeatedly stated tat the document was only a draft. Tr. 102, 211, 547. Student's Stepfather admits that Ms. Rydberg stated that the IEP was only a draft. Tr. 979. Fourth, in Parent's presence, the case manager wrote the word "Draft" on the top corner of every page of the document. SD Ex. 44; Tr. 103, 855. Fifth, the copy of the document retained by Parent has the words "rough draft" written on the second page; Stepfather admitted that these words indicate that the document is far from being a final draft. P Ex. L; Tr. 983-84. Sixth, the document contains several handwritten notations such as "computer?" and, consistent with District policy, the case manager's ordinary practice is to type all information on a final IEP. Tr. 106. Seventh, the case manager did not bring a copy of a signature page to the meeting, Tr. 104, which indicates that she did not intend to propose the document. Eighth and finally, District staff

expected that even if Parent did not have any objection to draft IEP, the final IEP would be very different from the draft IEP in Exhibit 44. Tr. 215. The draft IEP in Exhibit 44 is markedly different from the District's proposed IEP in Exhibit 84.

Parent argues that "an IEP is an IEP" because IDEA does not distinguish a draft IEP from a real or proposed IEP. P. Br. at 20. The District disagrees. The Eighth Circuit Court of Appeals has recognized a difference and has specifically held that a school district may develop a draft of an IEP before a meeting, as nothing in IDEA or its regulations prohibits a school district from coming to an IEP meeting with tentative recommendations for the development of a proposed IEP. Blackmon v. Springfield R-XII Sch. Dist., 198 F.3d 648, 657 (8th Cir. 1999). Moreover, the federal regulations also draw a distinction between "draft" IEPs and final or proposed IEPs. See 34 C.F.R. Part 300, Appendix A, Q.32 (stating that although an agency may not finalize an IEP before holding an IEP meeting, personnel may bring "drafts of some or all of the IEP content to the IEP meeting" if the draft is discussed with the parents). In the instant case, the District properly exercised its right to bring a draft IEP to the meeting on January 31, 2001, and to discuss the draft with Parent. See IHO FF 24 & IHO Decision at p.17-18; SD PFF 39-54; SD Brief at 26-28.

Parent does not have the right to challenge a draft IEP and, as the IHO correctly determined, the District certainly is not required to defend a draft IEP that embodies nothing more than tentative recommendations for the development of a proposed IEP. See IHO Decision at p.18. In the IHO's words, "It would be nonsensical to compel the District to defend an IEP it did not propose." Id.

The IHO's conclusion is well grounded in law. "The law limits the matters on which a due process hearing can be requested." Independent Sch. Dist. No. 432 v. J.H., 8 F. Supp.2d

1166, 1172 (D. Minn. 1998). Minnesota law clearly states that parents have the right to request a hearing only if they continue to object to one of the following:

> (1) a proposed formal educational assessment or proposed denial of a formal educational assessment of their child;
> (2) the proposed placement of their child in, or transfer of their child to a special education program;
> (3) the proposed denial of placement of their child in a special education program or the transfer of their child from a special education program;
> (4) the proposed provision or addition of special education services for their child; or
> (5) the proposed denial or removal of special education services for their child.

Minn. Stat. § 125A.09, subd. 6 (emphasis added). In short, a parent may obtain an impartial due process hearing only if the parent continues to object to the proposals by the school district. Independent Sch. Dist. No. 432 v. J.H., 8 F. Supp.2d 1166, 1172 (D. Minn. 1998). In the instant case, Parent may object to the District's proposed IEP, but not to a preliminary draft of that document.

Parent argues that she has the right to contest a draft IEP under Digre v. Independent Sch. Dist. No. 623, 893 F.2d 987 (8th Cir. 1990). Parent's reliance on Digre is misplaced. In Digre, the parent sought to challenge the appropriateness of a proposed assessment and the initial and continuing placement of the child in a special education setting. Id. at 989. The school district argued, and the hearing officer agreed, that the parent could only challenge the school district's proposed assessment. Id. at 989-90. The federal district court reversed and ordered the district to grant the parent a hearing to address her objections to the student's prior and current placement. Id. at 990.

Unlike in Digre, here the District is not seeking to prevent Parent from challenging a prior placement, a current placement, or any other completed action. Rather, the District is asserting that Parent does not have the right to challenge a preliminary draft of an IEP which merely embodies the tentative thoughts of the case manager and was intended to serve only as a

starting point for discussion by the team. The Digre case did not involve a draft IEP which the district never proposed to implement. To rule otherwise would be contrary to the Eighth Circuit's holding that school district's may bring a draft IEP to a meeting. Blackmon, 198 F.3d at 657.

## CONCLUSION

For the foregoing reasons, the School District respectfully requests that the Court deny the Plaintiff's Motion for Judgment on the Administrative Record in MDCFL Case No. 429.

**RATWIK, ROSZAK & MALONEY, P.A.**

Dated: March 15, 2005

By: s/Stacey L. Wilson

Paul C. Ratwik
Atty. Reg. No. 89795
Stacey L. Wilson
Atty. Reg. No. 0306174
300 U.S. Trust Building
730 Second Avenue South
Minneapolis, MN 55402
(612) 339-0060

**ATTORNEYS FOR DEFENDANTS INDEPENDENT SCHOOL DISTRICT NO. 11**

RRM: 73567