55-2130-13018-3

STATE OF MINNESOTA
OFFICE OF ADMINISTRATIVE HEARINGS

FOR INDEPENDENT SCHOOL DISTRICT NO. 11
(MDCFL Case 390)

In the Matter of

Matthew McKinney

v.

Independent School District No. 11
(Anoka-Hennepin)

FINDINGS OF FACT, CONCLUSIONS AND DECISION

The above-entitled matter came on for hearing before Administrative Law Judge Sara D. Jay, serving as hearing officer pursuant to Minn. Stat. Sec. §125A.09, commencing on August 24, 2000, and continuing on August 25, 28 and 29, 2000, at 403 Jackson Street, Anoka, Minnesota, and by telephone on September 1, 2000. The hearing was open at the request of the Parent in accordance with the provisions of Minn. Rule Part 3525.4200.

Patricia Maloney, Esq., and Amy Mace, Esq., Ratwik, Roszak & Maloney, P.A., 300 Peavey Building, 730 Second Ave. So. Minneapolis, MN. 55402 are representing the District. Sonja D. Kerr, Esq., Kerr Law Offices, 5972 Cahill Avenue S., Suite 110, Inver Grove Heights, MN., 55076, is representing the Parent, assisted by Mary Josefson, Esq., of the same firm. The record closed on September 14, 2000, upon receipt of the parties' post-hearing submissions by the hearing officer.

This decision is final and binding upon both parties unless appealed to the hearing review officer within 30 calendar days of the receipt of this decision, as provided by Minn. Stat. §125A.09. subd. 9. Any Notice of Appeal shall be in the form attached to this decision or otherwise in writing and shall be filed with the Commissioner of the Department of Children, Families and Learning with copies sent to all parties.

If the decision is appealed, a written transcript of the hearing shall be made accessible to the parties involved within five calendar days of the filing of the appeal. (This has already been done.) The hearing review officer shall issue a final independent decision based on an impartial review of the local decision and the entire record within 30 calendar days after the filing of the appeal. The hearing review officer shall seek additional evidence if necessary and may afford the parties an opportunity for written or oral argument.

EXHIBIT
I

## STATEMENT OF ISSUE

The issues in this case are:

1. Was the School District's assistive technology evaluation done in a timely fashion?
2. Was the School District's assistive technology evaluation appropriate?
3. Did the Student receive appropriate modifications and accommodations in the regular education setting?
4. Was the Parent denied equal participation in the IEP process?

Based upon all the proceedings herein, the Administrative Law Judge makes the following:

## FINDINGS OF FACT

Background

1. Matthew McKinney (Student) is a ten-year old child who resides with his mother, Tammy McKinney (Parent) within the Anoka-Hennepin School District, Independent School District No. 11 (District). His father, who resides in a another state, has joint custody of the Student, with the Student residing with his mother in the District during the school year. Also in the family are a step-father, a step-brother who is close to the Student's age, and other siblings.

2. The Student was diagnosed with autism shortly before he was three years old. The Student's cousin has also been diagnosed with autism. Hearing Transcript (Tr.) 1111. The Student received Early Childhood Special Education services from the Clark County School District, Las Vegas, Nevada, after determination of eligibility following evaluation in September 1994.

3. In December 1995, the Student and his Parent received auditory integration training. Tr. 1112; Parent Exhibit (Par. Ex.) A, page 13. The Parent observed that the Student began using new language during and following the training. *Id.*

4. During the 1997-1998 school year, the Student was enrolled in the Clark County School District, Nevada. The Student was placed in a small group setting with first and second graders who had been diagnosed with autism. The program used ABA and the Picture Exchange Communication System (PECS). Tr. 1114. His teacher was Kathleen Black (Las Vegas teacher). He was mainstreamed for lunch, recess, and "specials," i.e., music, library and physical education. Tr. 1339. The Student used some of the regular first grade curriculum, to the extent he was capable of doing that work. His first grade-level work was mainly in the area of mathematics; he was learning to count. Tr. 1346.

5. The Las Vegas teacher had been trained in the use of PECS. Tr. 1333. PECS was initially

used one-on-one with the Student. The protocol is normally for two adults to use the system with a student, but the Las Vegas program did not have sufficient staff to devote to working with PECS. Otherwise, PECS was introduced to the Student according to protocol, which involved the teachers not responding to the Student unless he gave them a picture or a sentence; his use of the PECS would then be acknowledged and he would get whatever he requested. Tr. 1339. The Student was very quick in learning how to use PECS and responded very well to it. The teacher characterizes the Student as a visual learner. Tr. 1333. The Student was at the fourth level of PECS at the end of the 1997-1998 school year, which means that the Student could not only ask for an object and use a verb to explain what he wanted to do with the object ("I want milk to drink," for example), but he could also use PECS to make comments. Tr. 1334.

6. A picture schedule gives a student a visual picture of his/her day. PECS is different from a picture schedule, having as its purpose to allow a child to communicate wants, needs, and whatever the child would like to tell another person. Tr. 1335-1336.

7. In fall 1997, the Student's verbal expression consisted largely of rambling in non-meaningful sing-song language, usage which is called verbal stimulation. Tr. 1336. In spring 1998, the Student had about 150 nouns, with some verbs, pronouns, prepositions and proper names which made his vocabulary about 200 words. Tr. 1338, 1114. The Student knew about six written words by sight, as of March 1998. Tr. 1341. At that time, he answered "who-what-where" questions with zero percent accuracy, and could not continue a conversation beyond the initial greeting, particularly outside his special education classroom. *Id.*

8. During the 1997-1998 school year, the Student used a computer. He was knowledgeable about the computer and enjoyed using it. Tr. 1114-15, 1340.

<u>1998 Move to Minnesota</u>

9. The Student and his family moved to Minnesota from Las Vegas in the summer of 1998. Prior to moving to Minnesota, the Parent contacted the District. Tr. 1115. She visited in May 1998 and met with a special education teacher or case manager. They discussed placing the Student in a mainstream classroom with a paraprofessional. Because the Student's other siblings were attending Andover Elementary, the Parent asked that the Student be placed at that school. Tr. 1115-1116. The District representative suggested that children in first grade would be more accepting of the Student, and that a first grade placement would be most appropriate. Tr. 1117. The Parent did not object to the first grade placement; one of the Student's siblings was in the same grade. Tr. 1306.

10. The Student attended Andover Elementary in the District for the 1998-1999 school year. He was placed in a mainstream first-grade classroom. An IEP was developed for him in October 1998. Ex. 4. The Student's case manager was Judy Trepanier, a special education teacher licensed in learning disability, and in MSI and MMI (Case Manager). Tr. 175

11. As of October 1998, the Student was able to answer "who-what-where" questions. He had a vocabulary of over 200 words, but was still unable to carry on a conversation with consistency. Ex. 4. Among the adaptations listed in his IEP is use of the PECS notebook and a daily communication notebook between home and school. *Id.* None of the student's teachers were trained in the use of PECS. Tr. 55, 162, 243. The Parent was not advised that teachers had not been trained in the use of PECS.

12. As of October 1998, the Student was screaming and crying upon returning from school, a behavior which indicated over-stimulation. At the suggestion of the Parent, sensory input activity time was set aside for the Student. Ex. 4.

13. The Student had some behavior difficulties during the year, but nothing which the Parent considered extreme. Tr. 1122-1123. At the end of the school year, the Student was promoted to the second grade. Ex. 19 at 2.

Second Grade (1999-2000)

14. The Student was placed in the second grade regular education class of Karen Winkelman, (regular education teacher), a teacher with twenty-five years of experience. Tr. 977. The Student's sibling was placed in a different second grade classroom.

15. At the beginning of the school year, the Parent contacted the Case Manager because she was concerned about the Student's behavior and adjustment to second grade. Tr. 181, 1121. The Parent observed that the Student was having outbursts on arriving home, and returning to some early self-injurious behaviors such as biting himself, while the communication log advised that he had had a good day. Tr. 1121, 1123, 1126. At the suggestion of the Parent, a behavior analyst was consulted, and observed the Student. Tr. 182, 1122.

16. The behavior analyst, a District employee, observed the Student in the mainstream setting. She noted that the Student was on task 65% of the time, and displayed 22 inappropriate behaviors[1] and complied with directions 50% of the time. He was removed from the classroom during spelling because he became loud and his paraprofessional anticipated that he would become agitated and disruptive, and believed that he was exhibiting signs of over-stimulation. The behavior analyst concluded that the Student was successfully mainstreamed but needed one-to-one paraprofessional support at all times in order to be successful. Ex. 9.

17. The Case Manager sent the Parent a Notice of Team Meeting dated September 14, 1999, for

[1] There is apparent typographical error in the report in labelling both sets of misbehavior as "physical," while apparently intending to label one set "verbal" and the other "physical." The behavior analyst did not testify; thus, both sets of inappropriate behavior have been added together, although from the Student's general behavior it appears most likely that there were 5 verbal and 17 physical inappropriate behaviors. Ex. 9.

a meeting scheduled for September 22, 1999. Ex. 8, Tr. 1119-1120. The purpose of the meeting was to develop an annual IEP. The Parent spoke with the Case Manager on September 21, 1999, and advised the Case Manager that she was unable to attend. The meeting was re-scheduled for September 29, 1999. Ex. 8, 10.

September 29, 1999 IEP Team Meeting

18. On September 29, 1999, the Student's IEP team met. Present were the regular education teacher, Dave Satterlund (Speech Clinician), the Case Manager, the behavior analyst who had observed the Student, a school district representative, the Parent, and the Parent's ARC advocate Jan Grieser (ARC Advocate). Tr. 184, 1120-1121, Ex. 11 at 12. The meeting lasted three hours. Tr. 1121.

19. At the meeting, the team reviewed the goals and objectives in the Student's then-current IEP. The Parent re-read the IEP prior to the meeting and had questions and concerns. Each portion of the IEP was reviewed in detail at the meeting. Tr. 1125, 1140-1142. The Parent asked questions about the IEP and other matters, and commented on each goal and objective as to whether she agreed or wanted changes. Tr. 185, 841-842, 1271, 1370.

20. The Parent expressed concern about the Student's behavior and suggested he might be having difficulty communicating. She mentioned that her autistic niece was using a device to help her communicate. Tr. 287, 1124-1125. The Parent did not use the phrase "augmentative communication device," and did not request an "assistive technology evaluation." Tr. 187, 288, 842, 875, 989, 1284-86, 1326-27. The Parent believed that the District knew what she intended, but the District did not respond. Tr. 287-88, 1126-27, 1319. District personnel believed that the Student was doing well verbally and did not need an augmentative communication device. Tr. 843, 876. It is unclear who, if anyone, voiced this opinion to the Parent at the September 29 meeting, although there was some discussion of the Student's verbal expression skills. Tr. 1349.

21. Toward the end of the meeting, the behavior analyst and District representative had left. The Parent asked that a one-to-one paraprofessional be written into the IEP, pursuant to the recommendation of the behavior analyst. The Case Manager said that a one-to-one paraprofessional is not written into IEPs to avoid paraprofessional dependency. Tr. 292. When discussion continued, the Case Manager became angry and said to the Parent, "What do you want from me?" The Parent repeated that she was requesting that one-to-one paraprofessional support be written into the IEP, and asked why the Case Manager was so upset. The Case Manager responded that she could not put that in the IEP. At one point during this exchange, the Case Manager forcefully placed her hands on the schedules. The Parent stated that the Case Manager did not understand all the fighting she had had to go through for the Student. Tr. 187. The Case Manager told the Parent to listen to her; that she had two brothers with mental retardation, and back then they did not even have paraprofessionals. She referred to being angry with parents who do not appreciate the

services that their child is getting, gathered her papers and left the room. Tr. 1127-1129, 1350, see Tr. 291, Par. Ex. K. The Advocate also recalled the Case Manager stating that she wanted to get out of the special education business, which the Advocate said would be a shame given her level of experience. Tr. 1351-1352.

22. The Advocate and the Parent were surprised by the Case Manager's reaction. The Parent was upset and did not respond to the Case Manager's statements. Tr. 1129-1130. After the Case Manager left, the meeting ended. Tr. 1129, 1375. As a result of the exchange, the Parent became uncomfortable about being at the school, where she often helps on behalf of her other children, and about asking for assistance for the Student. Tr. 1131, 1352.

Fall - Winter 1999 - IEP and Team meetings

23. The Case Manager mailed to the Parent a proposed IEP dated October 4, 1999, which refers to the September 29 IEP meeting. The Parent received the IEP on October 14, 1999. Tr. 1137-1138, Parent (Par.) Ex. C. It is the District's normal practice to send out a proposed IEP within ten days of the IEP meeting. Tr. 1045. The Parent objected to the proposed IEP. Par. Ex. C. The Parent's objections to the IEP were resolved and are not a subject of this hearing.

24. The Parent attempted to discuss the September 29 exchange with the Case Manager. The Case Manager had called to find out why the Parent objected to the IEP. Tr. 1135. The Case Manager stated that she felt that the Parent had needed to hear what the Case Manager had said. Tr. 1135.

25. The Parent found that the rejected IEP had been implemented by the District. Tr. 1144. This matter was resolved in conciliation. However, the Parent interpreted the implementation as a sign that her opinions did not matter to the District. Tr. 1144, 1146.

26. In a letter dated October 22, 1999, the Parent asked the Minnesota Department of Children, Families and Learning (MDCFL) to investigate allegations that she was not being treated as an equal participant in the IEP process. Tr. 1146; Par. Ex. K. In the letter, the Parent summarized the exchange between herself and the Case Manager at the end of the September 29, 1999, meeting, as well as concerns about the implementation of the rejected IEP. The letter also states that the Parent requested investigation only relating to equal participation, and that she was "still determining" whether to pursue due process with regard to other issues. *Id.*

27. By letter dated November 10, 1999, MDCFL responded that "[t]he issue raised in your letter does not allege a violation of Part B of the IDEA," and that it therefore had no authority to investigate. Par. Ex. L. MDCFL's letter quotes 34 C.F.R. Section 300, Appendix A, Question 9, and states that the issue raised could not be investigated without "additional allegations or increased specificity." *Id.*

28. On November 13, 1999, the Case Manger wrote to the Parent in the communication log that the Student had been engaging in inappropriate behavior "in almost every setting" and doing things "that could lead to injuries to himself and/or others ... His behavior has been deteriorating the last 2 weeks ... We will need to resolve the IEP as well as develop a regulated behavior plan." District Exhibit (Dist. Ex.) 7, page 68.

29. On November 24, 1999, the Parent made a written request to the District in the communication log for a conciliation conference. Tr. 1149; Dist. Ex. 7, p. 77. The Case Manager responded that she had sent forms for that purpose to the Special Education consultant the preceding week. Dist. Ex. 7, p. 77.

30. On December 9, 1999, the Case Manager, who was also the Student's language arts teacher, wrote in the communication log: "We continue to be very concerned about [Student's] self-injurious behavior here at school." She noted specific behavior, and comments relating to Christmas, and asked for insight as to what about the holiday might be bothering the Student. Dist. Ex. 7, p. 89. The Parent responded that the Student had been exhibiting anxiety at home about Christmas. *Id.* at p.91.

31. On December 14, 1999, a conciliation conference was held. The discussions at conciliation conference were excluded from evidence in the hearing. It was agreed that the Parent requested an augmentative communication/assistive technology evaluation, and the District agreed. Tr. 1149.

Classroom Work and Services 1999-2000

32. During the 1999-2000 school year, the Student received special education and related services in the areas of language arts, mathematics, communication, occupational therapy and adapted physical education. Ex. 19 at 13. The Student was in the regular education classroom for math, science, health, daily oral language, computer lab, and the session of physical education conducted by the regular classroom teacher. Tr. 978.

33. The Student's IEP included as Adaptations exposure to grade-level regular education curriculum and/or materials, and stated that "Assignments may be modified by the [regular education teacher], either by shortening or using an alternate assignment. In the areas in which the Student was receiving special education instruction, alternate materials and other adaptations were to be used. Maintenance of the PECS notebook was also listed as an adaptation. The IEP also states: "Alternative materials and methods will be used to ensure sufficient time for instruction and practice for skills acquisition." Dist. Ex. 4. The Student's IEP contained a goal for communication with numerous objectives, as well as goals in the areas of motor skills, math, reading readiness, social/behavioral (with an objective of increasing independent interaction with peers, and increasing his use of the PECS notebook or words when frustrated), and a functional skills goal (one of the objectives for which was to increase use of the picture schedule for transitions). *Id.* In an IEP adopted later in the year,

55-2130-13018-3

STATE OF MINNESOTA
OFFICE OF ADMINISTRATIVE HEARINGS

FOR INDEPENDENT SCHOOL DISTRICT NO. 11
(MDCFL Case 390)

In the Matter of

Matthew McKinney

v.

Independent School District No. 11
(Anoka-Hennepin)

FINDINGS OF FACT,
CONCLUSIONS AND DECISION

The above-entitled matter came on for hearing before Administrative Law Judge Sara D. Jay, serving as hearing officer pursuant to Minn. Stat. Sec. §125A.09, commencing on August 24, 2000, and continuing on August 25, 28 and 29, 2000, at 403 Jackson Street, Anoka, Minnesota, and by telephone on September 1, 2000. The hearing was open at the request of the Parent in accordance with the provisions of Minn. Rule Part 3525.4200.

Patricia Maloney, Esq., and Amy Mace, Esq., Ratwik, Roszak & Maloney, P.A., 300 Peavey Building, 730 Second Ave. So. Minneapolis, MN. 55402 are representing the District. Sonja D. Kerr, Esq., Kerr Law Offices, 5972 Cahill Avenue S., Suite 110, Inver Grove Heights, MN., 55076, is representing the Parent. assisted by Mary Josefson, Esq., of the same firm. The record closed on September 14, 2000, upon receipt of the parties' post-hearing submissions by the hearing officer.

This decision is final and binding upon both parties unless appealed to the hearing review officer within 30 calendar days of the receipt of this decision, as provided by Minn. Stat. §125A.09. subd. 9. Any Notice of Appeal shall be in the form attached to this decision or otherwise in writing and shall be filed with the Commissioner of the Department of Children, Families and Learning with copies sent to all parties.

If the decision is appealed, a written transcript of the hearing shall be made accessible to the parties involved within five calendar days of the filing of the appeal. (This has already been done.) The hearing review officer shall issue a final independent decision based on an impartial review of the local decision and the entire record within 30 calendar days after the filing of the appeal. The hearing review officer shall seek additional evidence if necessary and may afford the parties an opportunity for written or oral argument.

## STATEMENT OF ISSUE

The issues in this case are:

1. Was the School District's assistive technology evaluation done in a timely fashion?
2. Was the School District's assistive technology evaluation appropriate?
3. Did the Student receive appropriate modifications and accommodations in the regular education setting?
4. Was the Parent denied equal participation in the IEP process?

Based upon all the proceedings herein, the Administrative Law Judge makes the following:

## FINDINGS OF FACT

### Background

1. Matthew McKinney (Student) is a ten-year old child who resides with his mother, Tammy McKinney (Parent) within the Anoka-Hennepin School District, Independent School District No. 11 (District). His father, who resides in a another state, has joint custody of the Student, with the Student residing with his mother in the District during the school year. Also in the family are a step-father, a step-brother who is close to the Student's age, and other siblings.

2. The Student was diagnosed with autism shortly before he was three years old. The Student's cousin has also been diagnosed with autism. Hearing Transcript (Tr.) 1111. The Student received Early Childhood Special Education services from the Clark County School District, Las Vegas, Nevada, after determination of eligibility following evaluation in September 1994.

3. In December 1995, the Student and his Parent received auditory integration training. Tr. 1112; Parent Exhibit (Par. Ex.) A, page 13. The Parent observed that the Student began using new language during and following the training. *Id.*

4. During the 1997-1998 school year, the Student was enrolled in the Clark County School District, Nevada. The Student was placed in a small group setting with first and second graders who had been diagnosed with autism. The program used ABA and the Picture Exchange Communication System (PECS). Tr. 1114. His teacher was Kathleen Black (Las Vegas teacher). He was mainstreamed for lunch, recess, and "specials," i.e., music, library and physical education. Tr. 1339. The Student used some of the regular first grade curriculum, to the extent he was capable of doing that work. His first grade-level work was mainly in the area of mathematics; he was learning to count. Tr. 1346.

5. The Las Vegas teacher had been trained in the use of PECS. Tr. 1333. PECS was initially

used one-on-one with the Student. The protocol is normally for two adults to use the system with a student, but the Las Vegas program did not have sufficient staff to devote to working with PECS. Otherwise, PECS was introduced to the Student according to protocol, which involved the teachers not responding to the Student unless he gave them a picture or a sentence; his use of the PECS would then be acknowledged and he would get whatever he requested. Tr. 1339. The Student was very quick in learning how to use PECS and responded very well to it. The teacher characterizes the Student as a visual learner. Tr. 1333. The Student was at the fourth level of PECS at the end of the 1997-1998 school year, which means that the Student could not only ask for an object and use a verb to explain what he wanted to do with the object ("I want milk to drink," for example), but he could also use PECS to make comments. Tr. 1334.

6. A picture schedule gives a student a visual picture of his/her day. PECS is different from a picture schedule, having as its purpose to allow child to communicate wants, needs, and whatever the child would like to tell another person. Tr. 1335-1336.

7. In fall 1997, the Student's verbal expression consisted largely of rambling in non-meaningful sing-song language, usage which is called verbal stimulation. Tr. 1336. In spring 1998, the Student had about 150 nouns, with some verbs, pronouns, prepositions and proper names which made his vocabulary about 200 words. Tr. 1338, 1114. The Student knew about six written words by sight, as of March 1998. Tr. 1341. At that time, he answered "who-what-where" questions with zero percent accuracy, and could not continue a conversation beyond the initial greeting, particularly outside his special education classroom. *Id.*

8. During the 1997-1998 school year, the Student used a computer. He was knowledgeable about the computer and enjoyed using it. Tr. 1114-15, 1340.

<u>1998 Move to Minnesota</u>

9. The Student and his family moved to Minnesota from Las Vegas in the summer of 1998. Prior to moving to Minnesota, the Parent contacted the District. Tr. 1115. She visited in May 1998 and met with a special education teacher or case manager. They discussed placing the Student in a mainstream classroom with a paraprofessional. Because the Student's other siblings were attending Andover Elementary, the Parent asked that the Student be placed at that school. Tr. 1115-1116. The District representative suggested that children in first grade would be more accepting of the Student, and that a first grade placement would be most appropriate. Tr. 1117. The Parent did not object to the first grade placement; one of the Student's siblings was in the same grade. Tr. 1306.

10. The Student attended Andover Elementary in the District for the 1998-1999 school year. He was placed in a mainstream first-grade classroom. An IEP was developed for him in October 1998. Ex. 4. The Student's case manager was Judy Trepanier, a special education teacher licensed in learning disability, and in MSI and MMI (Case Manager). Tr. 175

11. As of October 1998, the Student was able to answer "who-what-where" questions. He had a vocabulary of over 200 words, but was still unable to carry on a conversation with consistency. Ex. 4. Among the adaptations listed in his IEP is use of the PECS notebook and a daily communication notebook between home and school. *Id.* None of the student's teachers were trained in the use of PECS. Tr. 55, 162, 243. The Parent was not advised that teachers had not been trained in the use of PECS.

12. As of October 1998, the Student was screaming and crying upon returning from school, a behavior which indicated over-stimulation. At the suggestion of the Parent, sensory input activity time was set aside for the Student. Ex. 4.

13. The Student had some behavior difficulties during the year, but nothing which the Parent considered extreme. Tr. 1122-1123. At the end of the school year, the Student was promoted to the second grade. Ex. 19 at 2.

Second Grade (1999-2000)

14. The Student was placed in the second grade regular education class of Karen Winkelman, (regular education teacher), a teacher with twenty-five years of experience. Tr. 977. The Student's sibling was placed in a different second grade classroom.

15. At the beginning of the school year, the Parent contacted the Case Manager because she was concerned about the Student's behavior and adjustment to second grade. Tr. 181, 1121. The Parent observed that the Student was having outbursts on arriving home, and returning to some early self-injurious behaviors such as biting himself, while the communication log advised that he had had a good day. Tr. 1121, 1123, 1126. At the suggestion of the Parent, a behavior analyst was consulted, and observed the Student. Tr. 182, 1122.

16. The behavior analyst, a District employee, observed the Student in the mainstream setting. She noted that the Student was on task 65% of the time, and displayed 22 inappropriate behaviors[1] and complied with directions 50% of the time. He was removed from the classroom during spelling because he became loud and his paraprofessional anticipated that he would become agitated and disruptive, and believed that he was exhibiting signs of over-stimulation. The behavior analyst concluded that the Student was successfully mainstreamed but needed one-to-one paraprofessional support at all times in order to be successful. Ex. 9.

17. The Case Manager sent the Parent a Notice of Team Meeting dated September 14, 1999, for

[1] There is apparent typographical error in the report in labelling both sets of misbehavior as "physical," while apparently intending to label one set "verbal" and the other "physical." The behavior analyst did not testify; thus, both sets of inappropriate behavior have been added together, although from the Student's general behavior it appears most likely that there were 5 verbal and 17 physical inappropriate behaviors. Ex. 9.

a meeting scheduled for September 22, 1999. Ex. 8, Tr. 1119-1120. The purpose of the meeting was to develop an annual IEP. The Parent spoke with the Case Manager on September 21, 1999, and advised the Case Manager that she was unable to attend. The meeting was re-scheduled for September 29, 1999. Ex. 8, 10.

September 29, 1999 IEP Team Meeting

18. On September 29, 1999, the Student's IEP team met. Present were the regular education teacher, Dave Satterlund (Speech Clinician), the Case Manager, the behavior analyst who had observed the Student, a school district representative, the Parent, and the Parent's ARC advocate Jan Grieser (ARC Advocate). Tr. 184, 1120-1121, Ex. 11 at 12. The meeting lasted three hours. Tr. 1121.

19. At the meeting, the team reviewed the goals and objectives in the Student's then-current IEP. The Parent re-read the IEP prior to the meeting and had questions and concerns. Each portion of the IEP was reviewed in detail at the meeting. Tr. 1125, 1140-1142. The Parent asked questions about the IEP and other matters, and commented on each goal and objective as to whether she agreed or wanted changes. Tr. 185, 841-842, 1271, 1370.

20. The Parent expressed concern about the Student's behavior and suggested he might be having difficulty communicating. She mentioned that her autistic niece was using a device to help her communicate. Tr. 287, 1124-1125. The Parent did not use the phrase "augmentative communication device," and did not request an "assistive technology evaluation." Tr. 187, 288, 842, 875, 989, 1284-86, 1326-27. The Parent believed that the District knew what she intended, but the District did not respond. Tr. 287-88, 1126-27, 1319. District personnel believed that the Student was doing well verbally and did not need an augmentative communication device. Tr. 843, 876. It is unclear who, if anyone, voiced this opinion to the Parent at the September 29 meeting, although there was some discussion of the Student's verbal expression skills. Tr. 1349.

21. Toward the end of the meeting, the behavior analyst and District representative had left. The Parent asked that a one-to-one paraprofessional be written into the IEP, pursuant to the recommendation of the behavior analyst. The Case Manager said that a one-to-one paraprofessional is not written into IEPs to avoid paraprofessional dependency. Tr. 292. When discussion continued, the Case Manager became angry and said to the Parent, "What do you want from me?" The Parent repeated that she was requesting that one-to-one paraprofessional support be written into the IEP, and asked why the Case Manager was so upset. The Case Manager responded that she could not put that in the IEP. At one point during this exchange, the Case Manager forcefully placed her hands on the schedules. The Parent stated that the Case Manager did not understand all the fighting she had had to go through for the Student. Tr. 187. The Case Manager told the Parent to listen to her, that she had two brothers with mental retardation, and back then they did not even have paraprofessionals. She referred to being angry with parents who do not appreciate the

services that their child is getting, gathered her papers and left the room. Tr. 1127-1129, 1350, see Tr. 291, Par. Ex. K. The Advocate also recalled the Case Manager stating that she wanted to get out of the special education business, which the Advocate said would be a shame given her level of experience. Tr. 1351-1352.

22. The Advocate and the Parent were surprised by the Case Manager's reaction. The Parent was upset and did not respond to the Case Manager's statements. Tr. 1129-1130. After the Case Manager left, the meeting ended. Tr. 1129, 1375. As a result of the exchange, the Parent became uncomfortable about being at the school, where she often helps on behalf of her other children, and about asking for assistance for the Student. Tr. 1131, 1352.

Fall - Winter 1999 - IEP and Team meetings

23. The Case Manager mailed to the Parent a proposed IEP dated October 4, 1999, which refers to the September 29 IEP meeting. The Parent received the IEP on October 14, 1999. Tr. 1137-1138, Parent (Par.) Ex. C. It is the District's normal practice to send out a proposed IEP within ten days of the IEP meeting. Tr. 1045. The Parent objected to the proposed IEP. Par. Ex. C. The Parent's objections to the IEP were resolved and are not a subject of this hearing.

24. The Parent attempted to discuss the September 29 exchange with the Case Manager. The Case Manager had called to find out why the Parent objected to the IEP. Tr. 1135. The Case Manager stated that she felt that the Parent had needed to hear what the Case Manager had said. Tr. 1135.

25. The Parent found that the rejected IEP had been implemented by the District. Tr. 1144. This matter was resolved in conciliation. However, the Parent interpreted the implementation as a sign that her opinions did not matter to the District. Tr. 1144, 1146.

26. In a letter dated October 22, 1999, the Parent asked the Minnesota Department of Children, Families and Learning (MDCFL) to investigate allegations that she was not being treated as an equal participant in the IEP process. Tr. 1146; Par. Ex. K. In the letter, the Parent summarized the exchange between herself and the Case Manager at the end of the September 29, 1999, meeting, as well as concerns about the implementation of the rejected IEP. The letter also states that the Parent requested investigation only relating to equal participation, and that she was "still determining" whether to pursue due process with regard to other issues. *Id.*

27. By letter dated November 10, 1999, MDCFL responded that "[t]he issue raised in your letter does not allege a violation of Part B of the IDEA," and that it therefore had no authority to investigate. Par. Ex. L. MDCFL's letter quotes 34 C.F.R. Section 300, Appendix A, Question 9, and states that the issue raised could not be investigated without "additional allegations or increased specificity." *Id.*

28. On November 13, 1999, the Case Manger wrote to the Parent in the communication log that the Student had been engaging in inappropriate behavior "in almost every setting" and doing things "that could lead to injuries to himself and/or others ... His behavior has been deteriorating the last 2 weeks ... We will need to resolve the IEP as well as develop a regulated behavior plan." District Exhibit (Dist. Ex.) 7, page 68.

29. On November 24, 1999, the Parent made a written request to the District in the communication log for a conciliation conference. Tr. 1149; Dist. Ex. 7, p 77. The Case Manager responded that she had sent forms for that purpose to the Special Education consultant the preceding week. Dist. Ex. 7, p. 77.

30. On December 9, 1999, the Case Manager, who was also the Student's language arts teacher, wrote in the communication log: "We continue to be very concerned about [Student's] self-injurious behavior here at school." She noted specific behavior, and comments relating to Christmas, and asked for insight as to what about the holiday might be bothering the Student. Dist. Ex. 7, p. 89. The Parent responded that the Student had been exhibiting anxiety at home about Christmas. *Id.* at p.91.

31. On December 14, 1999, a conciliation conference was held. The discussions at conciliation conference were excluded from evidence in the hearing. It was agreed that the Parent requested an augmentative communication/assistive technology evaluation, and the District agreed. Tr. 1149.

Classroom Work and Services 1999-2000

32. During the 1999-2000 school year, the Student received special education and related services in the areas of language arts, mathematics, communication, occupational therapy and adapted physical education. Ex. 19 at 13. The Student was in the regular education classroom for math, science, health, daily oral language, computer lab, and the session of physical education conducted by the regular classroom teacher. Tr. 978.

33. The Student's IEP included as Adaptations exposure to grade-level regular education curriculum and/or materials, and stated that "Assignments may be modified by the [regular education teacher], either by shortening or using an alternate assignment. In the areas in which the Student was receiving special education instruction, alternate materials and other adaptations were to be used. Maintenance of the PECS notebook was also listed as an adaptation. The IEP also states: "Alternative materials and methods will be used to ensure sufficient time for instruction and practice for skills acquisition." Dist. Ex. 4. The Student's IEP contained a goal for communication with numerous objectives, as well as goals in the areas of motor skills, math, reading readiness, social/behavioral (with an objective of increasing independent interaction with peers, and increasing his use of the PECS notebook or words when frustrated), and a functional skills goal (one of the objectives for which was to increase use of the picture schedule for transitions). *Id.* In an IEP adopted later in the year,

nearly identical adaptations were included, except that a change to the appropriate grade level was made. Dist. Ex. 19. Many objectives remained the same; many are phrased in terms of maintaining a rate of increase.

34. The Student's special education language arts teacher was the Case Manager. Tr. 174, 176. At the beginning of the school year, the Student was a non-reader. Tr. 201, 1011-12, 1258, 1309. By December, the Student had begun to read more than single words. Tr. 1258. By the end of the year, the Student had learned thirty sight words and was a beginning reader. Tr. 201-2, 1011-12, 1258; Dist. Ex. 41; Par. Ex. Q.[2]

35. The Speech Clinician worked with the Student during his second grade year, three times per week for a total of 90 minutes per week. At the beginning of the year, the Parent talked to the Speech Clinician about whether the Earobics computer program would be available for the Student. The Fast Forward program was a' ...cussed. Tr. 892. The Away We Go program was used by the Speech Clinician; it was developed by the same company that developed the Fast Forward program. Earobics was also used with the Student. Before using the programs as part of the Student's program, the Speech Clinician had tried both programs with the Student to confirm that the programs w... at the Student's level and that the Student could perform the tasks on those programs. Tr. 8927, 893-4.

36. The Student's verbal vocabulary increased by about 85 words during the 1999-2000 school year. Tr. 888. At the end of the school year, the Student could correctly answer "Who" questions 80% of the time, and "what doing" and "where" questions 60% of the time. The Student does not speak in full sentences.

37. The Student rarely used PECS. The Speech clinician did not train the student in increasing his fluency with PECS. The Speech clinician has not been trained in PECS, but has done some reading about PECS. Most pictures were removed from the PECS notebook which the Student brought with him from Las Vegas, as school staff found them irrelevant to the school setting. The Student began his school year in the District with 12-15 PECS symbols remaining in the PECS notebook. He had about 25-30 PECS symbols at the end of 1999-2000 school year. Tr. 245-46.

38. The Student had his PECS notebook with him at all times. The PECS notebook also contains a picture schedule. The District staff mainly used the picture schedule with the Student. The Speech Clinician is not familiar with applied behavioral analysis, and does not claim that he was using PECS in the way in which it was intended to be used. Tr. 971-72. Like other District staff, he relied on the PECS notebook mainly for the picture schedule. *Id.*

---

[2] Both the District and the Parent placed in evidence audiotapes of the May 15, 2000 meeting. Unfortunately, neither audiotape is readily intelligible. To the extent that the audiotapes can be understood, they appear to reflect the testimony of witnesses as to the content of that meeting.

39. The Case Manager is not trained in the use of PECS. Tr. 243. She showed the regular education classroom teacher how to use PECS with the Student. Tr. 1026. PECS was used in the regular education classroom with the Student when he was upset in the classroom only towards the end of the year. Tr. 1026-1027.

40. The Student worked on math in a special education setting, with a different special education teacher. He was using the regular education curriculum. In the special education classroom, the Student used manipulatives to work on problems at the level of the regular education curriculum. He also used a math line and touch point math. The Student's math work has been approaching grade level, with some extra assistance through use of manipulatives. Dist. Ex. 14.

41. While in the regular education setting, the Student participated in the regular education math curriculum. Tr. 979-80. The regular education curriculum uses manipulatives, games and group projects and discussion. *Id.* The Student's assignments were sometimes shortened or simplified; he was allowed to dictate answers rather than write them. Touch point math was also used. Tr. 764-5, 980-81. The special education math teacher met with the regular education teacher at the beginning of the year to discuss modifications generally. Throughout the year, the special education math teacher met with the regular education teacher or reviewed her lesson plans weekly to determine whether any special modifications would be needed for a particular unit. Tr. 761, 987. The special education math teacher also discussed modifications with the paraprofessional. Tr. 762, 769-70. The Student also had a paper math line (a strip of paper with consecutive numbers on it) to assist him in the regular education classroom. Tr. 1007.

42. The Case Manager occasionally modified language arts materials used in the regular education classroom, for example, for a composition assigned, the Student was given additional direction, and was given dot-to-dot outlines of the letters for him to trace. The Case Manager had worked with the regular education teacher previously, and knew what sorts of modifications the regular education teacher normally did. Tr. 220-221, 986-87. Communication about modifications in language arts was done mainly through the paraprofessional, who communicated with both the regular education teacher and the Case Manager.

43. The Student participated in one of the two science sessions held in the regular education classroom; during the other, he was in his special education program. The science curriculum involves experiments and discussion, as well as writing in a journal. The Student dictated his observations to the paraprofessional rather than writing in the journal. Tr. 982-83. The Student participated in observation, and in discussion to the limited extent he was able. Tr. 1005-06.

44. The regular education second grade health curriculum uses role playing and discussion, as does the social studies curriculum. Tr. 982-983. The Student participated in small group

activities with assistance from the paraprofessional. Tr. 983-84. After the Student's schedule changed, he was not present for more than ten minutes of social studies, which is a thirty-minute session. Tr. 1003. The Student was present for one of the two health sessions each week. Tr. 1004. The Student did not participate in discussions to the same extent as other students, and did not initiate discussion. He did respond to questions. Tr. 1005-6.

45. The Student attended computer lab with the regular education class. For the majority of the time, he worked on his own programs rather than those on which the class was working, due to frustration. Tr. 984-85. Rather than type his own autobiography, the Student dictated to the paraprofessional, who typed for him. Tr. 985.

46. The Student was using the regular education curriculum in spelling; his workbook was the same workbook used by other students including his sibling. Par. Ex. F, G. The Student's work was modified in that he was not expected to do the same amount of work, although the same concepts were covered. The Student's workbook was modified through his paraprofessional's dotting the shapes of letters for the Student's to trace, and on occasion by the Student's dictating his composition or ideas to the paraprofessional for her to write out.

47. The Student's tests in music class were administered by recording the test, then allowing the Student to listen to the test and take it by himself in the hallway. Tr. 985-6.

48. In the regular education classroom, students were seated in groups of four. Tr. 980. The paraprofessional was one member of the Student's group of four. Tr. 980. A bean bag chair was placed in the room for the Student to use when he needed time to be away from the class, at his choice. Tr. 1025.

49. When the Student became upset in the regular education classroom, he sometimes became very loud and disruptive. When disruption was at a point that the teacher could not continue teaching the class, the paraprofessional took him out. The Student was given warnings and opportunities to settle down before being removed from the classroom temporarily. Tr. 1008-9. The regular education teacher could sometimes tell why the Student was upset, from context; the Student was not able to explain why he was upset. Tr. 1008-9.

50. One of the Student's IEP objectives was to increase independent interactions with peers. There was no increase in interactions from the first to the second trimester, and no increase was recorded for the third trimester.

51. The communication log reflects continuing behavioral issues throughout the year. For example, on December 13, the Student's paraprofessional wrote that he refused to go to recess, and kicked her twice in the shins when she told him he could not paint a project in art class that day, that painting would be done in the next class. Dist. Ex. 7, p. 95.

Assistive Technology/Three Year Evaluation

52. On approximately January 21, 2000, the Speech Clinician contacted Ellen Surbrook, a special education teacher who is a member of the Augmentative Communication Team (ACT) regarding conducting an assistive technology evaluation of the Student. Tr. 601-602; Ex. 16. On January 26, 2000, Ms. Surbrook (ACT 1) was assigned as the Augmentative Communication Team representative for the Student. Ex. 16. She then developed an informal outline of the evaluation that she conduct of the Student, to provide to staff. Tr. 602; Ex. 16.

53. The ACT is a three-person team of District employees. Tr. 18-21. The members of ACT have received training the area of augmentative communication generally. Tr. 18-19. ACT members act as resources for other staff when a student's IEP team is evaluating a student's need for an augmentative communication device. Tr. 19-20, 1053-54, 1056-57. Sometimes they conduct portions of an evaluation. The extent of the ACT's involvement depends on the IEP team's knowledge of augmentative communication. Tr. 1038-39.

54. ACT 1 has fifteen years of experience as a special education teacher. She has taken a course at the University of Minnesota on augmentative communication, and has attended workshops and conferences on the subject. Tr. 599-600. She has participated in approximately 150 assistive technology evaluations. Tr. 600.

55. On February 8, 2000, a meeting was held. The parties stipulated that the District regards the meeting as a conciliation conference and the Parent regards it as an IEP meeting. The parties agreed upon which portions of the conference would be discussed to avoid breaching the confidentiality of any settlement discussions.

56. At the meeting, the Student's private occupational therapist was present. She provided information regarding the Student's sensory needs. Tr. 1172-73. The assistive technology evaluation was discussed at the meeting. Tr. 1286-87. Parent's counsel requested credentials of the ACT members. Tr. 1175.

57. Ms. Surbrook received an e-mail message from the Speech Clinician on February 9, 2000, asking her to prepare her credentials and advising her that permission to proceed with the evaluation had not been received. Tr. 603. The Speech Clinician was not aware that no proposed evaluation form had been given to the Parent to sign at that time. Tr. 882-83. The ACT credentials were never provided to the Parent. Tr. 603-604, 1177-78.

58. In February 2000, Cherie Peterson, a special education consultant for the District, contacted the Parent by the telephone. Tr. 26. Ms. Peterson, whose position is supervisory, suggested that the assistive technology evaluation be incorporated within the three-year reevaluation of the Student which was coming due. Tr. 26-27. According to Ms. Peterson, all areas of an evaluation may have implications in the area of assistive technology. Tr. 28-29. Ms. Peterson

supervises the ACT.

59. Ms. Peterson wrote a letter to the Parent dated February 22, 2000, stating that the MDCFL planned "to release a manual in April or May with a recommended process for determining Assistive Technology needs, including the need for augmentative communication." Dist. Ex. 22, p.1. Ms. Peterson explained that she had been given permission to use the MDCFL forms prior to release. The forms were enclosed for the Parent's review and completion of the Parent and Student worksheets.

60. The letter does not have an address listed for the Parent. Ms. Peterson was uncertain as to how the letter might have been sent to the Parent, and had no certainty that the letter and attachments were ever received by the Parent. Tr. 138-140. The Parent did not recall receiving the letter. Tr. 1152. The Parent did not return any forms. Tr. 33.

61. On February 29, 2000, an IEP meeting was held. Tr. 208-209. Attending the meeting were the Parent, the ARC Advocate, the Case Manager, the elementary school principal, and a special education consultant who was an employee of the District. The Case Manager gave the Parent a list of the individuals proposed to conduct the evaluation. The individuals to perform the assistive technology evaluation were listed as the Speech Clinician, by name, and "ACT." Tr. 1177-78. No further information was provided about the proposed evaluation at that time. *Id.*

62. On March 9, 2000, the Case Manager wrote a note to the Parent in the communication log asking whether she had made a decision about the reevaluation and whether the Case Manager should prepare the final forms and send them to the Parent for permission. Dist. Ex. 7, p.149.

63. On March 14, 2000, the Case Manager placed the permission form and evaluation description in the communication log. Dist. Ex. 7, p. 153. This was to be the Student's first full evaluation in the District, so it is noted as an initial evaluation. All areas were to be evaluated: intellectual functioning, academic performance, social/emotional/behavioral, communication, motor ability, functional skills, physical status, sensory status and assistive technology. The assistive technology portion states that "the SETT process will be used to gather information about needs in all areas that could be impacted by Assistive Tech." The evaluator for that portion was to be the Speech Clinician, "Assisted by ACT Team." Dist. Ex. 63.

64. The process to be used for the AT portion of the evaluation, SETT, stands for Student, Environment, Task and Tools. Tr. 32. The SETT process involves looking at a student to determine the student's needs and strengths, and the student's environment. Then the evaluator is to consider the tasks that the student is currently doing, or needs to do to be more independent in the environment. The evaluator then considers the various tools, such as augmentative communication devices, that would permit the student to accomplish the

necessary tasks more effectively or efficiently. Tr. 32-33.

65. The evaluation form states that the social/emotional/behavioral area would be evaluated through the use of behavior checklists, observation, motivational Assessment Scale, reinforcer surveys, Social Skills Checklist. The people responsible for this portion were the Case Manager and two behavior analysts, the building behavior analyst and Debra Anderson, who is a Behavior Analyst/Autism Resource Specialist for the School District (ARS). Dist. Ex. 63. Communication was to be assessed by the Speech Clinician, using "a combination of standardized and informal tests" and "File Review." *Id.*

66. Functional skills were to be evaluated using informal checklists; persons responsible were the ARS, the Case Manager and the Parent. *Id.*

67. The Parent signed the Notice of Evaluation Pla~ March 20, 2000, and returned it to the District. Ex. 63, p. 2. The District received the form on March 21, 2000. Tr. 1302. The Parent completed a Prosocial Skills Checklist, a Sensory Profile, and a Childhood Autism Rating Scale. Tr. 1302-04, Dist. Ex. 40, p. 8-9, Dist. Ex. 55, p. 3-4. The Parent provided the school with a speech and language evaluatic report by Kelly Woodford, the Student's private speech therapist. Tr. 1304.

68. On April 12, 2000, ACT 1 prepared a second "Evaluation Plan" outlining of the steps that she would follow in conducting the Student's assistive technology evaluation. Tr. 604; Dist. Ex. 29. The ACT Evaluation Plan was not provided to the Parent. The second Plan is much like the first, except that it omits steps already completed. It calls for an observation of the Student at school and an informal interview of staff regarding the Student's "present communication system," collection of questionnaire, reinforcement inventory and a copy of the current IEP. The observation and interview were to be performed by both the ACT 1 and another member of the ACT, Fran Ring, so that a different time of day could be observed. Additional observations were to be made if needed. Once observations were complete, the augmentative communication team was to meet and discuss the observations and compile a list of suggestions or recommendations. The ACT representative was then to write the ACT report, followed by a meeting with the Student's IEP team and implementation of agreed recommendations. Ex. 29.

69. The Speech Clinician completed an Augmentative Communication Intake Questionnaire, as requested by the ACT in January 2000. He based his responses on his knowledge of the Student, information from the Student's file, and information from conversations with the Parent and other staff who worked with the Student. Tr. 605-607, 853-54; Dist. Ex. 54. The Speech Clinician returned the questionnaire to the ACT. Tr. 853-54. The ACT 1 used the information as background. Tr. 607-08. She expected that the Parent had participated in filling out the questionnaire. Tr. 659.

70. District staff filled out a SETT worksheet entitled, "Student, Environment and Tasks

Worksheet." The Case Manager, Speech Clinician and paraprofessional completed a single form together, with the Case Manager doing the recording for the group. Dist. Ex. 23. The form was filled out on February 25, 2000. The staff answered the worksheet question, "What does the student need to do, but is currently unable to do?" by writing: "communicate his feelings, thoughts, directly, consistently - uncued responses which are socially appropriate to the situation. He needs to increase his vocabulary." He was described as having "rudimentary PECS skills"; among his strengths were "High interest with computers." *Id.*

71. ACT 1 observed the Student as part of her evaluation on two different days, and another ACT member observed him once. Neither was aware of his I.Q., which is 83. It had previously been reported as much lower. Tr. 663. The Student was observed on April 20, 27 and 28, 2000, in mainstream and special education settings, in the morning and in the afternoon. Dist. Ex. 40. ACT members observed the Student communicating verbally 89% of the time. His verbal communication was paired with facial or body gestures 6% of the time. He communicated by running away 11% of the time. His verbalizations were 88% intelligible to the ACT members, who were unfamiliar listeners. His verbalizations ranged from one to five words in length, with an average of two words per verbalization. His average was higher when working with the Speech Clinician, who used verbal cues to prompt the Student to expand on his sentence length. Dist. Ex. 33. Observers did not report on the number of attempts to communicate made by the Student.

72. ACT members observed that the Student used assistive technology tools: PECS, Typewrite to practice letter finding, computer programs and touch point number problem cards. They also observed that the staff used "wait time for processing," i.e., giving the Student a waiting period of at least 7 seconds to process and respond to verbal expression directed to him. They also observed that "safety signals" were given to the Student, i.e., reminders to continue an activity until it ended. Dist. Ex. 33; Tr. 613-614.

73. In February 2000, the ARS had been asked to collect information on the Student's behavior and communication because of concern about the Student's behavior and how it related to his ability to communicate. Tr. 462. The ARS is licensed as a teacher; her position in the District is behavior analyst. She was asked to assist in collecting data because the building behavior analyst, who had observed the Student previously, had "lack of knowledge of kids with autism." Tr. 539. The ARS consulted with the Case Manager, the Student's paraprofessional and the building behavior analyst. She did not speak to the Parent, nor was the Parent aware that the ARS had been contacted.

74. The ARS devised a data sheet to track some of the Student's behaviors which were of concern to staff, and some of his communications. Tr. 461-7. The "target" behaviors to be tracked were jumping (on tables or elsewhere), bolting (running away from staff), swearing and screaming. Tr. 464-65. The communications being tracked were requests for an item or activity and requests to avoid an item or an activity, and positive or negative responses from staff to those requests. Tr. 466-67. Not all of the Student's communication was to be tracked.

Tr. 522-23. Staff was to use the data sheet to record their observations.

75. Use of PECS was not considered in noting the Student's requests, both positive and negative in the ARS's data. She stated that there was not a "good reason" for failing to include that information, although the focus was on verbal rather than non-verbal communication. Tr. 548-549. The targeted behaviors did not include self-inflicted injuries such as biting or scratching himself, or injuries to others.

76. After a few days of use of the data sheet, the ARS visited the school to observe how staff were using the data sheet, to be sure the directions had been understood and that no changes were needed. The ARS did not formally observe the Student herself. Tr. 462, 470-71. Daily data was kept on the target behaviors and communications from February 14, 2000, through May 26, 2000. Dist. Ex. 21. The ARS is trained in the use of PECS, but did not have data taken on the Student's use of PECS. Tr. 548, 550-551.

77. The ARS graphed and analyzed the data from the data sheets that school staff completed. Tr. 476-81; Dist. Ex. 20, 21. She did not know that a daily communication log was being sent between home and school, and did not review the log. Tr. 589. The ARS believes that the daily reports are likely to less accurate than the tally reports kept on the data sheets, because daily reports include anecdotal data that may describe the reaction of staff as much as the Student's actual behavior or communications. Tr. 589-90; Par. Ex. Q.

78. On most days tracked, the Student made an average of ten requests to have or avoid an activity or item. The Student almost never engaged in jumping; incidents of screaming or swearing were infrequent. Bolting occurred more frequently. When these behaviors occurred, several sorts of inappropriate behavior often occurred on the same day. According to the tally sheets, inappropriate behavior was occasionally linked with being denied a request; often, there was no apparent cause for the behavior. Dist. Ex. 20, 21.

79. The ACT met in early May to discuss their observations and to compile a list of recommendations for the IEP team. Tr. 613-614. ACT 1 drafted a report, which was labelled April 15, 2000, by typographical error. It should be May 15, 2000. Tr. 613. The ACT concluded that the Student functionally communicated his wants and needs in all settings. Dist. Ex. 33; Tr. 613-614.

80. The ACT recommended continued use of visual presentation of symbol schedule, continued use of "symbol system" for backup, continued use of wait time, continued use of safety signals, and use of the carrier phrase "tell me" or "tell me all the words" (used by the Speech Clinician) across more settings. Dist. Ex. 33, 40.

81. The Speech Clinician reviewed a speech and language evaluation report written by Kelly Woodford, the Student's private speech therapist. Ms. Woodford has a Certificate of Clinical Competency, for which she had to take a national speech/language exam and to complete