a year of clinical supervision. She has been a speech pathologist for three years, and has a master's degree in speech. Tr. 1064-1065. She uses augmentative communication electronic devices in her practice, and is familiar with the DynaMyte and other devices. Tr. 1066. She has worked with the Student since July 1999, seeing him twice a week for 60 minute sessions. Tr. 1069.

82. The evaluation used by the District had been performed by the private speech therapist in January 2000. The private evaluation included administration of various tests. In the Peabody Picture Vocabulary Test, the Student's score fell significantly below the mean, with an age equivalency of 2.8 years. Tr. 1071, Dist. Ex. 59. In the Expressive One Word Picture Vocabulary Test, the Student was shown to have word retrieval difficulties. Tr. 1073. The Preschool Language Scale was also administered, although it is normed for children under the age of six. On that test, it was shown that the Student could recognize actions in pictures and understood colors. In a language sample, the Student had an average utterance of 2.5 words. Tr. 1077-78.

83. The Student's word retrieval problem impacts his ability to interact or converse with another child. An average five-year old child would have about 2000 words in his/her vocabulary. Tr. 1094. The Student, who just turned ten, has about 300 words in his vocabulary. In the opinion of the private speech therapist, his verbal vocabulary is not sufficient for him to be able to express his needs and wants. Tr. 1094. In her opinion, the Student would benefit from some kind of augmentative technology. Tr. 1078, 1088.

84. The ARS believed, inaccurately, that the Parent had participated in filling out the reinforcement inventory. Tr. 493, 494. The ARS reviewed the Prosocial Checklist, the motivation assessment scale, the reinforcement inventory and the tally data collected by staff regarding targeted behavior and specified communications. Based on that data, she concluded that the Student was able to verbally communicate his wants and needs to school staff. Tr. 495-499; Ex. 40, p 8. She concluded that school staff understand what the Student is trying to communicate to them. Tr. 496.

85. The ARS concluded that behaviors were not serious. She never saw or knew of the daily communication log between home and school. Tr. 513. Staff were not necessarily using the tally sheets correctly, for example, staff tallied the Student's loud request and throwing a paintbrush at another student as "bolting" Dist. Ex. 7, Feb. 17 entry, p. 140; Dist. Ex. 21, Feb. 17 entry; Tr. 519-525.

<u>Evaluation Report and Meeting</u>

86. The District sent the Parent a Notice of Team Meeting dated April 14, 2000, for a meeting to discuss the evaluation results to take place on May 4, 2000. Dist. Ex. 64. So that the Parent's counsel could be present, the meeting was re-scheduled. Dist. Exs. 34, 35. The Case Manager wrote to the Parent agreeing to change the meeting date, and stating: "The 30 time

limit is May 9th. If you can't meet before then, I'm assuming you are making the meeting date knowing it is past that limit." Dist. Ex. 34.

87. The IEP team met with evaluators and invited attorneys and others on May 15, 2000. Tr. 1202; Ex. 41 and Q. Persons present included the Case Manager, the regular education teachers, ACT 1, Cherie Peterson, the Speech Clinician, a special education consultant, the building behavior analyst, the ARS, the special education math teacher, the school psychologist, the occupational therapist, the adapted physical education teacher, the Parent, the ARC Advocate, the Parent's counsel (Sonja Kerr) and District counsel (Nancy Blumstein). Tr. 1199.

88. At the meeting, the Parent and her counsel asked questions and made comments. Staff asked the Parent questions. Tr. 58, 222-23, 1272-73. The Speech Clinician brought a Techspeak which he had begun using with the Student to the meeting. Tr. 621.

89. A Techspeak is an augmentative communication device that has a recording device built into it. Tr. 858. It is approximately twelve inches by eight inches, and sits on a slant so the user can see the pictures or words when the device is on a table. Tr. 858. It has twenty-eight different spaces on the front; the user can push the space to activate the recording of the word or phrase that has been programmed for each space. Tr. 859. Different overlays can be used with the device. An overlay is a sheet which slides into the Techspeak showing different sets of 28 words/phrases for the user to play. Tr. 867.

90. ACT 1 provided a Techspeak to the Speech Clinician to use with the Student. Tr. 620. ACT 1 showed the Speech Clinician how to use the Techspeak, and how to program it. Tr. 865. He developed some overlays for the device that contained pictures of words with which the Student was familiar, including items or activities typically requested by the Student and some of his reading words.

91. The Speech Clinician used the Techspeak with the Student in his classroom two or three times in early to mid-May. Tr. 865. The Student was given the opportunity to use the device to request some of his preferred items and activities in the speech room, which he had been requesting verbally or with PECS. The Student used the device spontaneously to comment on some of the things in the speech room. Tr. 865-66.

92. The ACT 1 presented the recommendations of the ACT, which did not include a recommendation for an augmentative communication device. Dist. Ex. 40, p. 5.

93. At the meeting, the ARS expressed her view that the Student did not have serious behavior problems. Most of his target behaviors occurred infrequently, and largely at a certain time of day. The ARS did not provide the Parent or the team with a copy of the tally sheets. Tr. 510. The Parent continued to be concerned about behavioral issues as related by teachers and the paraprofessional through the daily log.

94. To assist the Student's behavior, the team decided to add sensory activities throughout the Student's day, with staff to be trained in the application by the District's occupational therapist, who met with the Student's private occupational therapist at the invitation of the Parent. Dist. Ex. 46. The District members of the team agreed to increase use of the Student's picture schedule by breaking down the activities further. They proposed using this schedule board as well as increased positive reinforcement to assist the Student in managing his behavior. *Id.*

95. The team agreed to try different augmentative communication devices with the Student based on the Parent's request. Tr. 869-70. The Parent, ACT 1 and the Speech Clinician scheduled a meeting for May 17, 2000, to discuss augmentative communication devices. Tr. 60-61.

96. The Minnesota Assistive Technology Guidelines published by the MDCFL describe an "extended consideration" period which is "a trial period with one or more assistive technology devices in the child's customary environments [to determine] what, if any, assistive technology might help the child achie--- goals as developed by an IEP team." Par. Ex. V. Data can be maintained to determine whether and how well a device is helping a student. "An extended consideration period of any reasonable length can be written into the educational plan to allow for appropriate, well planned, and documented trials with a range of potential solutions." *Id.* ACT 1 considers this trial period to be a continuation of the evaluation.

97. It is important for a student to try using a device in the normal environment, so that it can be determined how the student will respond to the device. Tr. 42. Each device is different, in terms of tactile reaction, ease of use and portability; each child is different and it is not possible to predict how a child will react to a device without a trial. Tr. 42 and *infra.*

98. The District maintains a library of augmentative communication devices. Tr. 42-43, 600. The ACT team provides access to those devices when contacted by an IEP team or a speech clinician. Tr. 47-48. The District has about fifty devices, some of which are obsolete. If a student needs a device which the District does not have, its relationship with vendors usually enables it to borrow or rent the device. *Id.*

99. On May 17, 2000, the Parent, the ARC Advocate, the Speech Clinician and ACT 1 met. Tr. 623. They discussed devices which might be appropriate to try with the Student. The only devices which they felt would be appropriate and were sufficiently different to warrant trying were the Techspeak and the DynaMyte. Tr. 623, 856. Both are portable and accessible. While the Techspeak is less complicated to use initially, it has a more limited capacity; a student does not quickly outgrow the DynaMyte. Tr. 858, 862.

100. At the May 17 meeting, structured trials of both devices were discussed, with a trial period

for the Techspeak during summer school and trial of the DynaMyte in the fall. Tr. 624, 856-57.

101. The Speech Clinician programmed the Techspeak with the Student's brother's voice because it is more appropriate to have a child's voice on the device. Tr. 859. He began collecting data on the Student's use of the Techspeak. He worked with the Student on the device during the two weeks of May following the meeting. Tr. 858.

102. ACT 1 took a Techspeak to Beth Bryson, the speech therapist employed by the District who would be working with the Student during the time he was scheduled to receive extended school year services from the District. Tr. 624-25. She introduced Ms. Bryson to the device and showed her how to program it. She provided a data sheet on which to collect data on the Student's use of the Techspeak. *Id.*

103. On May 30, 2000, the Case Manager sent the Parent a Notice of Proposed Special Education Services, referring to a team meeting on May 2 and 3, 2000. Dist. Ex. 46. No IEP team meeting took place on those dates. Attached to the Notice was a description of Additions to Adaptation Section, which incorporates a schedule of sensory activities, visual supports in the form of the picture schedule, and "Augmentative Communication," which states that "extended consideration of specific Augmentative Communication devices" had been discussed. It recites that the ACT 1 "explained the type of data needed to make an informed decision about an appropriate device." The form states that the team agreed that the Student could take the devices home and to his father's home during his summer visit, and stated that after trial on the Techspeak and the DynaMyte, a decision would be made whether to consider a third device. *Id.*

104. In a letter dated June 29, 2000, the Parent requested a due process hearing. Dist. Ex. 49.

<u>*Outside Opinion*</u>

105. In working with the Student, the private speech therapist has found that the Student is bright, but is not always able to go into detail or elaborate on what he is attempting to communicate. If he is upset, he may yell or use swear words. Tr. 1084-85. She had not recommended using an augmentative communication device before the Student received the Techspeak from the District. Tr. 1098, 1100.

106. Ms. Woodford has seen and reviewed evaluations in her practice, and has conducted four augmentative communication evaluations for purposes of insurance coverage. Tr. 1066, 1095. Ms. Woodford's practice, and her understanding of the preferred method of augmentative communication evaluation is that either a trial of the device should be conducted or a "feature match" performed. A "feature match" involves matching the features desired or required by the person with the device. For example, for this Student, portability would be a necessary feature, since the Student is independently mobile. Other features to

be matched could include access and vocabulary. Tr. 1101-03.

107. The private speech therapist believes the Student would be capable of using a DynaMyte, which is like a computer. Tr. 1093. The DynaMyte is approximately ten inches by six inches, and has a touch-sensitive screen on the front. It has a memory for storing words or phrases that can be programmed. It has a database built into it with pictures and words that can be programmed into the spaces on the front of the device. On the DynaMyte, each different overlay is called a page. Tr. 860-861. Unlike the Techspeak, the DynaMyte does not have physical overlays to slide into the device. Instead, it has pop-up screens with different levels. Tr. 1093. If the user want to go to a different page, the user pushes a button on the front of the screen. Tr. 861.

108. The private speech therapist tried the Techspeak with the Student twice. Tr. 1085. On one occasion, the Student was having difficulty making himself understood verbally, and used the Techspeak to tell the therapist, "I want plane," and then elaborated that he wanted "dad, plane." He was going to fly to visit his father in Las Vegas the following day. Tr. 1085-86.

109. Dr. Peggy Locke was presented by the District as an expert witness on augmentative communication. Dist. Ex. 60; Tr. 318-27. Dr. Locke was the original trainer of the District's ACT. Tr. 19. Dr. Locke has conducted assistive technology assessments and reviewed them, most recently in the context of insurance company payment for assistive technology devices. In Dr. Locke's opinion, a two-step process, consisting of assessment and then recommendations from an IEP team, is appropriate. Tr. 361, 364. According to Dr. Locke, assessments do not normally include trials of devices, and trials of devices should take longer than 30 days, or however long the child needs to become comfortable with the device and see if it is effective for the child. Tr. 361-3.

110. Dr. Locke would not testify as to whether an assessment is appropriate for a particular child without knowing the child. Tr. 388-389. Dr. Locke gave her opinion based solely on written records as to whether the assessment appeared to comply with professional standards. Tr. 388-389. Dr. Locke is not trained in PECS. Tr. 440. Dr. Locke has no opinion on whether it was appropriate to evaluate the Student for AT as part of his three-year evaluation. Tr. 414. She found the SETT process as set forth by MDCFL to be very thorough, although she was not familiar with it before reading documents in preparation for her testimony and has not used the SETT process. Tr. 416. Dr. Locke did not have an opinion about the length of time for which the District proposed taking data on each device. Tr. 423, 434-5. Her opinion was given as to the appropriateness of the methods used. Tr. 442. Best practice is for an assessment to be done everywhere a child communicates: in the home, in the school and in the community. Tr. 432.

<u>SETT Clarification from MDCFL</u>

111. Ms. Peterson, the special education administrator, contacted Joan Breslin Larson, the Assistive Technology Specialist for the MDCFL, following the IEP meeting in May. She

asked for clarification regarding the SETT process and device trials. Ms. Breslin Larson responded by letter on May 18, 2000, stating that "there are no specific timelines given for evaluation, general guidelines would include determination of devices to be tried, conditions where they are to be tried, who will be responsible for trials and data and criteria for success." Dist. Ex. Ex. 43. She provided an excerpt from the Minnesota Assistive Technology Guidelines, which states in part "There are no definitive rules about how long an extended consideration should take...." She further stated that "time must be allowed to give time to move past the "honeymoon" phase of a device, and give the student a chance to use it in practical situations. ... At a bare minimum, 30 days for a sophisticated device or system could be used, although I would suggest that this number is too low and should be higher." *Id.*

112. On June 22, 2000, Ms. Breslin Larson sent Ms. Peterson another letter, with a copy to counsel for the Parent. Dist. Ex. 48. That letter states that "After more thought and consultation with other professionals, I have some revised thoughts on the matter. The original letter, and this letter, are informal responses to your phone call and do not represent a formal agency position on these issues." The letter cites Minnesota Rule 3525.2550, and quotes from the rule's requirement:

> that assessments must be conducted "... within a reasonable time not to exceed 30 days from the date the district receives parental permission to conduct the assessment or the expiration of the ten-day parental response time...." There is nothing to indicate than an assistive technology assessment need not meet the terms of this rule.... the parameters for the extended consideration should be addressed in the student's IEP. This provides data for documented trials of those devices while assuring that the student's access to assistive technology is not delayed.

113. On August 20, 2000, the hearing officer issued an order dismissing issue(s) regarding the appropriateness of extended school year services offered by the Las Vegas, Nevada, school district, and denying motions to limit the scope of the hearing to the time period following the February 8, 2000, conciliation conference and for continuance until completion of an independent educational evaluation proposed by the District.

114. On August 22, 2000, the hearing officer denied a motion to exclude the testimony of Dr. Peggy Locke.

115. Any Finding of Fact which should properly be deemed a Conclusion of Law, and any Conclusion of Law which should properly be deemed a Finding of Fact, is hereby adopted as such. The foregoing Findings have been made taking into consideration all of the testimony and documents, and reflect considered judgments as to the appropriate weight and credibility afforded such evidence.

Based upon the foregoing Findings of Fact, the Administrative Law Judge makes the following:

## CONCLUSIONS

1. The Administrative Law Judge, the School District and the Commissioner of the Department of Children, Families and Learning have jurisdiction in this matter pursuant to Minn. Stat. §§125A.09, 14.55, and Minn. Rule Part 3525.4000. The Parent received proper notice of hearing in this matter.

2. Independent School District No. 11, Anoka-Hennepin, Minnesota, as the district of residence, has the primary responsibility for providing an appropriate program of special education for the Student. Minn. Stat. §125A.03.

3. Pursuant to Minn. Rule Part 3525.4400, the burden of proof is upon the School District to show, by a preponderance of the evidence, that its actions were appropriate under the standards set forth in the Rule and applicable law.

4. Minn. Rule 3525.2750, subp. 1, Educational Assessment, provides that an assessment:

   D. must be conducted if the parent or student over age 18 requests....

   *See also,* 34 C.F.R. §300.536(b), which makes the same requirement than a reevaluation must be conducted if the child's parent requests reevaluation.

5. Minn. R. 3525.2550, Subp. 2, requires an assessment team to:

   C. Conduct the assessment within a reasonable time not to exceed 30 days from the date the district receives parental permission to conduct the assessment or the expiration of the ten-day parental response time in cases other than initial assessment, unless a conciliation conference or hearing is requested.

6. 34 C.F.R. §300.343(b)(1) requires:

   > Each public agency shall ensure that within a reasonable period of time following the agency's receipt of parent consent to an initial evaluation of a child: (i) The child is evaluated.

   A district may not unreasonably delay in responding to a parent's request for an independent evaluation. *Letter to Anonymous,* 23 IDELR 719 (OSEP 1995).

7. The Parent requested an assistive technology evaluation on December 14, 1999. The Parent's comment about an assistive technology device used by a relative at the September 29, 1999,

meeting was not a sufficiently clear request for an assistive technology evaluation to require a written response or further action by the District at that time.

8. The District has not shown by a preponderance of the evidence that it responded without undue delay to the Parent's request on December 14, 1999, for an assistive technology evaluation. The District did not ask the Parent until mid-February to agree to include the assistive technology assessment with the three-year assessment. No plan or request for permission to proceed was provided to the Parent until March 14, 2000. No sufficient reason was given for the delay before proceeding with the evaluation.

9. If the use of "extended consideration" caused the evaluation to continue beyond the 30-day limit, the District did not timely complete the evaluation. The facts are instead viewed as showing that the evaluation was complete at the time of the May 2000 meetings, when a decision was made to provide assistive technol[illegible] [illegible]vices and trials. At that time, use of assistive technology devices and a description of the trials should have been incorporated into the IEP. *See,* Dist. Ex. 48. That incorporation was later made, if unclearly, through a notice of significant change to the IEP dated May 30, 2000. Thus, it is concluded that the evaluation was not extended beyond the 30-day period allowed by Minnesota law.

10. 34 C.F.R. §308, Assistive Technology, provides:

> (a) Each public agency shall ensure that assistive technology devices or assistive technology services, or both, ... are made available to a child with a disability if required as a part of the child's
> (1) Special education under §300.26;
> (2) Related services under §300.24; or
> (3) Supplementary aids and services under §300.28 and 300.550(b)(2).

11. 34 C.F.R. §300.532(c)(1)(ii), Evaluation Procedures, requires districts to ensure that standardized tests "are administered by trained and knowledgeable personnel in accordance with any instructions provided by the producer of the tests." Minn. R. 3525.2750, Educational Assessment, requires that a team conduct a "comprehensive assessment ... using technically adequate instruments and procedures."

12. The District has shown that all standardized tests given to the Student were properly administered by trained and knowledgeable personnel. The instruments used in the assessment were technically adequate. The ACT followed the SETT process as prescribed by MDCFL. That process, although new, is based on accepted theory in the field of assistive technology; there was no disagreement with the use of the process. The assessment could have been more comprehensive in considering all behavior of concern and all of the Student's communications.

13. For students who are eligible for special education services, districts are required to provide

a free, appropriate public education. 20 U.S.C. §1401 *et seq.*; Minn. Stat. §125A. An education under the Act is appropriate if it confers some educational benefit. *Bd. of Educ. of Hendrick Hudson Central Sch. Distr. v. Rowley*, 458 U.S. 176 (1982). A district is not required to provide a student with assistive technology unless the assistive technology is necessary for a child to receive FAPE. *Letter to Anonymous*, 29 IDELR 1089, 1090 (OSEP 1997).

14. The District has shown by a preponderance of the evidence that it offered a free, appropriate public education to the Student. The Student began reading during the 1999-2000 school year, and was making progress in the regular education math curriculum. To the extent that delay in providing an assistive technology device to the Student detracted from the educational benefit of his program, and to the extent that there were omissions in the assessment content, those flaws have been overcome by provision of the assistive technology device with appropriate trials. Because the assessment was appropriate, no independent educational evaluation is ordered.

15. The decision as to what constitutes an appropriate program, including assistive technology, is to be made by an IEP team, not by a group of individuals advising the school staff independent of an IEP team. 34 C.F.R. §§300.343, .344; MDCFL Complaint No. 1009 (1999).

16. In this instance, the IEP team decided that assistive technology devices would be tried with the Student. The team was not required to, and did not, follow the recommendation of the ACT. Thus, to the extent that the ACT acted independently of the team process, that action did not harm the Student.

17. Minn. R. 3525.0800, Subp. 4, provides in pertinent part: "It is the responsibility of the providing district, agency, or academy to implement the IEP ...." 20 U.S.C. §1401(a)(1)(A), defines FAPE in relevant part as:

> special education and related services that -
> (D) are provided in conformity with the individualized education program required under section 1414(d).

18. The District has shown by a preponderance of the evidence that it implemented the modifications and accommodations provided in the Student's IEP, with the exception of the use of the PECS. As to the PECS, little or no use was made of the system for communication purposes. No one who worked with the Student was trained in PECS, and the vocabulary in the PECS notebook was not maintained to match the Student's vocabulary so that he could express himself through PECS effectively. The picture schedule was used effectively, demonstrating the Student's continuing interest in PECS.

19. The Student did make progress in increasing his vocabulary, and in communicating, despite

the failure to implement the PECS. There is insufficient evidence to conclude that the Student was deprived of FAPE by failure to implement PECS. Nonetheless, it is advisable that at least one staff member who works directly with the Student be trained in the augmentative communication device on which the Student will rely, whether that device is the Techspeak or DynaMyte, or some other device. The device will not confer benefit on the Student nor assist him in progressing toward his IEP goals unless use of the device is implemented effectively.

20. "Congress sought to protect individual children by providing for parental involvement in ... the formulation of the child's individual educational program." *Rowley, supra.* Parents must be afforded an opportunity to participate at IEP team meetings. Parental participation in discussing an evaluation is part of this right. 34 C.F.R., Appendix A, Question 5. Parental participation in planning an evaluation is not explicitly considered in state or federal law. "Parents are considered equal partners with school personnel in making these decisions, and the IEP team must consider the parents' concerns and the information that they provide .... The IEP team should work toward consensus but the public agency has ultimate responsibility to ensure that the IEP includes services that the child needs." 34 C.F.R. 300, Appendix A, Question 9.

21. Information which the Parent provided to the team was considered. The Parent was afforded an opportunity to participate, and did participate, in the IEP team meetings concerning the Student's education discussed herein, and affected the decisions of the team. IDEA requires openness to participation; it does not prohibit a teacher, case manager or paraprofessional from reacting emotionally, and perhaps angrily. While the Parent's discomfort is understandable, she remained an active and effective member of the team, which is all that is required by IDEA.

Based upon the foregoing Conclusions, the Administrative Law Judge makes the following:

## DECISION

1. The District ultimately complied with its obligation to provide an appropriate assessment to the Student, and provided him with assistive technology devices. Therefore, there is no basis to order an independent educational evaluation.

2. The District is ordered to convene an IEP team meeting as soon as reasonably possible following issuance of this decision,

a. to modify the IEP to provide for the assistive technology device trials as decided in the May 15, 2000, IEP meeting;

b. to modify the IEP to incorporate use of assistive technology devices into the Student's IEP goals and objectives.

Dated: September 29, 2000

Sara D. Jay
Administrative Law Judge

Reported: Affiliated Court Reporters

NOTICE

It is respectfully requested that the Commissioner of the Department of Children, Families and Learning serve a copy of the Hearing Review Officer's decision, resulting from any appeal of this decision, upon the Administrative Law Judge.

MEMORANDUM

The focus of the parties in this case, brought pursuant to the Individuals with Disabilities in Education Act, 20 U.S.C. §1401 *et seq.*, (IDEA), and its Minnesota counterparts, Minn. Stat. §125A.01 *et seq.* and Minn. Rules Chapter 3525, has been on the evaluation of the Student for assistive technology. The timeliness of the evaluation, as well as its adequacy, have been questioned. In addition, implementation of modifications and accommodations required by the IEP have been challenged. Lastly, the Parent asserts that she has not been treated as an equal participant on the IEP team.

*Evaluation*

The District suggests that it had no obligation to assess the Student for assistive technology, citing the recent case of *Zigich v. Independent School District No. 623*, Civ. No. 99-1212 (D. Minn., July 13, 2000). However, the District did not advise the Parent it was refusing assessment, which would have given her the opportunity to challenge that refusal if she so chose. Rather, the District agreed to the evaluation in December 1999, and provided an evaluation. Whether or not the District was obligated to perform the assessment in the first instance is not at issue. Having agreed to do so, it was obligated to do so promptly and properly.

*Timeliness of Evaluation*

The law does not specify the time in which a district must respond to a parent's request for

an assistive technology (AT) evaluation. However, as with a response to a request for an independent educational evaluation, a response to request for AT evaluation should be made "without undue delay and in a manner that does not interfere with the child's right to a free appropriate public education." *Letter to Anonymous*, 23 IDELR 719 (OSEP 1995). An AT evaluation is considered under the same standards as any other evaluation. *Letter to Fisher*, 23 IDELR 565 (OSEP 1995). The decision recently issued in MDCFL Case 372 (El-Ghazzawy, September 25, 2000), provided to the hearing officer by the Parent, has been reviewed and is not in conflict with the decision herein.

Here, the District verbally agreed on December 14, 1999, that an AT evaluation would take place. It began contacting District personnel about evaluation one month later, but did not advise the Parent of its activities, and did not provide her with a Proposed Evaluation. By the end of February, the only progress visible to the Parent was the provision of a list of evaluators. No proposal was made until March 14, 2000, three months after the Parent had requested an AT evaluation and the District had agreed that evaluation would be appropriate.

It is suggested that the evaluation was delayed by the process of conciliation. However, there was no evidence that the content of the proposed AT evaluation was discussed during conciliation. Even assuming that AT issues were interwoven with issues which remain part of confidential settlement discussions and were therefore not part of the testimony at hearing, a period of three months is not a reasonable time for the District to wait to provide a plan and ask for permission to proceed. Combining the AT evaluation with the three-year evaluation has not been suggested to be a legitimate reason to delay the evaluation. Involvement in conciliation is not an adequate reason to delay an evaluation. *See*, MDCFL Complaint 1059 (September 23, 1999).

From the testimony, it appears that both the Speech Clinician and the Augmentative Communication Team had the impression that the Parent had been asked for permission to assess in January, and had not responded; in other words, it was assumed that the Parent had caused the delay. In fact, she had not been asked for permission to proceed, and was not provided with an evaluation proposal until mid-March 2000. She was asked to combine the AT evaluation with the three-year evaluation in mid-February, and was asked to agree to the evaluation in early March without having received a proposal describing the evaluation. The Parent had asked for credentials of the ACT, but gave prompt permission for the AT evaluation to proceed despite the fact that she never received those credentials. The delay in beginning the AT evaluation was improper, and was due to inaction by the District.

<u>*Content of Evaluation*</u>

Changes were made to the AT requirements of IDEA by the 1997 amendments. As yet, there is little law as to the meaning of those changes, and the required content of AT evaluations. *See*, *In re Student with a Disability*, 31 IDELR 99 (SEA Dela. 1999); *Houston Indep. School Dist.*, 30 IDELR 68 (LEA Tex. 1998).

Like all evaluations, an AT evaluation must be conducted by knowledgeable personnel using technically adequate instruments. It is appropriate to rely on a summary of information, rather than providing raw data to the IEP team. *T.S. v. Ridgefield Bd. of Education,* 19 IDELR 709 (D. Conn. 1992).

Here, the evaluators followed the SETT process and other processes set forth in the Notice of Evaluation. The SETT process is new, and was being used by the District even before its formal distribution. Nonetheless, it appears that the ACT followed the process as outlined. Observations were made, checklists were filled out, consultations and interviews took place, and records were reviewed.

There were omissions in the process. Observation and tallying of the Student's communication was limited to his verbal communication, and to only limited types of verbal communication. No analysis was made of the Student's [illegible] of PECS, admittedly without a good reason. *Compare, Zigich, supra,* in which the student was successfully using "low technology" (non-computer-based) augmentative communication. Failed attempts to communicate were not tracked, although there were occasions when even "familiar" listeners did not understand what the Student was trying to convey; no analysis was made of the Student's attempts at maintaining conversations, participating in class discussions, or initiating contacts. The evaluation by the ARS, the ACT, and some IEP team members focussed solely on whether the Student could make his "wants and needs" understood by staff. There was no inquiry as to whether the Student was meeting his IEP goals including peer communication, or whether augmentative communication was needed to help him meet those goals.

The Student's behavior was analyzed in a similarly limited fashion. Only four types of behavior were tallied. His injurious and self-injurious behaviors were not tracked, although the Case Manager and the Parent were noting an increase in those behaviors. There is also some question about how accurately staff were using the tally sheets, as behavior was counted as "bolting" which actually involved throwing objects.

The persons mainly responsible for the functional behavior analysis and the AT portion of the evaluation were not acquainted with the Student and did not work with him. However, the federal requirement is that members of the team *include* persons knowledgeable about the child, not that each evaluation team member be knowledgeable about the child. Thus, so long as individuals working with the Student took part in the evaluation, the evaluation did not become invalid simply because some members of the team were not knowledgeable about the Student.

However, just as a perfect IEP is not required so long as FAPE is provided, neither is a perfect evaluation required, so long as the result is to provide a reasonably clear picture of the student's needs for consideration of the IEP team. The IEP team members had their own observations to add to the picture given by the ACT and ARS, and were empowered to accept or reject the ACT and ARS recommendations just as the team can accept or reject recommendations from an outside provider. *See, Letter to Naon,* 22 IDELR 888 (OSEP 1995). The regular education

teacher was aware that the Student could not always be understood, and rarely initiated communication. Other staff did not always understand the Student's communications, and were aware that his verbal skills deteriorated when he was upset. The Parent was successful in persuading the IEP team that augmentative communication devices should be tried, despite the recommendation of the ACT to the contrary. The decision was made by the IEP team, not by the ACT. *See*, MDCFL Complaint No. 1009 (1999)(IEP team, not other district staff, to make decisions about IEP). Ultimately, the IEP team decided to provide an augmentative communication device, and to proceed with trials. Thus, defects in the evaluation did not ultimately deprive the Student of the benefit of the AT evaluation, because those defects have not deprived him of the opportunity to have an AT device as part of his IEP.

*Testimony of Dr. Peggy Locke*

The Parent objected to the testimony of Dr. Locke for several reasons, primarily that she was not acquainted with the Student. A motion to exclude her testimony on several grounds was denied. At hearing, the Parent again moved to exclude Dr. Locke's testimony, based on alleged violation of the Minnesota Government Data Practices Act, (MGDPA), Minn. Stat. §13.32, educational records, and under the federal Family and Educational Rights and Privacy Act (FERPA), 20 U.S.C. §1232g. The Parent asserts that Dr. Locke reviewed the Student's medical records, occupation and speech therapy records without receiving parental permission as required by law, and that Dr. Locke's evaluation was not provided five days in advance of hearing as required by federal law. The District responds that it may release data to its contractors, as part of its right to release educational records to school officials who have a legitimate educational interest in such records. 20 U.S.C. §1232g(b)(1)(a); Minn. Stat. §13.32, subd. 3(e). The District cites *Prins v. Independent Sch. Dist. No. 761*, 27 IDELR 312 (D. Minn. 1997) in support of its claim.

As to the alleged violation of the five-day rule, it was established that no evaluation was conducted, and no written recommendation created, by Dr. Locke. As ruled at hearing, there was nothing to disclose under 34 C.F.R. §300.509(b)(1). Further, the Parent was not unfairly surprised by Dr. Locke's testimony that she believed the District had acted appropriately.

As to the alleged violation of MGDPA and FERPA, in this case, any violation does not provide grounds for excluding the witness's testimony. It is noted that in *Prins, supra*, data was released to a district contractor who was working on behalf of the student, not an expert hired for purposes of litigation. *See also, Burlington Comm. Sch. Dist.*, 20 IDELR 1014 (SEA Ia. 1993). Nonetheless, as to Dr. Locke's testimony, the District could have attained the same result by providing its expert with records from the Student's file after redacting all individually identifiable data, and asking for her opinion as to the appropriateness of the process used. The hearing in this case was open, except that the parties agreed that two documents would be sealed. Under these circumstances, the only rationale for exclusion of the testimony would be as enforcement of the MGDPA and FERPA, laws over which a special education hearing officer does not have jurisdiction. Further, there is no precedent in special education law for considering improperly obtained expert witness testimony to be so "tainted" by the means of procurement that it must be

excluded. There are other avenues open to the Parent for raising these objections.

Based on Dr. Locke's own disclaimers, her testimony was considered for the purposes of general information rather than as an opinion about the needs of the Student in particular. More weight is customarily given to witnesses who know and work with a child. *See, Redlands Unified Sch. Dist.*, 3 ECPLR 236 (LEA Calif. 1998). That principle was applied here.

*Timely Completion of Evaluation*

A Minnesota evaluation is to be finished within 30 days after receiving parental permission. The Parent has objected that the failure of the evaluation to include trials of AT devices within that 30 day period caused delay in the evaluation.

The ACT believed that the evaluation was not complete until device trials had been completed, and understood the SETT process to contemplate trials extending the AT evaluation period beyond 30 days. Neither Minnesota rule nor the MDCFL informal interpretation permit extension of an assessment beyond 30 days in order to conduct trials of specific devices. Minn. R. 3525.2550, subp. 2; *see*, Dist. Ex. 48. If the period of "extended consideration" is a continuation of the evaluation for IDEA purposes, as believed by the ACT, then the evaluation was not timely completed. However, the MDCFL (albeit informally) has stated that its intent in providing for "extended consideration" was not to extend the evaluation period, but to provide a means of considering devices through the IEP process. Extended consideration is to be made a part of the IEP; the evaluation portion ends with the decision that a device could be useful and trials are worthwhile.

The IEP team appeared to follow the process anticipated by the MDCFL, even if their intent may have been to continue the evaluation as advised by the ACT. At the evaluation meeting on May 15, 2000, a decision was made to try at least two AT devices, through a formal trial process. The IEP was later modified to refer to trials of the devices, through an "Additions to Adaptations" section, although no outline of the period and method of trials was included in the IEP. The "Additions" do not imply that no device will be used. Rather, the "Additions" suggest that the decision as to which device to use will be made after trials have been conducted. If the view is taken that the decision to use an AT device was made at the team meeting on May 15, 2000, the evaluation was timely completed.

Based on statements by all witnesses experienced in the field, including the private speech therapist, it is appropriate to decide whether any device would be helpful as a separate matter from deciding which device would be most helpful. It was established that it is necessary to provide a device to a child for an extended period in order to determine suitability of the device for the child's needs, preferences, interest and comfort. The devices under consideration are "high tech," *i.e.*, sophisticated in function and means of use, and require the Student to learn how to use alternate screens or overlays. While those with experience agreed that it would be possible to determine suitability in less than 30 days, doing so would not be likely to give an accurate result. The private speech therapist believed it might be confusing for the Student to use a device for only fifteen days

and then to try another device. Trying to compress the process further, so as to complete both evaluation of needs and device trials within a 30 day period, would be quite likely to give an inaccurate view of the suitability of a device. Thus, no violation can be found in the District's failure to complete device trials in the 30 day period after receiving parental permission to assess.

*Parental Participation in Evaluation Planning*

There is no legal requirement that parents be included in designing evaluations. *Letter to Anonymous*, 20 IDELR 1222 (OSEP 1993); *Letter to Simon*, 211:436 EHLR (OSEP 1987). A state may require that parents be included in evaluation planning. 22 PA. Code §342.25(d), as cited in *Chester-Upland Sch. Dist.*, 20 IDELR 1107 (SEA 1994). However, Minnesota has not clearly made that requirement. Thus, the District did not fail in its obligation to include the Parent by not including her in planning for the design of the evaluation.

An evaluation may limit consideration of information from a parent to information already known, without additional direct contact. *Texas City Indep. Sch. Dist.*, 38 IDELR 1237 (LEA Tex 1998). Information here was taken directly from the Parent, in the form of checklists and other data. While it would have been helpful for the District to make inquiry about the Parent's failure to return the SETT forms, it was not required.

*Harm to Student*

The District did delay in beginning the evaluation. Because of this delay, the period of extended consideration of the devices extended beyond the school year. Because of the initial delay, further delay in evaluating devices was caused by the timing, with a summer hiatus and apparent non-gathering of information by the Las Vegas school district. However, the Student's private speech therapist believed that it would confuse the Student to use either device for as short a period as fifteen school days before changing devices. There was no evidence that the Student was harmed by a longer period of use of the Techspeak. Thus, the delay did not cause a loss of FAPE or of educational benefit. *See*, Minn. Stat. §125A.09, subd. 8.

IEP decisions are to be made by IEP teams. The IEP team decided that assistive technology devices would be tried with the Student. The team was not required to, and did not, follow the recommendation of the ACT. Thus, to the extent that the ACT acted independently of the team process, that action did not result in depriving the Student of an AT device nor in causing him to lose educational benefit. The evaluation was appropriate, if considered to have been completed on May 15, 2000, with the decision of the IEP team to try devices. A parent has a right to an independent evaluation only if a district's evaluation is inappropriate. Here, no independent evaluation should be provided. However, so that the matter is clarified for the future, the team should include provision for the AT device trials, and measures of success, in the IEP, and should set a date for review of the IEP once it is decided which device will be of most benefit to the Student.

*Implementation of Modifications and Accommodations*

IDEA requires that a program provide a free appropriate public education. *Board of Education of the Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 206-207 (1982). The program must be shown to be reasonably calculated to provide only "some educational benefit" to a student. *Id.* "While a trifle might not represent 'adequate' benefits, [citation omitted], maximum improvement is never required." *J.S.K. v. Hendry County School Bd.*, 18 IDELR 143, 148 (11th Cir. 1991). "Appropriate education" has been defined as "making measurable and adequate gains in the classroom." *Id.* at 149. Where an IEP team has placed modifications and accommodations in an IEP to provide educational benefit, those modifications and accommodations must be implemented.

Here, concern was expressed that the Student's work was not being modified, because he was using the same curriculum and materials as his non-disabled sibling in the same grade. However, although the Student was using the regular education classroom materials while in that classroom, those materials were modified for his needs. His IEP does not require use of a substitute curriculum. The regular education curriculum was modified under the direction of special education teachers, who had regular and frequent consultation with the regular education teacher. Having the paraprofessional type the Student's words in computer lab, or draw the dots for the Student's lettering, does not amount to improper delegation of modifications.

One accommodation was not fully implemented. The PECS notebook was not utilized, and no one worked with the Student on the objective of increased use of PECS for expressive communication. No one working with the Student had been trained in PECS; no apparent effort was made to increase the Student's ability to use PECS as a means of communication. Only the picture schedule was used regularly, and that was used almost entirely for receptive purposes, to explain the Student's schedule to him. Use of PECS for expressive purposes, to supplement the Student's communication, would necessarily have been difficult, because few additions had been made to the system to match the Student's knowledge. A maximum of 30% of his consistent verbal vocabulary was contained in the PECS notebook. It is difficult to see how it would help the Student's word retrieval problems to have a notebook which also did not contain the word he could not retrieve verbally.

Despite this lack, the Student did receive educational benefit from his program. It is not possible to separate progress made in private therapy from progress made due to the school program. However, his progress in reading is more than minimal. While he was working with the private speech therapist on communication, there is no testimony that anyone outside the District worked with him on his reading. The Student also progressed in math, an area not supported by outside work with the private speech or occupational therapists. His verbal vocabulary increased; he progressed in his communication goals. However, he made minimal progress in peer communication and speech initiation objectives. Also, the Student had been communicating in sentences through PECS before arriving at the District. His verbal communication in the District was normally not in sentences. Thus, the lessened ability to communicate must be balanced against the Student's

significant educational gains.

To the extent that the Student was harmed by the lost opportunity to improve his communication through the use of PECS, that harm is being cured by provision of an assistive technology device which staff understand how to use with the Student. *See, Zigich.* An AT device is being provided, and it was planned in May that staff would be trained in its use. Thus, ordering provision of AT for the Student is not necessary, even assuming that the harm of lost opportunity outweighs the educational benefit of the Student's program in the District, which is not an assumption that can be made based on the evidence.

*Parental Participation in the IEP Process*

The importance of parental involvement in educational planning has been emphasized by Congress, and by the courts. *Board of Education of the Hendrick Hudson Central School District v. Rowley,* 458 U.S. 176, 206-207 (1982).

> "...participation means something more than mere presence; it means being afforded the opportunity to be an equal collaborator, whose views are entitled to as much consideration and weight as those of other members of the team in the formulation and evaluation of their child's education."

*T.S. v. Ridgefield Bd. of Educ.,* 808 F.Supp. 926 (D. Conn. 1992), citing *V.W. v. Fravolise,* 131 F.R.D. 654, 659 (D.Conn. 1990).

Parental participation is not to be "trivialized"; however, a district may consider and reject parental preferences as lacking interaction with other children. *Blackmon v. Springfield,* 31 IDELR 132 (8th Cir. 1999). An IEP may be set aside if procedural inadequacies compromise the pupil's right to an appropriate education, seriously hamper the parents' opportunity to participate in the formulation process, or cause a deprivation of educational benefits. *Id.,* citing *Independent Sch. Dist. No. 283 v. S.D.,* 88 F.3d 556, 562 (8th Cir. 1996).

Here, the Parent received accurate notice of meetings, which she attended. *Compare, T.F. v. North Penn Sch. Distr.,* 31 IDELR 2, (E.D. Pa. 1999)(no notice); *Amanda v. Webster City,* 27 IDELR 698 (N.D. Iowa 1998)(parents not notified that meeting was to change placement, not just a discussion of behavior). The Parent influenced decisions and changes to the Student's program were made in response to her requests and concerns, including trials of an AT device. *See, Burlington Sch. Dist.,* 20 IDELR 1014 (SEA Iowa 1993).

The underlying issue here seems to be less about substance than about demeanor. The Parent was uncomfortable and unhappy with the way in which the Case Manager spoke to her, and has felt that District staff on the team have ignored her and the private therapists whom she has brought to meetings. Private therapists and her Advocate supported this view.

A special education hearing officer lacks jurisdiction over demeanor and conduct of parties to the special education process, if that conduct does not otherwise violate IDEA. *See, Muscogee County Sch. Dist.*, 30 IDELR 75 (LEA Ga. 1999)(district alleged that parents had excessive time requirements, inappropriate demeanor and conduct). There is no legal requirement that school district personnel never become upset, tired, impatient, or disproportionately sensitive, nor is such a requirement applied to parents. It would be unrealistic to order that participants be even-tempered at all times, even if there were a legal basis for doing so. Instead, the hearing officer will confine herself to encouraging the participants to continue to maintain respectful and open communication for the benefit of the Student.

S.D.J.