UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Victor Grant, by his
parent Kelley Sunderlin,

Plaintiff,

v.

State of Minnesota, et al.,

Defendant.

Court File No. 02-795 (ADM/AJB)

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD/ SUMMARY JUDGMENT**

---

Defendant Independent School District No. 11, Anoka-Hennepin submits this Reply Memorandum in support of its Motion for Judgment on the Record/Summary Judgment in the above-captioned matter.

## ARGUMENT

### I. THE IHO AND HRO CORRECTLY DETERMINED THAT THE STUDENT RECEIVED FAPE

#### A. The Student was not entitled to a due process hearing on a draft IEP.

The Parent does not have the right to challenge a draft IEP and, as the IHO correctly determined, the District certainly is not required to defend a draft IEP that embodies nothing more than tentative recommendations for the development of a proposed IEP. See IHO Decision at p. 18. In the IHO's words, "It would be nonsensical to compel the District to defend an IEP it did not propose." Id.

The IHO's conclusion is well grounded in law. "The law limits the matters on which a due process hearing can be requested." Independent Sch. Dist. No. 432 v. J.H., 8 F. Supp.2d

1166, 1172 (D. Minn. 1998). Minnesota law clearly states that parents have the right to request a hearing only if they continue to object to one of the following:

> (1) a proposed formal educational assessment or proposed denial of a formal educational assessment of their child;
> (2) the proposed placement of their child in, or transfer of their child to a special education program;
> (3) the proposed denial of placement of their child in a special education program or the transfer of their child from a special education program;
> (4) the proposed provision or addition of special education services for their child; or
> (5) the proposed denial or removal of special education services for their child.

Minn. Stat. § 125A.09, subd. 6 (emphasis added). In short, a parent may obtain an impartial due process hearing only if the parent continues to object to the proposals by the school district. Independent Sch. Dist. No. 432 v. J.H., 8 F. Supp.2d 1166, 1172 (D. Minn. 1998). In the instant case, the Parent may object to the District's proposed IEP, but not to a preliminary draft of that document.

The Parent argues that she has the right to contest a draft IEP under Digre v. Independent Sch. Dist. No. 623, 893 F.2d 987 (8th Cir. 1990). Parent's reliance on Digre is misplaced. In Digre, the parent sought to challenge the appropriateness of a proposed assessment and the initial and continuing placement of the child in a special education setting. Id. at 989. The school district argued, and the hearing officer agreed, that the parent could only challenge the school district's proposed assessment. Id. at 989-90. The federal district court reversed and ordered the district to grant the parent a hearing to address her objections to the student's prior and current placement. Id. at 990.

Unlike the situation that existed in the Digre case, here the District is not seeking to prevent the Parent from challenging a prior placement, a current placement, or any other completed action. Rather, the District is asserting that Parent does not have the right to challenge

a preliminary draft of an IEP which merely embodies the tentative thoughts of the case manager and was intended to serve only as a starting point for discussion by the IEP team. The Digre case did not involve a draft IEP which the district never proposed to implement. To rule otherwise would be contrary to the Eighth Circuit's holding that school district's may bring a draft IEP to a meeting. Blackmon v. Springfield R-XII Sch. Dist., 198 F.3d 648, 657 (8th Cir. 1999) (recognizing a difference between a proposed and draft IEP and specifically holding that a school district may develop a draft of an IEP before a meeting, as nothing in IDEA or its regulations prohibits a school district from coming to an IEP meeting with tentative recommendations for the development of a proposed IEP). The IHO did not err by determining that only the May, 2001 proposed IEP could be the subject of a due process hearing.

**B. The administrative record establishes that the Student did not need one-to-one reading instruction.**

Plaintiff erroneously argues that the weight of the evidence supports the Student's argument that he was entitled to one-on-one reading instruction. This argument is simply not supported by the evidence in the record. See Defendant's Memorandum in Support of Judgment on the Administrative Record at p. 8-10. Even the hearing testimony of Plaintiff's own witnesses supports the assertion that the Student did not need one-to-one reading instruction to receive FAPE. For example, Jennifer Brown, owner of the Student's private tutoring service, testified that if the Student were making progress in reading at school, she would change her opinion regarding whether he needs one-to-one reading instruction. Tr. 1189-90. She specifically stated, "If [Student] were making progress at school, there wouldn't be an issue. I would not believe he needed one-on-one if he was having his needs met." Tr. 1190. Ms. Brown further acknowledged that if the Student had made progress in school without one-to-one instruction, then her opinion that he needs one-to-one instruction would be incorrect. Tr. 1216.

Finally, Ms. Brown admitted that she does not know whether the Student made progress in school, and that she assumed he did not because that is what the Parent told her. Tr. 1187, 1189, 1255. Like Ms. Brown, Arlene Sonday, creator of the Sonday Reading System, admitted that she did not know whether the Student made progress during the past year, Tr. 1591, but she was told by Parent or her counsel that the Student was not making progress. Tr. 1600-01. Careful review of the administrative records establishes that the Student made progress in reading and therefore did not need one-to-one reading instruction to receive FAPE. See E.S. v. Independent Sch. Dist. No. 196, 135 F.3d 566, 569 (8th Cir. 1998); Klein Indep. Sch. Dist., 29 IDELR 670 (SEA Texas 1998; Hingham Pub. Schs., 29 IDELR 567 (SEA Mass. 1998).

The Plaintiff also argues that the Hearing Officer's decision that the Student did not need one-to-one reading instruction must be overturned because the School District "predetermined" the Student's services. Again, review of the administrative record simply does not support this contention. Reading services for the Student were discussed with the Parent at IEP meetings on March 20, 2001 and May 1, 2001. At the March 20, 2001 IEP meeting, the team discussed and considered a range of alternatives and options in regard to reading instruction. See SD Exs. 54 & 87, at 2. The team discussed, at varying lengths, several options for providing specially designed reading instruction to Student, including the following: (1) a mainstream class with support; (2) an AOM class; (3) a resource room with higher level reading; (4) a resource room with lower level reading; (5) the computer based Fast ForWord program; (6) the computer based earobics program; (7) the targeted services program ("TSP"), which is an after school program with one-to-one support available; and (8) one-to-one instruction. SD Exs. 54 & 87, at 2. Several of these options were discussed further at the IEP meeting held on May 1, 2001. See SD Ex. 87, at 2. The Parent admits that when she went to the March 20, 2001 IEP meeting, she was unwilling to

accept anything less than one-to-one reading instruction for Student, and she was unwilling to consider any options that did not include one-to-one reading instruction. Tr. 1272-73.

The Parent alleges that Linda Gardner, Special Education Consultant for the School District, "pre-determined" the IEP team decision regarding one-to-one reading services for the Student. Ms. Gardner attended the IEP meeting on March 20, 2001 at the request of Student's teachers. Tr. 860-61, 925. Ms. Gardner is often invited to IEP meetings by staff because she brings fresh ideas to the meeting and a more global knowledge about programming options and available alternatives. Tr. 861, 956. Part of her job is to provide this sort of information an IEP team. It is not her job to make decisions for an IEP team, and she did not do so.

During her opening statement at hearing, Parent's counsel stated: "The district special education administrator, according to District Exhibit 54, page 10, Linda Gardner, specifically told the team that they could not provide one-to-one." Tr. at 48. The transcript of the IEP meeting on March 20, 2001, found at District Exhibit 54, and specifically page 10 of the transcript, reveals that Ms. Gardner never told the team that they could not provide the Student one-to-one services.

The transcript of the March 20, 2001 IEP meeting *does* reveal, however, that Ms. Gardner stated "I'm not hearing any needs that [Student] has that we can't meet here. This is Linda G. And given the opportunity to provide reading services to him, I believe we can meet his needs." SD Ex. 54, at 9. Ms. Gardner made this statement in response to the list of needs that Parent had brought to the meeting. Tr. 862. Before attending the IEP meeting on March 20, 2001, Ms. Gardner spoke with Student's teachers and reviewed the draft IEP and the evaluation report for Student. Tr. 860, 862.

During the meeting, Ms. Gardner also offered her opinion that one-to-one reading instruction is not necessary to meet Student's needs. Tr. 862-63. The teachers were then asked to offer their opinion, but Parent's counsel interrupted and stated that "the administrator has already said what is appropriate or what isn't appropriate or what the school will do." SD Ex. 54, at 11. Ms. Gardner responded by stating that she personally had not experienced a situation in which teachers were unwilling to state their opinion. She further stated, "I encourage anyone on the team to state what they really think is true and I'm seeking a team process and I have always encouraged the team to do that." SD Ex. 54, at 11; Tr. 863. District staff uniformly testified that Ms. Gardner did not predetermine any IEP team decisions. Tr. 135 ("I don't feel that she made up my mind"), 232 ("I don't think she did that at all"), 367, 490, 778.

District staff also uniformly testified that they did not feel compelled to agree with any opinion or statements made by Ms. Gardner. Tr. 132-33, 231-32, 367 ("I felt quite comfortable with her. . . I didn't feel like I needed to agree with any" opinions offered by Ms. Gardner.), 490, 778. District staff further testified that they were not at all intimidated by Ms. Gardner, and that they felt comfortable expressing their own opinions and conclusions about Student. Tr. 133, 232 ("I felt perfectly fine expressing my opinions."), 367 ("Not at all" intimidated), 490, 778. They also testified that Ms. Gardner did not interfere with or delay the IEP team process. Tr. 135, 232, 367-68, 778, 864. The Parent presented no competent evidence to challenge the testimony of District staff, and the Court must reject as wholly unfounded Plaintiff's argument that Ms. Gardner somehow "predetermined" services for the Student.

**C. The decision regarding the Student's need for assistive technology was made by the Student's IEP team.**

The Plaintiff blatantly mischaracterizes the School District's argument by her statement, "Defendants concede that the decision to deny Plaintiff Victor an assistive technology evaluation

came not from his IEP team, but from outside that team process." Pl. Mem. at 16. In fact, the District's memorandum states:

> At the IEP meeting on May 1, 2001, the ***team*** had already fully considered and discussed whether Student needed AT. Tr. 150, 392-93, 896, 901; see also SD Ex. 92. The ***team*** concluded that Student would be successful if the District provided him with a palm sized, hand held spell checker and a calculator. Tr. 150, 793-94; SD Ex. 84 at 8. The ***team*** also concluded that Student did not need a computer to receive meaningful educational benefit, because he made significant progress during the 2000-2001 school year without a computer. Tr. 150, 263, 393, 580. Accordingly, on May 22, 2001, the District sent Parent a letter denying her request for an AT evaluation. SD Ex. 92; Tr. 896.

District's Memorandum in Support of Judgment on Administrative Record, p. 12 (emphasis added).

Nowhere in the School District's memorandum does the District "concede" that the assistive technology decision was made outside the team process.

The Plaintiff further asserts that the Parent first asked for an assistive technology evaluation in January, 2001, not May, 2001. Pl. Mem. at 17. Plaintiff offers no support in the administrative record for this claim. The Plaintiff also asserts, citing as support District Exhibit 92, "Defendant ISD 11's school administrator denied the parents request for an assistive technology evaluation without reconvening another IEP team meeting to discuss it." Again, Exhibit 92 does not support the Plaintiff's contention. School District Exhibit 92 is a letter to the Parent from Special Education Consultant Linda Gardner. In this letter, dated May 22, 2001, Ms. Gardner told the Parent "I note that you have not previously requested an assistive technology evaluation." The letter goes on to deny the Parent's request for an assistive technology evaluation because the Student's IEP team had already fully considered and discussed the Student's need for assistive technology at a team meeting on May 1, 2001. As the letter states, the team uniformly concluded that the Student did not need a computer or software to receive meaningful educational benefit. S.D. Ex. 92, page 2. The Court should reject

Plaintiff's dubious argument that the decision regarding assistive technology was made outside of the team process.

Finally, the Plaintiff argues that the District Court's decision in ISD 11 v. Pachl, not Zigich v. ISD No. 623, controls whether the Student is entitled to an assistive technology evaluation in this case. In Pachl, the Court distinguished the Zigich decision because in Pachl neither the IHO nor the HRO explicitly found that the Student made progress without assistive technology. Zigich, however, is similar to this case because both the IHO and the HRO specifically found that the Student made progress, and therefore received FAPE, without assistive technology. Despite Plaintiff's assertion to the contrary, the record establishes that the Student made excellent progress during the 2000-01 school year without a computer or other assistive technology. This evidence includes the Student's grades (Tr. at 382, 478, 485; Tr. at 382, 386; Tr. at 382) and observations by the Student's teachers and other District staff (Tr. at 222; Tr. at 377; Tr. at 499, 580; Tr. at 264). In contrast, at hearing the Parent presented no testimony or other evidence regarding the function she believes a computer would serve for Student, or why she believes Student needs a computer. The IHO and the HRO correctly determined that the Student was not entitled to assistive technology.

## II. THE STUDENT HAS FAILED TO EXHAUST ADMINISTRATIVE REMEDIES ON HIS CLAIMS REGARDING ESY AND INITIAL IDENTIFICATION

### A. The Student's ESY claims are not properly before this Court.

The Plaintiff's memorandum simply ignores the fact that neither the timeliness nor the adequacy of the Student's ESY program was before the IHO. Instead, the Plaintiff chooses to make unsupported accusations such as "Defendant ISD 11 claims that because the parent did not TELL the Defendant ISD 11 about a desire for ESY services or attend meetings about same, the parent had no right to a hearing on that issue." Pl. Mem. at 20. This again misconstrues the

District's argument, which is simply that the Parent cannot raise an issue before the District Court which was not raised and litigated in the administrative proceeding below. Moubry v. Independent Sch. Dist. No. 696, 9 F.Supp.2d 1086, 1100 (D. Minn. 1998) (explaining that student failed to exhaust administrative remedies on one issue, precluding review on that issue). Indeed, the District "produced no evidence at hearing to show that it had specifically discussed ESY at an IEP meeting prior to the parents' request for hearing" specifically because ESY was not an issue identified for hearing.[1] See Pl. Mem. at 20. The Plaintiff has failed to exhaust administrative remedies on this issue.

Should the Court chose to consider the Plaintiff's ESY claims, however, Plaintiff's argument that the District's ESY determination was not timely has no legal support. There is no requirement in federal law that ESY determinations be made at a particular time during the school year. In fact, the Office of Special Education Programs ("OSEP") has confirmed the lack of a time requirement for determining ESY. In response to comments suggesting that "the regulations should specify a timeline for determining eligibility for ESY services to enable the parents to take appropriate steps to challenge the denial of services," OSEP declined to amend the regulations. 64 Fed. Reg. 12575, 12575 (March 12, 1999). As OSEP explained, in its view:

> There is no need to specify a timeline for determining whether a child should receive ESY services. Public agencies are expected to ensure that these determinations are made in a timely manner so that children with disabilities who require ESY services in order to receive FAPE can receive the necessary services.

Id. at 12577. As recent decisions demonstrate, ESY determinations made in the spring, and even as late as mid-June, comply with OSEP's recommendations regarding timeliness. See e.g.

[1] Plaintiff also erroneously states, "Defendant ISD 11 apparently concedes that neither the January 2001 IEP or the "after the fact" IEP of May 2001 followed any discussion of ESY services." Pl. Mem. at 19. There is no such concession in the District's discussion of the ESY issue, which simply focuses on the Plaintiff's failure to exhaust administrative remedies on any potential ESY claims.

Etowah County Bd. of Educ., 34 IDELR 302 (Ala. SEA 2001). The Minnesota Rules only require that the ESY determination be made "at least annually." Minn. R. 3525.0755, subp. 3.

Finally, the Parent filed an amendment to her statement of objections, describing additional issues for hearing, on April 23, 2001. See Letter from Kerr to IHO Udoibok and M. Waldspurger, dated 4/23/01. If the Plaintiff felt, as is now argued in her Response Memorandum, that "Determination of [ESY] services by April, 2001 effectively eliminates Plaintiff's ability to seek procedural redress of any contested ESY services," she certainly could have included this issue in her statement of objections for hearing. See Pl. Mem. at 20-21. She did not do so. Plaintiff's argument that the District failed, as a matter of law, to offer timely ESY services is completely without merit.

**B. The Student's claim that he was denied timely evaluation of his reading skills is not properly before this Court.**

Plaintiff's memorandum also asserts that "Defendant's evaluation for reading was not completed in a timely and comprehensive way." Pl. Mem. at 22. Again, this issue was not before the IHO during the due process hearing, and therefore the Parent has not exhausted her administrative remedies on this issue. Moubry, 9 F.Supp.2d at 1100.

In support of her argument, the Parent alleges that the STAR tests relied upon by the District to show the Student made progress in reading are not adequate because they do not test word attack. Extensive testimony at hearing, however, established that the Student made significant progress in reading. For example, based on his review of the Student's STAR tests, Dr. Richard Spicuzza, a licensed school psychologist and Ph.D. with extensive research experience involving the STAR test, testified "with certainty" that the data show the Student made gains in reading between September 2000 and April 2001. Tr. at 639-40; 714. The record also establishes the Student made progress based on the Gates reading test (Tr. at 372; Compare

S.D. Ex. 15 with S.D. Ex. 70, Tr. at 646), the Woodcock Johnson Revised Achievement Test (Tr. at 764-765), and the observations of the Student's teachers (Tr. at 455-56; 461-62; Tr. at 370; Tr. at 463-464). The Plaintiff's argument that the hearing officer's reliance on STAR testing data is somehow "less than what the IDEA requires" lacks both factual and legal support.

## III. THE PARENT RECEIVED APPROPRIATE PROCEDURAL SAFEGUARDS

The Plaintiff argues that the Parent was unaware of her procedural rights until the 2000-2001 school year, and as a result "did not act earlier to get Plaintiff Victor qualified for services." Pl. Mem. at 23. Timely evaluation of the Student's need for services was not an issue before the IHO during the due process hearing. See IHO Decision at 12-13. Furthermore, this statement again contradicts the evidence in the administrative record. For example, during hearing the Parent testified that she reads documents before she signs them, and that she understands the importance of not signing her name on a document without reading it first. Tr. 1417. The Parent admitted that on the Student's evaluation plan, dated November 4, 1998, she signed directly on the right of the following statement, ""Parents or students age 18 or older please sign here if you have received a copy of the parents rights and procedural safeguards brochure." Tr. 1418; SD Ex. 8, at 3. The Parent obviously received notice of her rights, with respect to this Student, as early as November, 1998.

The Plaintiff also asserts that the Parent did not have notice of her rights at the time of the January, 2001 IEP meeting. Again, the evidence in the record directly contradicts this statement. The District provided Parent with notice of her procedural safeguards relative to Student on at the following times: on November 4, 1998; on September 28, 2000, along with the District's Notice of Educational Evaluation/Reevaluation Plan (Tr. 76); at the start of the first IEP meeting, which was held on December 8, 2000 (Tr. 95); along with written notice of each of the

subsequent IEP meetings; and on May 10, 2001, when the District provided Parent a copy of the proposed IEP. Tr. 1416. In addition, Parent admits that she received the procedural safeguards brochure in December 2000, in connection with her youngest son. Tr. 1417. Finally, even if the Parent had not received notice of her procedural safeguards at these times, the record is devoid of any evidence to suggest that a lack of notice has compromised Student's right to an education, seriously hampered Parent's ability to participate in planning Student's program of education, or deprived Student of educational benefits. Independent Sch. Dist. No. 283 v. S.D., 88 F.3d 556, 562 (8th Cir. 1996).

**A. The Parent received prior written notice regarding her request for one-to-one reading services.**

The Plaintiff argues that the School District did not provide the Parent with prior written notice regarding its denial of one-to-one reading services and therefore the Parent should be reimbursed for the private tutoring she obtained.[2]

Despite the Plaintiff's argument to the contrary, the evidence at hearing established that the District did not make a final decision regarding the request for one-to-one reading instruction on March 20, 2001, as the Parent contends, and therefore the prior written notice requirement did not apply. See 34 C.F.R. 300.503(a) (stating the prior written notice requirement applies when a school district proposes to initiate or change, or refuses to initiate or change, the identification, evaluation, educational placement, or provision of FAPE for a child with a disability). The

[2] The Parent argues that the District failed to provide prior written notice of an alleged refusal to provide reading services in January 2001. Because this issue was neither pleaded nor argued before the IHO, it must be deemed waived. See Minn. Stat. § 125A.09, subd. 6; see also Moubry v. Independent Sch. Dist. No. 696, 9 F. Supp.2d 1086, 1100 (D. Minn. 1998) ("At a minimum, the failure to raise, and to preserve, an issue in the administrative process . . . constitutes a waiver of such an issue in a subsequent civil action.").

District did not make a decision on the Parent's request for one-to-one tutoring until May 1, 2001.

At a duly noticed IEP meeting on May 1, 2001, District staff on the IEP team rejected Parent's request for one-to-one reading instruction. Tr. 789. The team reached the following conclusion: "With the exception of [Student]'s mother, the IEP team believes that [Student] does not need one-on-one instruction to receive meaningful educational benefit and that one-on-one instruction would not be the least restrictive environment for [Student]." SD Ex. 84, at 3. During the meeting on May 1, 2001, every member of the team affirmatively expressed agreement with this statement, except for Parent who was not present. See Tr. at 391, 497-498, 828-29.

By letter dated May 16, 2001, the District provided Parent with prior written notice of the IEP team's decision regarding her request for one-to-one tutoring in reading. SD Ex. 87; Tr. 890. The District's letter contains all the required elements of prior written notice. See 34 C.F.R. § 300.503(b). As is argued more extensively in the District's Memorandum in Support of Judgment on the Record (pages 16-18) and its Response to Plaintiff's Motion for Judgment on the Record (pages 20-22), the Court must adopt the IHO and HRO's finding that the District provided Parent with timely and appropriate written notice of its decision to deny her request for one-to-one reading instruction.

**CONCLUSION**

For the foregoing reasons, the School District respectfully requests that the Court uphold the Hearing Review Officer's decision in MDCFL Case No. 429 and enter final judgment, pursuant to Federal Rule of Civil Procedure 54(b), because there is no just reason for delay in this matter.

**RATWIK, ROSZAK & MALONEY, P.A.**

Dated: April 1, 2005

By: s/Stacey L. Wilson
Paul C. Ratwik
Atty. Reg. No. 89795
Stacey L. Wilson
Atty. Reg. No. 0306174
300 U.S. Trust Building
730 Second Avenue South
Minneapolis, MN 55402
(612) 339-0060

**ATTORNEYS FOR DEFENDANTS INDEPENDENT SCHOOL DISTRICT NO. 11**

RRM: 75257